**SEDCO INTERNATIONAL, S. A.,**
**Plaintiff,**

v.

**William F. CORY and Marcella McKillip, Executors of the Estate of Roy J. Carver, Deceased, Defendants and Counterclaim Plaintiffs,**

v.

**SEDCO INTERNATIONAL, S. A., Sedco, Inc., and Sedco Energy Corporation (formerly TerraMar Consultants, Inc.), Counterclaim Defendants.**

**Civ. No. 77–85–D.**

United States District Court,
S. D. Iowa,
Davenport Division.

Aug. 21, 1981.

---

John H. McElhaney, Stanley E. Neely and Elizabeth Lang-Miers, of Locke, Purnell, Boren, Laney & Neely, Walter W. Cardwell III, Dallas, Tex., Ralph D. Sauer, of Betty, Neuman, McMahon, Hellstrom & Bittner, Davenport, Iowa, for plaintiff and counterclaim defendants.

David A. Elderkin and D. M. Elderkin, of Wadsworth, Elderkin, Pirnie & Von Lacken, D. G. Ribble, of Lynch, Dallas, Smith & Herman, Cedar Rapids, Iowa, for defendants and counterclaim plaintiffs.

## OPINION AND ORDER FOR JUDGMENT

HANSON, Senior District Judge.

### I.

This litigation is the aftermath of a Middle East oil venture gone sour. The principal questions in the case are whether the original defendant and counterclaim plaintiff, Roy J. Carver,[1] was induced to join the venture through fraudulent or negligent misrepresentations of certain agents of the counterclaim defendants, Sedco International, S.A., Sedco, Inc., and Sedco Energy Corporation (formerly TerraMar Consultants, Inc.); and, if so, how far the counterclaim defendants are liable for the expenses Carver incurred.

In brief outline, the facts are as follows. Carver was a citizen of Iowa whose Muscatine-based businesses, first in pumps (through Carver Pump Co.) and later in the recapping of tires (through Bandag, Inc.), made him a large personal fortune. Sedco, Inc., a Texas corporation with headquarters in Dallas, is a petroleum drilling contractor which through various of its divisions and subsidiaries also provides other services to the petroleum industry, including consulting services. Carver's (ostensible) partner in the venture here at issue was R. Eugene Holley, former lawyer, Georgia state senator, speculator in real estate and Texas oil wells, and paper multi-millionaire since come to grief. In October 1975 Holley and Carver formed the Holcar Oil Co., for the immediate purpose of reentering and exploiting three abandoned oil wells located in the waters of the Persian Gulf about 60 miles off the eastern shores of the state of Qatar. Carver had been led to believe by Amos Carter, a Sedco, Inc. vice president for mideast drilling operations, and by Robert Smith, president of TerraMar Consultants, Inc. (then operated as a division of Sedco, Inc.) that the wells could be reentered and production of saleable oil begun in less than three months for a total front-end investment of between $2 million and $2.5 million, with subsequent quick return of the investment and eventual enormous profits. Holcar contracted with the government of Qatar for (among other things) the right to reenter and produce the wells, and with Sedco International, S.A., a wholly-owned subsidiary of Sedco, Inc., for the services of an offshore drilling rig and its crew, to be used to reenter the wells and ready them for production. TerraMar, through Robert Smith and others, was to provide a wide range of services in aid of the venture. Carver and Holly both personally guaranteed payment of Holcar's debts to Sedco International, although Holley and Carver had agreed that the front-end investment would be made in whole by Carver, through the device of loans made by him to Holcar.

Work on the project began in Qatar in late January 1976. Things did not go as had been expected, for two main reasons. First, it was soon revealed that the effluent of the wells included large quantities of hydrogen sulfide ($H_2S$), a gas that even in relatively small quantities has deleterious effects on equipment and on humans—on the latter to the point of quick fatality. To speak of nothing else, the presence of the $H_2S$ rendered any oil the wells might produce unsaleable absent prior elaborate and expensive separation of the gas from the oil: Carver was advised by experts in such matters that installation of the required production facilities would take at least nine months and cost from $13 to $14 million in addition to the expense connected with reentering and reworking the wells. Second, the reentry and workover of the wells did not itself proceed quickly or smoothly. Instead of taking less than three

1. Since the case was fully submitted for decision on February 25, 1981, Roy Carver has died. None of the claims in the case was there- by extinguished; and the Court has ordered substitution of Carver's executors as parties to the action pursuant to Rule 25, F.R.Civ.P.

months, it took six, at an average daily cost of between $40,000 and $45,000. Even at that, work on one of the wells—the best producer of the three—was not completed, and that well may indeed have been ruined during its workover. By mid-August 1976, when Sedco reclaimed its rig and crew for rental to another customer, Holcar (hence Carver) had spent between $7 and $8 million on reentries and workovers alone. For this there was to show no saleable oil, and not even the prospect of saleable oil for many more months and millions to come. An additional $5 to $7 million (the exact figure is in dispute) was eventually expended on other aspects of the venture, including attempts to assemble production equipment capable of rendering saleable any oil the wells might eventually produce.

Carver was arguably on notice of the severity of the $H_2S$ problem as early as February 25, 1976, when relatively little had been spent: that is, an attempt was made to make him aware that the large amounts of $H_2S$ in the wells could very well prevent the generation of any income unless and until he invested some $13 to $14 million in completely unforeseen front-end expenses and waited at least nine more months, no matter how quickly the reentry and workover program should go. This raises the question whether, even assuming fraud or negligence in the inducement, Carver should be permitted to recover amounts expended after he knew the cost and time projections on the basis of which he had joined the venture were radically too low. Resolution of this question turns on the quality of the notice actually had on February 25 and afterwards, and on whether Carver acted, as he became increasingly aware of the huge additional front-end costs, in reasonable efforts to mitigate damages already incurred. In fact, he continued to act into the first months of 1977 in reliance on the advice of Amos Carter, who consistently assured him his further investments of time and money need not be nearly as great as others said, and of Robert Smith, who (along with Carter) assured him that even the largest further front-end ex-

penditures being discussed would still be paid back, and with good profits besides, eventually. Whether or not this was good or even honest advice, which has been a subject of dispute between the parties, it is in any case clear that Carver acted on it as and while he did, both in continuing to fund the workover program and in investing in production equipment, in good faith efforts to salvage as much as possible of investments already made.

Carver's ability to generate cash to invest was not however unlimited; nor was his faith in Amos Carter and Robert Smith. By early 1977 he found himself unable to borrow the large sums still required on terms acceptable to him. Holley was on the verge of bankruptcy and unable to contribute anything. It was becoming increasingly clear that installation of production facilities would indeed cost many months and about $15 million, despite what Amos Carter had been saying. Finally, Carver was given reason to doubt that the wells were capable of producing sufficient oil to pay back his investment, let alone generate a reasonable profit. Beginning in early 1977, Holcar's efforts to develop the wells by itself ceased, and both Carver and Holley began looking for a partner for Holcar willing to invest the further sums needed to bring the venture to fruition. Such a partner was eventually found in the person of the Attock Oil Company, a Pakistani corporation, with which final agreement was reached in November 1977. By then, however, the government of Qatar had become disenchanted with Holcar, for reasons that require to be explored in further detail. The government refused to permit Attock to join the venture as Holcar's partner, and in early 1978 ended matters by cancelling its agreement with Holcar. Holcar never made a cent.

This suit was commenced in this district on December 14, 1977, by Sedco International, against Holcar and Carver, to recover amounts still owing for the services of Sedco's drilling rig, whose payment Carver

had personally guaranteed.[2] Holcar was quickly dismissed from the action;[3] subject matter jurisdiction of this Court over the action against Carver (now his executors) is proper under 28 U.S.C. § 1332. By way of answer to the claim against him, Carver set up defenses of improper and incomplete workmanship by Sedco International, and fraud in the inducement of the personal guaranty sued upon. By way of counterclaim against Sedco International, and additionally against Sedco, Inc., TerraMar, Amos Carter, and Robert Smith, Carver alleged fraud, conspiracy to defraud, and negligent misrepresentations; subject matter jurisdiction of the counterclaim is again proper under 28 U.S.C. § 1332.[4] Sedco, Inc., TerraMar, Amos Carter, and Robert Smith all moved to dismiss the claims against them, arguing that this Court lacked personal jurisdiction over them. Following a hearing on the motion to dismiss, the Court (per Judge Stuart)[5] dismissed Amos Carter and Robert Smith from the action, but found sufficient basis for the exercise of personal jurisdiction over Sedco, Inc. and TerraMar.[6] In their joint answer to the counterclaim, Sedco International, Sedco, Inc., and TerraMar raised by way of denial and affirmative defense a variety of issues that shall be addressed herein. Trial of the case was to the Court, beginning on September 2, 1980 and ending on October 9, 1980. The issues were subsequently fully briefed and orally argued, and proposed findings of fact and conclusions of law submitted by the parties. This opinion, which shall constitute the findings and conclusions required by Rule 52, F.R.Civ.P., is based on the entire record in the case, including the pleadings, the testimony and exhibits offered and received at trial,[7] and the arguments of the parties.

## II.

### A.

Sedco, Inc., began in the 1930s as the Southeastern Drilling Company, a "one rig land operation in northern Mississippi;" since then it has grown, by its own account, to be "one of the petroleum industry's largest and most respected drilling contractors," Ex. 441, owning and operating world-wide more than 30 on- and offshore drilling rigs costing as much as $80 million apiece. Sedco's drilling business is conducted in large part through a number of partly- and wholly-owned subsidiaries, among them the wholly-owned Sedco International, S.A., the Panamanian corporation through which Sedco evidently conducts its drilling operations in the Middle East. From at least late 1970 until September 23, 1975, the president of Sedco International was Amos Carter, who worked out of the company's offices in Tehran. Carter began working for Southeastern Drilling Company in 1951 as an oil-field roughneck; he went to the Middle East in c. 1957 as an employee of Sedco International and worked his way up to the top position in that company. During his years there he gained a great familiarity

---

2. The amount Sedco International now claims is $168,630.60, plus interest and attorneys' fees. On the first day of trial, Carver admitted his liability in this amount, subject to his affirmative defenses.

3. *See* Order of July 13, 1978. Holcar was dismissed because both Sedco International and Holcar were found to be wholly alien corporations, the former being incorporated in Panama and having its principal place of business (at that time) in Iran, and the latter being incorporated in Grand Cayman, British West Indies, and having its principal place of business in Doha, Qatar.

4. The amounts now claimed by the counterclaim plaintiffs are $15,003,015.27 in actual damages, plus prejudgment interest, plus an unspecified sum in the form of exemplary damages.

5. The case was assigned to the undersigned judge for further proceedings in February 1980.

6. *See* Order of January 7, 1980. *See also post* at 264–265.

7. Some evidence, both testimonial and by way of exhibit, was received subject to objections made during the trial. Where necessary in what follows, the Court shall give full consideration to the objections.

with both on- and offshore drilling and oil exploration in the Middle East. Among other things, he personally managed drilling operations in various countries; he made necessary arrangements with the governments of countries in which drilling operations were carried out; he was involved in the resolution of labor disputes; he solicited business for Sedco's rigs; and he negotiated drilling contracts with oil companies in need of Sedco's services. Over the years he became well-acquainted in government and other circles throughout that part of the world. In the fall of 1975, wishing to return to live in the United States, he left his job with Sedco International (though continuing as a director) and became a vice president of Sedco, Inc. for Middle East operations, a position he held at the time of trial. His replacement as president of Sedco International was Carl Thorne, who had gone to Tehran in 1970 or 1971 as vice president of that company, after having begun as a lawyer in 1968 in Sedco, Inc.'s headquarters in Dallas.

Besides contract drilling, Sedco, Inc. has branched out into pipeline construction, the manufacture of drilling-related equipment, petroleum consulting, and the provision of engineering services to the petroleum industry. Engineering services are provided through Earl and Wright Consulting Engineers, a wholly-owned subsidiary of Sedco, Inc., of which more will be heard later. Petroleum consulting was provided through TerraMar Consultants, Inc., organized in July 1970 under the laws of Texas, with headquarters in Dallas. The first officers of TerraMar were Phil Porter, president; Robert Smith, senior vice president; E. R. Schroeder, vice president; and Carl Thorne, secretary and treasurer. In late 1973 Robert Smith became president of the company, a position he retained until August 1977, when he took other employment. TerraMar was operated as a division of Sedco, Inc. until late in 1975, when 1000 shares of stock were issued to Sedco; even after that, as late as June 1977, the TerraMar letterhead still indicated that it was "A Division of SEDCO." At all material times Sedco, Inc. represented TerraMar and its personnel as possessing a depth of technical knowledge acquired in productive consulting work in all parts of the world, in such areas as reservoir analysis, reserve estimates, reservoir stimulations, production studies, geological analysis, valuation of permits and concessions, prospect valuation, geological interpretation of geophysical data, exploration program planning, management studies, exploration organization, feasibility studies, investment planning, and concession and joint operation contracts. Sedco specifically represented Robert Smith as having been a consultant for many years in the petroleum industry in many areas of the world including the Persian Gulf, and as having furnished solutions to a variety of technical problems to private oil companies, governments, and government agencies.

TerraMar did not prove to be as profitable as Sedco had hoped. As of July 31, 1975, it had accumulated a deficit of $313,-345. Regular discussions concerning TerraMar's losses were had with B. Gill Clements, president of Sedco, Inc., and John Rhea, senior vice president. Robert Smith was told he and TerraMar had to generate more work; that "you have got to start making money." Smith reasonably concluded that TerraMar would not be permitted to operate indefinitely at a loss and that he would probably have to find other employment if the losses continued. Smith depo. at 348–350. In fact, TerraMar did make money for about one year—1976—the year it was actively engaged with the Holcar Oil Company project in Qatar; during that year between 40% and 50% of its income was derived from Holcar. When that work ceased, TerraMar again began showing a loss. Robert Smith left TerraMar on August 8, 1977; and the name of the company itself has since been changed to Sedco Energy Corporation, under which name it is a party to this lawsuit.

■ As has already been indicated, there has been some question in the case as to

whether Sedco, Inc. and TerraMar (which shall be so-called herein) are subject to the *in personam* jurisdiction of this Court. Judge Stuart's January 7, 1980 ruling on this question turned on the internal treatment accorded Sedco International and TerraMar by their parent Sedco, Inc. This treatment was found to be such as to make it fair and just, particularly under the circumstances of this case, to disregard the separate corporate identities and to subject Sedco, Inc. and TerraMar to the jurisdiction of the Court based on the Court's unquestioned jurisdiction over Sedco International. Apparently without wishing to concede the correctness of Judge Stuart's ruling, counsel for Sedco, Inc., Sedco International, and TerraMar made the following stipulation on the first day of trial:

[I]t is not the intention of Sedco, Inc., to try to avoid any legal responsibility for any judgment that might be rendered on the counterclaim in this case by shifting assets or avoiding payment through the fact that they have the corporate structure that they do. So for the purposes of this litigation, we hereby agree and stipulate that in the event some judgment were to be rendered on the counterclaim in favor of Carver, that that judgment could be jointly and severally against the three corporate entities that are parties to this lawsuit; that is, Sedco, Inc., Sedco International, S.A., and Sedco Energy, formerly TerraMar [Consultants].

I would like to make it clear that in making this stipulation, it's done for the purposes of simplifying the issues in this trial and without any admission that the tax planning and the substantive corporate identities of those entities is anything other than as represented. We believe that it's not necessary to address any of those issues, and certainly [ ] the stipulation is without prejudice to those matters .... [T. 34–35].

Under questioning the next day as to whether by this stipulation Sedco, Inc., Sedco International, and TerraMar agreed to be treated as one and the same for all purposes of this suit, counsel for the three at first indicated that such was the purport of the stipulation, saying its purpose was to "facilitate ease of reference," to "simplify things by collectively calling them Sedco, and making no distinction," and to "eliminate any necessity to even address or adjudicate" the question whether "the corporate entities truly or factually should be disregarded," that point remaining unconceded. T. 148–150. Counsel later appeared to retreat from this construction of the stipulation, however, in the following exchange at least:

THE COURT: Well, I understand you are indicating and contending that they are separate and distinct corporate entities.

MR. McELHANEY: Yes, sir.

THE COURT: I understand that .... And I further understand that for the purposes of the trial of this lawsuit, in all aspects they can be considered one.

MR. McELHANEY: That is not part of the stipulation.

THE COURT: All right. All right. Now, let's just assume we have a jurisdictional problem, then what?

MR. McELHANEY: We do in fact, and that would be one of the points of error in the event that there was a—

THE COURT: All right. All right. I just want to be sure.

MR. McELHANEY: I say this, though, that we still don't retreat and fully intend to honor our stipulation and commitment to the Court about the fiscal responsibility. [T. 150–51].

The question then remains as to how far and for what purposes Sedco, Inc., Sedco International, and TerraMar did agree to be treated as one. In immediate practical terms the question comes to this: whether the issue of liability on the counterclaim is to be adjudicated separately and severally as to each of the three (absent some finding by the Court that the corporate identities

should be disregarded for this purpose), they having agreed to stand together only in respect of any judgment that might otherwise be entered against fewer than all of them; or whether the issue of liability on the counterclaim is to be adjudicated as if the three were one, no close track being kept or further question raised of which agent or employee was acting for what corporate entity on what occasion, or whether their corporate structure should otherwise be disregarded. The question being put in these terms, the Court finds the answer clear: the three corporations agreed not only to stand together in respect of any judgment that might be entered against any of them, but to stand together as well, no distinction being made between them, for purposes of adjudicating the question of liability on the counterclaim. They will be treated accordingly herein, and will sometimes be referred to collectively as "Sedco." This construction of the stipulation is the only one consistent with the various expressed purposes for which it was made; and it is the only one consistent with the way the case was actually tried by counsel for Sedco, Inc., Sedco International, and TerraMar, and with the way the briefs and proposed findings and conclusions were written. What bearing the stipulation as so construed may have on the jurisdictional question may be left for the Court of Appeals to consider should the need arise.

## B.

The Emirate of Qatar is an independent Arab state located on the eastern side of the Arabian Peninsula, just north of where the peninsula turns sharply eastward before dipping down again to the southeast and then around to the southwest toward the Gulf of Aden. The land portion of Qatar itself forms a small peninsula jutting northward into the Persian Gulf. Qatar was part of what was left of the Ottoman Empire until as late as 1916, when it passed under the protection of Great Britain under treaty terms similar to those then prevailing between Britain and the neighboring Trucial States, now the United Arab Emirates. Qatar is now ruled by the al-Thani family, the present ruler being Khalifa Bin Hamad al-Thani. One of the ruler's sons is Minister of Finance and Petroleum. The capital of Qatar is Doha, situated on the eastern coast. Qatar has land boundaries with Saudi Arabia and the Emirate of Abu Dhabi (across its neck); since disposition was made of the waters of the Persian Gulf following World War II, it has also shared boundaries in the Gulf with Saudi Arabia on the west; the island nation of Bahrain to the northwest; Iran to the northeast and east; and Abu Dhabi to the southeast and south. These boundaries are indicated on the map included herein as Fig. 1.

Oil in significant quantities was first discovered in Qatar in the early 1940s, in an onshore region along the southwestern coast called Dukhan. Offshore exploration began in 1953, when an affiliate of Shell Oil Company was granted the concession of the whole of Qatar's territorial waters three miles or more offshore, with rights for a limited time to explore for oil and develop any fields found, the profits obviously to be shared with Qatar. Shell made extensive seismic surveys, mapping the contours of the rock formations deep under the seabed in search of the sorts of structural anomalies where oil might have accumulated.

Figure 1
From Stipulation filed August 28, 1980

Subsequent drilling disclosed a large oil field at a place called Idd El Shargi in 1960; another at Maydan Mahzam in 1963; and a third at Bul Hanine in 1970. See Fig. 1. Meanwhile a consortium known as Abu Dhabi Marine Areas (ADMA) had discovered a field along the water border between Abu Dhabi and Qatar, called El Bunduq (put on production in 1972). All these oil fields produce from limestone formations laid down in the middle and upper Jurassic periods of the Mesozoic era, some 160 mil-

lion years ago. Two groups of strata in particular have been found to be oil-bearing: the Qatar and the Areaj; the former produce from zones more particularly known as the Arab I to Arab IV. See Fig. 2. These are the same zones from which oil is being produced at Dukhan and in Saudi Arabia. Deeper down, a group of strata known as the Khuff (dating from the Permian period) has been found to contain large deposits of natural gas, demand for which has increased in recent years.

Examination of Fig. 2 will disclose that the Qatar formations just mentioned—i. e., the four Arab zones—are overlaid by deposits of anhydrite; beds of anhydrite also separate the four Arab zones from each other. Ex. 78. Anhydrite is the mineral anhydrous calcium sulfate; its significance here is that its presence in the vicinity of the oil-bearing Arab formations may well account for their contamination by hydrogen sulfide, the "particularly vicious"[8] gas that figures importantly in this case. The obnoxious qualities of $H_2S$ may be briefly summarized as follows. It reacts in damaging and sometimes dangerous ways with iron and steel equipment that has not been specially treated beforehand. It can react with water to form sulfuric acid, whose highly corrosive nature is familiar to every student of chemistry. Humans can tolerate extended exposure to it only in low concentrations, viz., in the range of 10 to 50 parts

per million (ppm) by volume (.001% to .005%); levels in the range of 1000 ppm of $H_2S$ in the air (.1%) produce immediate unconsciousness and death. It is heavier than air, so that upon release to the atmosphere it tends to flow to the lowest point, or "ground" level; thus its presence on an offshore drilling rig, for example, cannot be escaped simply by taking to the lifeboats. When burned in air it produces sulfur dioxide which, though not considered toxic, can damage plant and animal life if present in high enough concentrations. Obviously the presence of $H_2S$ in the gasses and crude oil coming out of an oil well requires elaborate safety and other precautions; and in any case the $H_2S$ concentrations in the oil itself must be reduced to several hundred ppm at most before the oil is saleable. The record establishes that $H_2S$—known as "sour" gas—is present in most if not all of the fields being produced on the Arab side of the Persian Gulf, and that this fact is well known to those working in the petroleum industry in the area. The amount "varies from well to well and from field to field, and in fact, from different zones penetrated by the same well." T. 3420 (Elson). In the El Bunduq field, near neighbor of the scene of events here at issue, the $H_2S$ concentrations in the gasses produced by the wells are as high as 350,000 ppm (35%); in the Idd El Shargi field to the north they are around 40,000 ppm (4%).

8. T. 601.

Figure 2
From Exhibit 84

---

C.

Under the terms of its agreement with the government of Qatar, Shell was required to relinquish from time to time undeveloped portions of its original offshore concession area. This was done in stages whose end result was the division of Qatar's territorial waters indicated on Fig. 1. In 1969 a Japanese consortium of power companies operating under the name of Qatar Oil Company (QOC) was granted for 35 years the concession of the (roughly) southwestern third of the whole original territory, an area comprising some 2.5 million acres. QOC agreed, among other things, to spend at least $24 million on exploration for petroleum during the first eight years; to pay certain bonuses to the government upon the happening of stated events (e. g.,

$2 million on signature of the concession agreement; $2 million on discovery of oil in "commercial quantities"); to relinquish fixed percentages of the concession area at stated times; and to pay certain taxes and royalties on profits. *See* Ex. 742, Ahmed report at 2.

QOC spent about eight months, from August 1969 to April 1970, making and analyzing further seismic surveys of its concession area. Seven possibly interesting subsurface anomalies were identified, dubbed "A structure" to "G structure." Three of these—A, D, and E—in the far eastern part of the area, were found to be located on the same general structural uplift as Bul Hanine to the northeast and El Bunduq very close by, where oil in commercial quantities had already been found. "A" was the largest

structure—it actually appeared to be two-domed—and the closest to El Bunduq; the decision was made to drill there first. QOC contracted with Sedco for the services for two years of the Sedco drilling rig "Gusto," also called "Rig 75;" Amos Carter and Carl Thorne negotiated the drilling contract for Sedco. QOC began drilling its first well on January 18, 1971; its last was completed on January 9, 1973. Altogether, eight wells were drilled, five on the A structure and three elsewhere in the concession area. Three wells, all on the A structure, tested significant amounts of oil; none other did. After having spent about $35 million on the project, QOC decided to go no farther, at least on its own. During 1973 and early 1974 some consideration was given to farming the concession out to another oil company; in this connection Koch Industries, Inc., of Wichita, Kansas, which was already in the petroleum business elsewhere in Qatar, gave strong consideration to taking over. Koch however concluded the undertaking was too risky to justify the large investment required and broke off negotiations with QOC and the government. On March 10, 1974, QOC relinquished its entire concession.

It will be useful for future reference to explore in some detail the reasons why QOC and Koch decided not to proceed with further exploration and development of the concession area. These reasons are expressed in a report prepared by QOC in 1973 (Ex. 113) and a report dated January 24, 1974 prepared for Koch by Alexander Erickson (Ex. 115), who also testified (via deposition) at trial.

1. There appeared to be little hope of finding significant amounts of oil anywhere in the area except in the A structure.

2. The A structure and the manner of oil accumulation in it proved more complex than had been expected or hoped. Instead of two local culminations, or likely reservoirs, QOC found four. Oil was found in both the Arab III and Arab IV zones of two of the culminations into which wells were drilled. But even the local behavior of these culminations proved unpredictable. In the north dome, one well (A1) produced only from the Arab IV zone, while another (A4) produced only from the Arab III. In the southwest dome, well A2 produced from both the Arab III and Arab IV. The porosity of the rock—through which oil must migrate toward wells during production—changed erratically especially in the Arab IV zone, leading Erickson to conclude that "the predictability of probable porosity trends [in Arab IV] is essentially zero." Moreover, bottom water was found in the Arab IV reservoirs, giving rise to the clear danger of "water coning" during production, that is, pulling up water through a well into which oil is not migrating fast enough.

3. QOC concluded that "more wells would be required to be drilled to confirm the magnitude of total original oil in place in Anomaly-A," and that in any case "the real extention of oil pool was limited and small."

4. QOC was uniformly disappointed by the "pay" and "porous zone" thicknesses disclosed by the producing wells—that is, by the vertical and lateral extensions of rock from which each well could be expected to produce oil. Low pay and porous zone thicknesses, plus bottom water, tend to mean that many wells are needed to produce reasonably high percentages of the oil in place; they also tend to mean either low producing rates for each well, or short-lived wells, or both.

5. Volumetric analysis of the oil-bearing strata in the north and southwest domes led Koch to estimate the total recoverable reserves at a "probable" 15 million barrels of oil and a "possible" additional 7 million barrels. Such volumes are considered relatively small by Middle East standards. Furthermore, about ⅔ of the "probable" reserves were assigned to the Arab IV zone and "are considered high risk because of bottom water and erratic pay development;" Erickson's report stated that "the actual value of these calculated reserves should be reduced by a comparatively high risk factor." Erickson testified that he was unable to assign any "proved" reserves to

the A structure based on the data available to him, which included most of the QOC data and the QOC report on the results of its exploration. T. 2147. There are evidently no fixed definitions in the petroleum industry of the terms "proved," "probable," and "possible" as applied to "reserves," but the following definition of "proved reserves" will serve to convey what is meant by this term: "Proved reserves are the reserves that are proved to be present beyond a reasonable doubt, *which can be produced under current economic conditions*." This definition was characterized by Robert Smith of TerraMar as "a good definition." T. 3612.

6. Wells A1, A2, and A4 produced at the following rates (barrels of oil per day (BOPD)) during flow tests performed by QOC: [9]

| Well | Arab III | Arab IV |
|------|----------|---------|
| A1 | 0 | 154 |
| A2 | 2051 | 1900 |
| A4 | 1838 | 0 |

A1's rate was low because the well was tested without prior "acidization;" QOC estimated it would have tested at about 2000 BOPD from the Arab IV zone had this been done. Acidization is done by pumping hydrochloric acid down through the well and out into the surrounding rock; the acid cleans and enlarges the pores of the rock, increasing its permeability.

7. Erickson estimated that "four producing wells [the three already drilled plus one yet to be drilled] should be more than adequate to support a[n initial] producing rate of 10,000 BOPD." The producing rates of wells of course decline over time; how much and how quickly depends on the size and character of the reservoirs they drain and how fast they are made to produce. In making his economic calculations Erickson assumed the estimated initial producing rate of 10,000 BOPD from four wells would begin to decline after one, two, or three years, depending on the volume of recoverable reserves in the reservoirs. The one-year period assumed 10 million barrels recoverable; the two-year period assumed 15 million barrels; the three-year period assumed 20 million.

8. Analyses done for QOC of the effluents of the three wells showed that the concentrations of $H_2S$ in the produced gasses ranged between 4% and 7% from the Arab III zones and between 27% and 35% from the Arab IV. One sample from the Arab IV zone penetrated by well A2 showed 60.41% $H_2S$ in the produced gasses.

9. Wells A1 and A2 had been capped at the ocean floor when the drilling rig had moved on; A4 had been left with pipe sticking up out of the water. If the wells were to be put on production, it was necessary to do something more with them; it was also necessary to provide somehow for pre-sale processing and storage of the oil they would produce. QOC considered two production possibilities: transmission of the oil (presumably through pipelines) to El Bunduq or Idd El Shargi for processing and sale; and installation of independent production facilities at the A structure. Why the first idea was rejected is not clear. As to the second, QOC said the following:

> With all the existing data obtained, the Company estimated the amount of oil reserves in Anomaly-A. But the amount turned out to be too small to be developed economically with the independent development system.

At the time this statement was made, sometime in 1973, the price of oil was around $2–$3 per barrel. The statement and the economic study on which it was presumably based confirmed the opinion expressed on March 28, 1972 by Don Canada of TerraMar Consultants, Inc., who had done a study for QOC (before well A4 was drilled) "to provide better definition of the petroleum prospects of the QOC concession by analyzing and combining the seismic and well data." According to the Canada report:

> It is doubtful if the "A–1" or "A–2" structures can be economically produced due to the thin oil columns and small productive areas. The thin oil column

---

**9.** These are the rates reported in Ex. 113. They are given here without regard to the choke size information also contained in Ex. 113. The wider the choke, the faster a well will produce.

would probably result in production problems due to water coning and also necessitate many development wells. A thorough economic study should be made to determine the feasibility of producing the "A–1" and "A–2" structures. [Ex. 78, p. 00105].

10. In doing his economic study of the feasibility of producing the A structure, Erickson estimated that the total front-end investment required to put the structure on commercial production (using an independent production system) would be around $20 million. This figure included the cost of drilling two new wells ($3.5 million); farm-in and "commercial discovery" bonuses to the government ($1 million and $2 million, respectively) (it was assumed the first new well would qualify the project as a commercial discovery—i. e., raise the production capacity of the field to some minimum); and further development costs of around $13.4 million. The further development costs were for such things as construction of a production platform (presumably over one of the wells) and production equipment capable of processing the effluent of the wells prior to sale of the oil ($2.2 million); construction of tripods or "jackets" around three otherwise unprotected producing wells ($1.5 million); floating facilities (tanker or barge) for storage and sale of processed oil, and the means of anchoring the same ($5.5 million); flow lines from three wells to the production facilities and from there to floating storage ($1 million); and mobilization of the whole venture ($2 million). Erickson estimated it would have taken from one to two years to begin production, essentially all the above costs being incurred before any oil was ready for sale. T. 2154–55. Erickson's projections were made without regard to the costs of drilling into and testing the deep Khuff strata for natural gas, an operation required by the Qatar government. Erickson estimated that "The required Khuff test could conceivably increase [the] cost another $1–2 million."

There are several things to be noted particularly about Erickson's projected front-end "development" costs of $13.4 million. First, they were based on "a fairly detailed, in-depth study prepared by one of our former engineers who was attached to [Koch's] International Division." T. 2150. Second, they remain roughly the same whether or not any new well is drilled and put on production: the only savings effected by producing only from A1, A2, and A4 are in the number of protective jackets and the lengths of flow line needed—surely representing less than $1 million. Third, Erickson made his development cost projections without regard to the special problems presented by the high $H_2S$ contents of the wells, of which he was aware. Even without the $H_2S$, various other gasses had to be separated from the oil prior to sale; and in Erickson's view, and that of other experts who testified at trial, a production platform and production equipment, along with floating storage facilities and the rest, were needed in any case if the oil was to be processed and sold from the A structure, $H_2S$ only serving to raise the cost of some of these items.[10] Fourth, even if it might have been possible, absent $H_2S$, to cut costs somewhat by installing the production facilities on the storage tanker instead of building a separate (unmanned) platform to hold them, the presence of such large quantities of $H_2S$ put this out of the question: it would simply have been too dangerous to the people necessarily on the tanker.

11. Erickson testified that "our preliminary studies indicated that it was economically feasible until we progressed along with the engineering work, when it became evident that it, from an economic standpoint, could be a very high risk project. * * [F]rom an engineering standpoint, why, the reserves were somewhat limited when you compare reserve potential with other fields in the area." T. 2147. In his study Erickson assumed a market price for crude oil of $11.53 per barrel; the posted price in the

---

10. See T. 1703 (Luedtke); T. 2112f (Erickson); T. 2379f (Kirkpatrick); T. 3099f and 3141 (Ber- nie Carter); T. 3522 (Robert Smith).

Middle East had by then gone to $12.40. In one respect Erickson proved a poor prophet: he feared oil prices might come down. He recommended that Koch terminate its negotiations for the QOC concession area for two reasons:

 a. Uncertainty in crude oil pricing. Economics were based on a posted price of $12.40 (market 11.53). Future crude oil prices will probably be controlled by alternate fuel costs, shale oil tar sands and coal ($7–10/bbl.).

 b. The minimal reserve potential coupled with high risk will not justify the anticipated front end costs.

### D.

The QOC operations generated a lot of information about the A structure and what was to be found there. This and other information related to the potential attractiveness of investing in the A structure was known or available in 1975 as follows.

The history and results of the QOC's efforts were documented in, among other things, analyses of seismic surveys; daily drilling reports; well logs; pressure build-up studies; pressure-volume-temperature (PVT) analyses; flow test results; and analyses of the composition and character of the effluents of the wells. Copies of these documents, which contained all the basic data on the QOC wells and the reservoirs they penetrated, were kept by QOC in Tokyo, and were probably available from there on some terms; in fact, QOC made the documents available to Koch for Erickson's 1973 study. Copies were also kept by the Qatar Department of Petroleum Affairs in Doha. Once the concession area was relinquished by QOC and became available for re-letting, it was possible, by persuading the Qatar government that one was either a bona fide independent consultant attempting to interest oil companies in the area or was representing a company already interested, to get permission from the government to sit down with the files and make notes on them. T. 2482. It was well known in the petroleum industry, particularly in the Middle East, that QOC had relinquished its concession; and during 1974 and 1975 at least three independent broker/consultants gained access to the QOC files kept by the government, and using information gleaned therefrom attempted to interest a variety of oil companies in the area. No takers were found.

The fact that Sedco had drilled the wells for QOC meant Sedco had independent access to information on them, in two forms. First, as the drilling contractor, Sedco made out daily drilling reports, on standard forms prepared by the International Association of Drilling Contractors (IADC). These reports, the basis for a driller's billing to the oil company for which it works, contain information on what is done each day the drilling rig is over a well. Among other things, they indicate the flow rates established during production tests and how a well is left when the drilling rig moves on. Although some question was raised about this at trial, Billy Joe Peterson, Sedco's rig manager during part of the QOC operations, testified that the daily drilling reports should also contain information on the $H_2S$ concentrations in the effluents of the wells. T. 1311. Multiple copies of each report are made out and disposed of per the instructions of the oil company. In the case of Sedco's work for QOC, one copy of each daily drilling report was given to QOC, one went to the government of Qatar, and one was kept by Sedco in its office in Doha. Copies of these reports were never introduced in evidence in this case. The evidence supports the conclusion that Sedco's copies were in Doha at all times material hereto, and the Court so finds. Second, quite apart from the daily drilling reports, there was much information about the QOC operations stored up in Sedco's collective memory. In particular, even if the exact percentages of $H_2S$ in the wells were not recorded on the drilling reports, it is nevertheless certain that the approximate percentages at least were known to the Sedco personnel on the rig when the wells were drilled and tested, to whom they were contractually required to be disclosed for safety reasons. T. 173 (Amos Carter). The

Court has no doubt that this information was in turn communicated to Amos Carter and Carl Thorne, Sedco's top men in the area. *See* Thorne depo. at 153. Billy Joe Peterson, who did not work on any of the wells here in question, learned when he came on the scene (to work on the last four wells drilled for QOC) that the $H_2S$ concentrations in wells A1, A2, and A4 were as high as 33%. T. 1312–13. Peterson will reappear later in this account.

TerraMar, through Don Canada, had of course done a study of the petroleum prospects of the QOC concession area in 1972, using seismic information and well data supplied by QOC. This report was on file in TerraMar's office in Dallas. In addition, TerraMar represented itself as follows in an August 25, 1975 letter from Robert Smith to R. Eugene Holley:

> In 1972 personnel of TerraMar Consultants completed engineering studies of all the producing fields in Qatar. TerraMar Consultants has also reviewed for other clients the exploratory prospects of Qatar, both onshore and offshore.... [Ex. 8, p. 1].

It is clear that TerraMar knew, or claimed to know, a good deal about the oil business in Qatar, and about the A structure in particular.

There can be no doubt, particularly in view of the high $H_2S$ contents of the wells, that elaborate and expensive production facilities were needed if oil was to be produced for sale from the A structure itself. Despite his protestations of lack of familiarity with the "production end" of the oil business, the Court finds that Amos Carter knew this all along, and that Robert Smith of TerraMar realized it once he became aware of the $H_2S$ contents of the wells.[11] As to the investments of time and money required to install the required production facilities, it may be said in general that these are very high in the Middle East because of the need to import so much of the materials and so many of the personnel

required to do the work. This too must have been well known to Amos Carter and Robert Smith.

### III.

#### A.

Roy Carver was born in a small town in Illinois in 1910. He graduated from the University of Illinois in 1934 with a degree in "general engineering." He then began working as a superintendent of construction in Davenport, Iowa, and later went to work for a company that was putting in locks and dams on the Mississippi River. In 1938 he went into business on his own, making pumps. During the first years of World War II he made some pumps for use by the British armed forces under contract with the U. S. Army Corps of Engineers; after the United States joined the war, he was given substantially larger contracts. In 1942 he bought an old sauerkraut factory in Muscatine, Iowa, converted it into a pump factory, and was on his way. Although it has expanded considerably in the meantime, Carver Pump Co. is still headquartered in Muscatine.

In 1958 Carver happened to be in Frankfort, W. Germany, visiting an acquaintance. He noticed something different about the tires on his friend's car, inquired about it, and learned that the tires were recaps made using a new process and "We get twice the mileage of a new tire." T. 715. He went next day to see the inventor of the recapping process, and secured the right to exploit it in the United States. The result was Bandag, Inc., engaged in the manufacture of retread rubber and tire recapping machinery. Like Carver Pump, Bandag is headquartered in Muscatine, Iowa and has manufacturing plants there. Bandag is publicly held and traded on the New York Stock Exchange; it is now a worldwide operation, doing business in some 90 countries.

---

11. As to when Robert Smith became aware of the H2S contents of the wells, *see post* 282.

Carver was chief executive officer of both Carver Pump and Bandag until 1968, when he retired to become chairman of the boards of both corporations. He still held these positions at the time of trial. In addition, he was chairman of the board of Carver Tropical Products, a cattle-raising operation in Belize, Central America. After he retired from day-to-day involvement in the affairs of his companies, Carver gave himself over to a life largely of travel, the enjoyment of his wealth, and good works. Although he kept an apartment in Muscatine and maintained his legal residence there and voted there, his "haunts" were "the Cote d'Azure and Miami and the Isles of the Caribbean, places like that." Carver's second depo at 237–38. He served however on the board of trustees of Augustana College in Rock Island, Illinois and on the board of the University of Iowa Foundation, a "money-raising institution" for the university. Carver's first depo. at 13–14. The University of Iowa particularly benefited from his largesse: he made large contributions both to the department of athletics and to the university hospital, whose new wing is called the Carver Pavilion. *Id.* at 28. In addition, just before he became involved in the oil venture here at issue, Carver had purchased about 340 acres of land in Muscatine which he planned to develop into a park and recreational facility for the city. *Id.* at 27. It was partly because the costs of this project grew so large (c. $20 million) that Carver decided to go into the oil business in Qatar.

Carver was first interested in the Qatar project through R. Eugene Holley and Amos Carter, at a meeting on Carver's yacht off Cannes, France, on July 25, 1975. In the process Carver was drawn into a tight little circle of friends and business associates, the details of whose relationships he did not learn until much later.

Holley and Amos [12] had met in 1973 on a flight from Iran to the United States. They had become friends; Amos had helped Holley promote one of his ventures by introducing him to various prominent Middle Eastern businessmen and government officials; [13] and Amos and Holley were themselves in the cattle business together in Texas. [14] Among those to whom Amos had introduced Holley were Ali and Kassem Jaidah of Doha, Qatar, with whom Amos had long been on friendly terms. Ali Jaidah was then director of Qatar's Department of Petroleum Affairs; he and his brother Kassem operated Jaidah Motors and Trading Company in Doha, with which Sedco did a good deal of business; and Kassem also acted as Sedco's agent in Qatar, earning a 4% commission on all revenues taken in by Sedco from work done in the country. [15] Amos and Kassem were also about to go into business together on their own. [16]

12. No disrespect is intended by calling Amos Carter by his first name. This was agreed to at trial in view of the ease of confusing "Carter" and "Carver"; moreover, there are two Carters in the case, Amos and his brother Bernie, who comes into the picture later on.

13. Holley was trying to sell lots on a mountain he owned in Tennessee, which he hoped to develop into a resort. As he explained it: "One of the ways I thought that maybe I could make a contribution to peace in the world [was] that if I could get some high-ranking Arabs over there and some high-ranking business people, you know, of our country, then maybe the dialogue between them would be helpful. And, of course, I also had the profit motive in mind." T. 1131–32.

14. They had purchased 3,770 acres of land in Texas in early 1975; the Carter Cattle Company was incorporated in Texas on August 7, 1975, with Amos, Holley, and Carl Thorne as the first directors. Ex. 280. Amos bought out Holley's share of the ranch in 1977 for $234,-000.

15. It is required by certain Middle Eastern countries, including Qatar, that foreign corporations doing business there have resident sponsors or agents. As Sedco's agent, Kassem Jaidah rendered such services as securing visas and local housing for Sedco employees and helping the company in its dealings with the Qatar government. Between 1971 and 1980 Kassem received over $1 million for his services. Exs. 571 and 572.

16. Amos and Kassem signed a contract on September 13, 1975, providing for "the establishing of a process food distribution center in the Middle East. . . . The Center shall process raw United States food products in the Middle East and thereupon distribute same." Amos was to handle the business in the United States, Kas-

During one of his discussions with Holley in the early summer of 1975, Ali Jaidah mentioned that the old QOC concession was open, evidently told him something about it, and suggested that Holley might be interested in investing in its development. Holley indicated he would like to take a look at it, and turned to Amos for advice. Amos must have encouraged him—at any rate, Holley waxed enthusiastic. Amos however warned him that he was not "heavy enough" financially to undertake the project on his own. Holley was then worth $40 to $50 million on paper, although his assets were probably overvalued and were in any case already heavily borrowed against. Holley began looking for a partner willing to finance the venture, through which he hoped to quickly improve his cash flow position; and his thoughts turned to Roy Carver. Holley and Carver had met earlier in the year, when Carver had sold Holley a $3.3 million airplane on easy terms.[17] Believing that Carver was "a very good man to deal with," T. 1138, and knowing that Carver needed additional funds so he could begin work on his charitable project in Muscatine, Holley decided to try to interest him in the Qatar venture. Hence the meeting in Cannes on July 25, 1975, which Holley initiated and to which he brought Amos (whom Carver had never met).

The substance of the July 25 conversation was memorialized in the form of a recorded and transcribed telephone call that Holley made on August 4, 1975 to Marcella McKil-lip, Carver's administrative assistant. Ex. 105. According to Holley, his remarks to McKillip reflected his thinking at the time based on what he had been told by Amos, T. 1196; and Carver testified that Amos told him "exactly" and "almost word for word" what Holley told McKillip on August 4. T. 723–24. The Court finds Ex. 105 to be a faithful reflection of the representations made by Amos on July 25.

As McKillip said at one point in the telephone conversation, "It sounds absolutely incredible;" and Amos certainly did make investment in the A structure sound like an attractive proposition. The crux of his message was that for an investment of roughly $2.5 million it would be possible to uncap the three producing wells drilled by QOC, run pipe down into them, produce them directly into a tanker or barge at a rate of at least 5500 BOPD[18] for five years without any decline in production (with declining production for five to ten years after that), recoup the $2.5 million within the first six months from sale of the oil, and then net about $500,000 a month for a total recovery (in the first five years) of about $30 million on the $2.5 million investment. With minor variations, this (mis)information is what Carver believed and acted on until well into 1976, when he learned otherwise. Amos represented these figures as "conservative" and characterized the wells as "sleepers"[19] and the deal as "one of the finest ... you'll find in the Middle East because of the little risk involved" (the wells already having been drilled and

sem in the Middle East. Kassem was to make an advance payment of $325,000 to Amos to cover Amos's compensation and all incidental expenses for a period of four years. Ex. 315. The bulk of the payment was made on January 14, 1976. See n. 40, infra.

17. Holley borrowed the money to buy the airplane from the Harris Trust Bank in Chicago, where Carver had close ties. Carver personally guaranteed payment of the loan. Carver received no money down. Carver's faith in Holley is explained by the facts that the two met through Oral Roberts, who represented Holley as his friend and a member of his church board; that when Carver went to Georgia to discuss the airplane deal with Holley, he was introduced to Governor Jimmy Carter and a number of Holley's friends in the Georgia State Senate (of which Holley was then majority leader), all of whom recommended Holley highly; and that Holley showed Carver a balance sheet indicating that his net worth was around $50 million. In the end, Holley defaulted on the loan, and Carver was forced to pay it off and repossess the airplane.

18. Amos said that one of the three wells had been tested by QOC at 4500 BOPD, the other two at 2500 BOPD each, for a total of 9500. He warned however that "you don't produce wells at what they test at."

19. T. 720.

known to produce at certain rates). He explained that QOC had abandoned the wells because "they [were (unnecessarily)] going to run a pipe line out to these wells which were sitting 30 miles off the coast and go to a tremendous expense. Based on the value of oil [when QOC gave up] and the fact that [it's] not a big producer at all [in] the Middle East [, t]hey determined that they would ... surrender their lease, which they did." He evidently said the major oil companies were not interested in the A structure because by Middle East standards "this is a marginal deal. In other words this is a little bit of production." On the other hand Carver was warned to keep quiet about the deal until it was firmly in hand, for fear that someone else—including the Qatar government—might find out how good it was and steal it away. Carver was given good—and, the Court finds, sufficient—reason to rely on Amos in these matters. He was informed that Amos was a vice president of Sedco, Inc., "the largest drilling firm in the world;" that Sedco, Inc. was involved not only in drilling but also in petroleum consulting (through TerraMar); that Amos had long worked for Sedco in the petroleum business in the Middle East; and that Amos knew a great deal about the QOC concession in particular since Sedco (under his supervision) had drilled the QOC wells.[20] Moreover, Holley's opinion of Amos was high: "[L]ike I say I trust Amos Carter with every nickel I got and I've known him a good while and I have spent a lot of time with him and I know what he tells me is true." Amos said nothing about H$_2$S, nothing about the need for costly production equipment, and nothing about the fact that reentry of the wells might prove complicated and expensive in its own right. These were all matters on which he was well informed and which he knew were highly relevant to the investment decision Carver was presented with. The Court can only find that on July 25 (and thereafter) Amos deliberately misrepresented the value of the A structure by affirmatively and knowingly misrepresenting the costs in time and money required to put it on production and by failing to disclose information known to him that was inconsistent with the figures he gave out. At the very least, Amos's assertions were made with a reckless disregard for the truth of the matters asserted. The Court specifically rejects Amos's testimony to the effect that he was not aware on July 25 that the A structure was under particularly interested discussion, and that whatever he may have said about it was more in the nature of casual and unconsidered conversation than advice he had any reason to believe would be relied upon. According to Amos, Holley and Carver were just talking about possible Middle East oil deals in general terms, the A structure being one among many possible deals they bandied about. The Court finds, on the contrary, that Amos knew at the July 25 meeting that Carver's interest was already focused on the A structure, and that what he said about it was being taken as the advice of a professional in the oil business in the Middle East and being relied on as such. In any case, if Amos didn't know these things on July 25, he surely came to know them very soon after that; and he didn't change his tune.

In fact, by the end of the July 25 meeting, Holley and Carver had reached a "gentlemen's agreement" to actively pursue the right to develop the A structure. The arrangement between them was roughed out: at Amos's suggestion they would form an oil company; Holley, using his and Amos's friendship with Ali and Kassem Jaidah, would contribute the rights to the old QOC concession and Carver would contribute the $2.5 million needed to develop it; Carver's investment would be repaid out of the first

---

**20.** The Court recognizes that there are many subspecialties in the petroleum industry, and that no one person is an expert in all of them. Amos was an expert in drilling. Nevertheless, throughout his association with Carver, Amos purported to be and was long reasonably believed by Carver to be capable of giving professional advice on a much wider range of topics, including, most importantly, how much it would probably cost in time and money to reenter the A structure wells and put them on production, and (given production rate information later confirmed by Robert Smith) the probable payoff from doing so.

proceeds (within six months); and "after that, he and I would then divide the ½ million a month—50% to him, 50% to me." Before Carver spent any money, however, Holley was to see to it that he was provided with some hard information about the project. Holley was to get this information through TerraMar: "[T]hey know something about this particular thing and I am going to have the benefit of what they do know when I go back over there;" additionally "we [will] get all the data that the country has got on the thing. They'll give us more information to evaluate it." Finally, Holley and Carver were to have the help of Carl Thorne, "Amos Carter's understudy in the Middle East" who "draws Sedco's contracts with these countries," when it came time to draw their contract with Qatar. All told, Holley was of the opinion that with Sedco's help "we have an awful lot going for us."

### B.

The basic fallacy in what Amos told Carver on July 25 was that the three producing wells QOC had drilled on the A structure could be reentered and put on production quickly, for the modest investment of around $2.5 million. Given this, the questions of how much oil could eventually be recovered from the wells, at what daily rates, and on what terms, paled into relative insignificance: any set of reasonable assumptions about these matters based on the QOC well data and likely terms with the government supported the conclusion that the investment was a good one, at worst relatively risk-free and at best extremely lucrative. Between August 1975 and January 1976 Carver was given additional reason to believe Amos's cost and time projections, and, with one exception, no reason to doubt them. Carver's commitment to the project—which took shape in much the manner discussed on July 25—was based ultimately on these projections.

In early August Holley commissioned Robert Smith, president of TerraMar, to write a preliminary report on the QOC concession and two other areas within the territorial waters of Qatar. It was made clear to Smith that the report would be submitted to Carver in an effort to convince him of the attractiveness of investing in the A structure; and in fact Carver saw and relied upon the report.

Smith's report came out on August 25. Ex. 8. In it Smith gave Carver good and sufficient reason to believe he knew whereof he spoke. Although he warned that "We have by no means complete files on the former Qatar Oil Company concession," and in consequence "the conclusions reached may be subject to revision as additional data are obtained," he went on to say that:

> In 1972 personnel of TerraMar Consultants completed engineering studies of all the producing fields in Qatar. TerraMar Consultants has also reviewed for other clients the exploratory prospects of Qatar, both onshore and offshore and made a thorough review of the exploratory prospects of the Qatar Oil concession for Qatar Oil Company. By virtue of this background in Qatar we feel that the conclusions reached in this study are valid and represent a reasonable basis for negotiations with the Government of Qatar.

The report itself was a pastiche of information that Smith took from Don Canada's 1972 report for QOC and that was given to him by Amos. Curiously, although Smith correctly indicated that QOC had drilled a total of 8 wells, he apparently did not realize that A4—drilled after the Canada report was written—had tested oil. He faithfully reiterated the flow rates of A1 and A2 as stated in Canada's report, and included Canada's evaluation that the areal extents of the oil accumulations were questionable and the presence of bottom water could prevent sustained production from the wells at the test rates. However, he estimated that a minimum of 3.3 million barrels of oil could be recovered from A1 and a minimum of 8 million barrels from A2. And he drastically parted company with Canada's conclusion (which he did not mention) that it was doubtful whether A1 or A2 could be produced economically.

We estimate a capital expenditure of $2,000,000 should be adequate to re-enter and complete both wells, to install flow lines, and to purchase and install a tanker to provide storage for produced oil. Oil would subsequently be loaded on tankers from the captive tanker.

Smith thus confirmed Amos's basic misrepresentations as to the cost and manner of producing the wells. Included in his report was a series of economic projections based on alternative combinations of assumptions about capital costs ($2 million or $3 million), production rates (6000, 4000, or 2000 BOPD, declined at a rate of 15% annually), and percentages of produced oil accruing to Holley and Carver.

The only case which does not even recover the invested capital is the case of a $3,000,000 investment to be recovered out of 15 percent of the oil from wells having initial potentials of only 2000 barrels of oil per day. Furthermore, it appears that only in the case of a 15 percent working interest project with initial well potentials of only 2000 barrels of oil per day would neither the $2,000,000 nor the $3,000,000 investment meet good investment criteria; that is, yield a discounted cash flow rate of return greater than 10 percent. The effect of doubling operating costs does not alter conclusions significantly although percent profit is decreased and payout times are increased.

In fact, Carver was expecting to recover his investment out of far more than 15% of the oil. And Smith's bottom line was this: The re-entry of the QOC wells and production therefrom is an attractive oil field investment. Considerable additional study is warranted but the risk of complete failure is very low in view of the fact that test data have demonstrated production capability of approximately 4000 barrels per day from only one well [A2].

Carver was encouraged when he received Smith's report. At the end of August he, Holley, and Amos (with others in the party) flew to the Middle East "to talk about this concession and to look into the business aspects of it and check it out." T. 733. They stopped first in Beirut, where they had dinner at Sedco's expense with Ali and Kassem Jaidah, Carl Thorne, and some others.[21] This was evidently intended as an opportunity for Carver to meet the Jaidahs and vice versa, and no business was discussed. From Beirut, Carver, Holley, and Amos traveled on to Doha; Amos arranged for Billy Joe Peterson, then Sedco's general manager for drilling operations on the Arab side of the Persian Gulf, to meet them there. Peterson was introduced as someone who would know the flow rates of the QOC wells, since he had worked on the rig that drilled them. But Peterson had not worked on A1, A2, or A4, and the best he could come up with was confirmation that one well had tested at 4000 BOPD. He and Amos did however describe to Carver the enormous success some oil companies had been having in the area by heavily acidizing their wells to stimulate greater oil production. There was additional information that could have been made available to Carver then and there: Peterson was well aware of the huge amounts of $H_2S$ in the QOC wells; and the meeting with Peterson was held only five minutes away from Sed-

21. The fact that the dinner was at Sedco's expense indicates that Amos, who arranged it, already considered Carver and Holley to be Sedco customers (through TerraMar) or potential customers, and was acting on behalf of Sedco in his dealings with them. He clearly continued to act on behalf of Sedco throughout the greater part of his involvement with the Holcar venture. Cf. his affidavit, filed herein on September 6, 1979 ("[T]hroughout my association with Holcar Oil Company and its officers and directors I was at all times acting solely as an employee of Sedco, Inc. and was never in any way acting on my own behalf");

Order of January 7, 1980, dismissing Amos and Smith for lack of in personam jurisdiction ("All contacts [Amos and Smith] had with the State of Iowa were on behalf of their corporate employers and were within the course of the employers' business and for their benefit"); T. 533 ("THE COURT: So that what you have done here in your representations of SEDCO, all the statements and matters that you have made, you have done those in behalf of SEDCO, INC.? THE WITNESS [Amos]: Yes, sir, that's my understanding."). Sedco has at no time argued that it should not be liable for Amos's actions for the reason that they were ultra vires.

co's Doha offices, where copies of the IADC daily drilling reports on the QOC project were on file. *See* p. 273, *supra.* Although Peterson knew Carver was actively considering investing in the A structure, he did not volunteer any of this information; nor did Amos. The meeting with Peterson only served to confirm in Carver's mind the attractiveness of the venture.

At this point Carver believed he had sufficient corroborative information to permit him to join with Holley in making an offer to the Qatar government, and on September 7 the two submitted a proposal to the Minister of Finance and Petroleum. Ex. 7. They relied on the advice of Amos and Robert Smith in setting the terms of the proposal, which stated that they would work over five wells previously drilled by QOC and drill at least three exploratory wells within a period of two years. They indicated they would be "applying new techniques for realizing commercial production" from the QOC wells—i.e., the massive acidization that Peterson and Amos had explained to them. They said they were willing to enter into a service contract agreement with the government "under mutually agreeable terms currently applied in OPEC countries," the critical question being how profits from the oil would be split. The terms they expected (apparently via Amos's discussions with Ali Jaidah), and ultimately got, were that capital and operating expenses would be recovered out of up to 40% of the proceeds from sale of the oil, the remaining 60% to be split 80/20 between the government and themselves.

In anticipation of acceptance of their proposal by the government, Carver and Holley incorporated Holcar Oil Company in the Grand Cayman Islands on October 10, 1975, upon a capital investment of $1,000 each with each receiving fifty percent of the stock.[22] It was understood that the capital costs of the project would be paid by Carver through loans made by him to Holcar. After each of Carver's loans, Holley was to draft a promissory note to Carver for one half of the amount loaned, each note maturing nine months after date of demand. This facet of the agreement was reduced to writing on January 5, 1976. Ex. 605.

Holcar was formed with Carver's understanding that although Holcar would be the party contracting with the Qatar government to perform the reentry and workover operations, Sedco—including TerraMar—would provide the expertise required to carry out this work. In particular, Carver relied on Smith of TerraMar to provide Holcar with technical personnel. Carver testified:

I was assured by Amos that TerraMar could handle all my technical problems. He was going to do everything he could to help me, with his long background in the Near East and drilling wells for SEDCO. No, I wouldn't have gotten into this thing at all if I thought I had to furnish the technical expertise. I didn't have that. [T. 786].

Likewise, Holley expected that, "As far as geology was concerned, we were relying wholly on TerraMar. The rig would be manned by SEDCO personnel fully, except for [Holcar's manager] being there." T. 1229. Smith was well aware of Holcar's reliance on him and TerraMar. In a December 16, 1975 memo he wrote, "Holcar has no technical staff whatsoever. They are counting on SEDCO to provide all of the necessary field personnel." Ex. 56. He wrote Carver and Holley on December 17 and assured them that TerraMar would be able to provide the technical personnel Holcar would need, saying Holcar would have to supply only a manager responsible for overseeing the entire project.[23] Ex. 602.

22. Carver was chairman of the board and president; Holley was vice chairman, president and secretary; McKillip was vice president and assistant secretary; and John Rhodes, Holley's accountant, was vice president and treasurer. Ex. 363, T. 2663.

23. The services to be performed and in fact performed by TerraMar personnel included: (1) planning the entire drilling and exploration program; (2) providing petroleum engineering and geological talents; (3) preparing and submitting work programs and reports to the government; (4) supervising the operation; (5) preparing a prognosis of operations for reentering

Even so, Smith indicated that upon request TerraMar would find someone suitable to manage the operation.

During the latter part of 1975 Smith performed a number of services for Holcar in preparation for the workover and completion of the QOC wells. He prepared a second report on the economic prospects of the ventures; he went to Doha to obtain the additional data on file with the government; he helped Holley negotiate the production-sharing agreement with the government; and he went to London to meet with and answer questions raised by a consulting firm that had (at Carver's request) performed a cursory examination of the project. Throughout all these endeavors, Smith, by various misrepresentations, succeeded in smoothing the path for Holcar's ultimate commitment to both the Qatar government and to Sedco, TerraMar again included.

Smith sent his second report to Holley on November 14. Ex. 83. There is no doubt that Carver received and relied on this report; in any case he, through Holcar, paid for it. Carver believed the report to be based on additional information about the wells that Smith had received since his report of August 25; and there was no indication to the contrary in the second report itself. In fact, the only new data at Smith's disposal were the terms of the proposal Carver and Holley had submitted to the government, and the expected cost recovery provisions of the yet-to-be-finalized production-sharing agreement. In a cover letter Smith reiterated that "It is certainly obvious that this is a very attractive venture. I believe examination of these data by personnel with the Ministry in Qatar would be detrimental to your case." The report itself was based on a series of economic projections supporting Smith's assertion that "The economics of this project are extremely attractive." Various producing schedules were created under two sets of assumptions about flow rates and recoverable reserves: one schedule assumed A1 and A2 [24] would produce at a combined rate of 7500 BOPD with a 15% annual decline and total recoverable reserves of 14.48 million barrels; the other assumed a rate of 6000 BOPD, the same annual decline, and recoverable reserves of 11.58 million barrels. Smith increased the projected capital expenditure from $2 million to $8 million, but it was still understood that Holcar could get A1 and A2 onstream at a cost of about $2 million, T. 1376; Smith explained that "The assumption of an $8,000,000 capital expenditure might, for example, represent the unsuccessful drilling of several exploratory wells after production had been developed for the re-entered wells." He gave the impression that even if he had underestimated the capital costs,[25] there would be little change in his economic projections or his ultimate conclusion about the project's attractiveness: "The economics of the venture seem relatively insensitive to great changes in capital expenditures, primarily because very high rates of oil production are anticipated and capital recovery is permitted out of 40 percent of the revenue stream." The only caveat in this report was that the wells might not attain the predicted flow rates; otherwise it reinforced the basic misrepresentations made to Carver.

Smith finally got some genuinely new (to him) data about the wells in late November, when he travelled to Doha (at Carver's expense) to examine the records on file with

the wells; and (6) having a TerraMar representative at the well sites during all operations to obtain and report test data.

24. At this point Smith had still not discovered there was a third producing well.

25. Which he clearly had: quite aside from the radical underestimation of the front-end costs of putting A1 and A2 (and A4) on production, Smith allowed $6 million at most for carrying out the rest of Holcar's proposed program; but the drilling of the proposed three new wells would alone have cost about $15 million, to say nothing of the costs of reentering an additional two of the old QOC wells. See T. 2523 (Brennan).

the government.[26] According to Smith, before this he did not know about the massive quantities of $H_2S$ in the wells, and accordingly had no reason to doubt they could be put on production in the manner and for the costs in time and money projected by Amos; nor, he testified, did he learn any differently while he was in Doha in November. According to Carver, Smith discovered the true facts in November when he examined the QOC records on file with the government, but deliberately suppressed them. The Court so finds.

Conclusions about the extent of what Smith learned in November 1975 in Doha depend largely on interpretation of Ex. 81, the handwritten notes Smith made as he examined the government files. The Court makes the following findings with respect to Ex. 81: (1) All 13 pages of Ex. 81 were written in November 1975. This finding contradicts Smith's claim at trial that some of the pages were written in January 1976 when he examined the government documents a second time; but it is consistent with his deposition testimony, see T. 3541; and with the fact that all the notes are on identical sheets of paper written upon with what clearly appear to be the same two differently-colored pens. (2) Smith made Ex. 81 in the course of examining documents that clearly indicated that the effluents of wells A1, A2, and A4 included large amounts of various gasses, including large amounts of $H_2S$ in particular. See T. 3544–47. Thus, even assuming, as Smith claimed at trial, that he was not given access by the government to all the data he would have liked to see, the fact remains that he had access to sufficient data to apprise him of the fact that the wells could not be put on production as simply, quickly, or cheaply as (he knew) Amos had led Carver to believe. (3) When he made Ex. 81, Smith clearly realized and noted that there would be "PROBLEMS WITH *GAS*!!" Ex. 81 at p. 4163. As he said in explanation of this notation, "Well, there is always going

to be gas associated with oil production. In this case because of the reported gas-oil ratios, which were pretty high, we knew that there would be a relatively larger volume of gas than ordinarily one would expect." T. 3673. It was the problem of what to do with all that gas that Smith was thinking about. (4) Smith testified that even if he had known about the "problems with gas" in November 1975 (which he did), he would not have known about their significance in relation to the production of the wells. The Court finds, on the contrary, that by reason of his education, his experience, and his specific knowledge of the composition of the effluents of the wells, Smith was well aware when he made Ex. 81 that gas, including $H_2S$, would make it impossible to put the wells on production for anything like the time and money or in the manner suggested by Amos.

Smith learned several other significant facts at this time. On the positive side, he finally learned that well A4 had tested oil at a rate of 2160 BOPD from the Arab III zone, and that A2 had once tested 3000 BOPD from the Arab III, whereas his previous data had indicated a highest test rate of 2051 BOPD. On the negative side he learned that whereas Amos had told him that both A1 and A2 were "free-standing and live," [27] in fact both had been plugged with cement and capped at the sea bed, making them more difficult and expensive to reenter and ready for production than Smith had previously believed. T. 1417–23.

There is no doubt about what Smith should have done with all the new information at his disposal: he should immediately have disclosed it to Carver, and urgently suggested that he undertake a thorough reevaluation of the project before further committing himself. This he did not do. Instead he disclosed only the *favorable* information, giving Carver the impression that examination of the government's data

---

26. Carver: "I thought I would be getting all the information that was pertinent to this thing...." T. 738.

27. The difference between this version of the way A1 and A2 had been left, and Holley's earlier impression that all three wells had been capped at the sea bed, is not explained.

only further confirmed the belief that, as Smith put it, Carver was privy to "one of those rare opportunities in the Middle East." T. 2202 (Griffith). Moreover, if it is true (as Smith claims) that he was not given access in November to all relevant information in the government's possession, he neither disclosed this fact to Carver nor suggested that he hold off until more data could be obtained. Instead Smith proceeded directly to join Holley in finalizing negotiation of the production-sharing agreement with the government.

"Negotiation" of the agreement had proceeded almost exclusively through Amos, who was in close contact with Ali Jaidah throughout the fall of 1975 regarding the Holcar venture. On November 10, Amos sent a telex to Holley "to confirm that Ali Jaidah has discussed your proposal with the ruler and has verbal agreement to same," Ex. 231; this message was in turn passed on to Muscatine, Ex. 9.[28] One week later Amos telexed Holley that "I am confident no other changes and your future meeting will finalize agreement as expected." Ex. 231. On November 19 Amos suggested to Holley that he "avoid any direct communication with either Ali or Kassem where possible until agreement finalized." Ex. 228. It was only on November 25—after Smith had examined the QOC records on file with the government—that Holley, with Smith to advise him, finally sat down with representatives of the government, led by Ali Jaidah, to talk about the proposed agreement. It is not clear how much negotiating actually occurred at this meeting; it may be that Holley won some concessions on the cost recovery provisions of the contract. Holley depo. at 37–38. In any event, soon after the meeting Holley and Smith flew to London to show the contract to Carver and to meet with the independent consulting firm that had looked into the venture on Carver's behalf.

Carver had retained Secondary Recovery Services Ltd. (SRS) at the suggestion of the Harris Trust Bank, which had recommended that he obtain a second opinion on the project before proceeding. Evidently first contacted on November 21, SRS was unable to obtain enough information to carry out "even a preliminary study" before meeting on November 30 with Carver, Holley, and Smith; the best it was able to do was to "formulate a number of questions which we would have preferred to see answered before you were asked to commit yourself to a binding agreement with the Government of Qatar." Ex. 169. These questions, which constituted the only warning Carver received in 1975 that the front-end costs of putting wells A1, A2, and A4 on production might not be as represented by Amos and Smith, included the following:

2. The detailed costs of the proposed re-completing and acidising programme, which were roundly stated at about one million dollars, per well.

3. The engineering feasibility and costs to produce and to separate produced oil from gas and water and to provide storage and loading facilities. We believe on past experience of Arabian Gulf production that it is very easy to underestimate these costs and there may have to be significant investment before the first sales.

4. Considerable thought must be given to the mechanics of the producing, storage and loading of crude oil and to its disposal and marketing. Although your colleagues have some interesting ideas on marketing the crude, much further thought has still to be given to exactly how this will be done.

But, not for the last time, any doubts Carver may have entertained were immediately and effectively quelled, in this case by Smith:

Mr. Smith told me that these were good questions. They were normal questions that would be asked, to be cautious about, and he was going to very carefully con-

---

**28.** Amos's November 10 telex also said, "I am presently gathering all necessary data for your review and use in negotiating final contract." In fact Amos gathered no data useful to Holcar in the negotiation of the production-sharing agreement.

sider these questions, . . . and he was going to handle it. [T. 879].

\* \* \* \* \* \*

He said it was going to cost me two to two-and-a-half million dollars to get on-stream, to get oil flowing, and I assumed that within that parameter that the higher cost would be within the two to two-and-a-half million dollars. It would maybe vary from two million to two-and-a-half million. [T. 879–80].

\* \* \* \* \* \*

Mr. Smith assured me over and over and over again, Mr. Amos Carter assured me over and over and over again, that two to two-and-a-half million dollars was what it was going to cost, and Mr. Smith and TerraMar, a company of wide reputation, of excellent reputation in the oil business, how could I—I assumed that they knew what they were talking about. They were backed by one of the big corporations in the world in the oil drilling business, and they were on the New York Stock Exchange. I wasn't flattering myself thinking that I should question the judgment of Mr. Carter or Mr. Smith. The reputation was well established. [T. 881–82].

The Court recognizes that the assurances as to costs that Carver mentions in this testimony were probably mostly made before the meeting with SRS; but Smith did not gainsay them at or after the meeting, and there is no doubt that Carver continued, to Smith's knowledge, to rely on them as well as on Smith's assurances that he would "handle" all the potential problems mentioned by SRS.

From London, Carver, Holley, and Smith returned to Doha where they met with Amos and Carl Thorne to discuss the production-sharing agreement. It is not necessary to review the terms of the agreement in detail here; suffice it to say that it was much as Amos had led Carver to believe it would be. Holcar agreed to reenter five wells and drill three additional wells during the first two years for a total expenditure during that period of at least $6 million.[29] In return it was to receive 40% of the revenues from produced oil toward recovery of capital expenditures and operating costs, the remaining 60% to be split 80/20 between the government and Holcar. It should also be noted that Holcar undertook to provide the government with detailed plans of its reentry and workover programs and later its development and production programs, and with budgets and statements of account; these matters later became sources of friction. Although the term of the agreement was 30 years from the effective date (the date of signing by the government), the government retained the right "to terminate this Agreement and to take without payment all property of whatever nature" belonging to Holcar should Holcar fail, among other things, to fulfill its work obligations or should it commit "any material breach of this Agreement." For further details see Ex. 606.

The meeting in Doha to discuss the agreement came to very little. Carl Thorne in particular, who had been said by Amos to know about such things, proved to be of little help in advising on the merits of the agreement because, as he told Holley at the time, it was the first production-sharing agreement he had ever seen.[30] The general

29. Rudy Luedtke, hired by Carver in August 1976 as an engineer in charge of production, testified that "even for a larger oil company it would have been quite a task in two years' time" to accomplish the work Holcar undertook. T. 1714. B. Gill Clements, president of Sedco, Inc., testified that the work program was "a very difficult program to meet, because Holcar was not properly prepared . . . to undertake this program on short notice." According to Clements, the demanding nature of the work undertaken by Holcar should have been obvi-

ous to Amos Carter, Robert Smith, and Carl Thorne. Clements' second depo. at 128.

30. Thorne's ignorance is explained partly by the fact that although he was very familiar with drilling contracts between Sedco and oil companies, he had little if any experience with contracts between oil companies and governments; and partly by the fact that production-sharing agreements, as opposed to the older concession agreements, were new to the Middle East at the time. In fact the Holcar-Qatar contract may have been the first production-

consensus of Smith, Thorne, and Amos seemed to Carver to be that this was a good agreement, and Carver and Holley signed and returned it to the government on December 2, 1975. That evening Ali Jaidah gave a dinner party for them and Amos at his home. The agreement was eventually signed by the oil minister of Qatar, on behalf of the government, on January 1, 1976.

It remained only to plan in more detail how Holcar's obligations were to be carried out. Holcar's officers—Carver, Holley, McKillip, and Rhodes—met on January 2 in the Virgin Islands and again on January 9 in Augusta to discuss such matters with Amos and Smith. One important step taken was the hiring of Bernie Carter, Amos's brother, as Holcar's general manager. Bernie possessed a wide range of experience as a management consultant for private and government-operated oil companies, and when the first candidate for general manager suggested by Amos proved unavailable, Holcar hired Bernie at a salary of $9000 per month.[31] Most of the day-to-day burdens of running Holcar fell on Bernie; it was Carver's understanding that he was "to run our little office we had in Qatar, and to coordinate with Amos and with Mr. Robert Smith the work being done, the re-entry program." Bernie was also to keep Carver and Holley informed about on-site activities on a daily basis. His contact person in the United States was to be John Rhodes, who was to pass the messages along to Holley and to McKillip, Carver's liaison in Muscatine. It was agreed that Muscatine would be the record headquarters for Holcar, that billing would be directed there, and that McKillip would pay the bills—except for those few paid directly in Doha—from there. McKillip was to handle financial matters with the assistance of Larry Griffith, Carver's accountant. For further details on financial matters *see* Sec. V–D, *infra.*

The other important step taken during the first week of January was the decision to contract for the almost immediate services of Sedco's Rig 75 for the purpose of reentering the wells and readying them for production. Amos had anticipated all along that if Holcar got the concession a contract for a Sedco drilling rig would follow; as early as October 14, 1975 he had sent Holley a draft of a standard offshore drilling contract, explaining that one of Sedco's rigs would soon be available. Ex. 11. After Carver and Holley signed the production-sharing agreement, Amos created a sense of urgency about committing for use of Rig 75 by informing them that three other companies were interested in it, but that he was holding it for them for the moment. Ex. 226; T. 283. At the January 2 Holcar meeting Amos again urged them to decide, giving them 14 days to do so. Carver and Holley acceded, and Amos mailed a draft of the drilling contract to Muscatine on January 7.[32] It provided (among other things) that Holcar would pay an inflated day work rate of $14,500 for the services of the rig and its crew;[33] and that it was without specific duration, allowing Sedco to proceed on a well-by-well basis at Holcar's direction

sharing agreement in the area; and Holcar might well have been better off with an older-fashioned concession agreement. *See* T. 2608–09.

31. Amos suggested this salary, which Carver thought high; but Bernie assured him this was a median consultant's salary and "within the normal range" for him. T. 2901. A consultant hired by Carver in 1977 thought however that the management fees paid by Holcar were "extremely high." T. 651 (Freeze).

32. Carver and his advisors were surprised upon receipt of the contract to learn that Holcar would be contracting, not with Sedco, Inc., with which they thought they had been dealing through Amos, but instead with Sedco International, S.A., an entity of which they had never heard. When asked about this, Amos explained that Holcar was really dealing with Sedco, Inc., and that Sedco International was "just a foreign corporation that held registration of the vessel." T. 1835 (McKillip); *cf.* T. 1911–16 (McKillip); T. 2205 (Griffith); T. 747 (Carver).

33. Unbeknownst to Carver, this rate was $4,000 more than the customer before Holcar had paid, and $3,000 more than the customer after Holcar paid. Sedco's Answer to Interrogatories No. 109.

unless and until Sedco should receive an offer for the long-term use of the rig. For further details *see* Ex. 716. Carver and Holley signed the contract on January 15 in Muscatine and Atlanta, respectively.[34] At Sedco's insistence, Carver also personally guaranteed payment to Sedco of any Holcar indebtedness up to $500,000. Carver signed the guaranty under which Sedco International now sues on January 23, in Chicago. Ex. 355. Although he believed Holcar was fortunate to have obtained the services of Rig 75, Carver had actually been done another disservice. Immediately contracting for the rig forced Holcar to begin operations before proper preparations had been made, and later problems were in part attributable to the haste in which the project was begun.

Carver signed the production-sharing agreement, the drilling contract, and the personal guaranty in reliance upon the representations Amos and Smith had made to him over the course of the past months. He believed he would only have to spend between $2 and $3 million to get oil onstream, and that oil would be flowing and revenue coming in by April 1976. These beliefs were perpetuated by Amos and Smith up through the signing of the drilling contract and the guaranty. Three days before they signed the contract, Carver and Holley received a letter from Smith assuming that "all three wells will have been successfully reentered and placed on production by April 1, 1976," and estimating that the average monthly net income to Holcar from April to December would be $504,336, a figure nearly identical to Amos's original estimate on July 25, 1975. Ex. 82–88. On the day

before the drilling contract was signed, Amos wrote to Carver about insurance for Holcar: "I assume Holcar would prefer to negotiate this coverage for a three month period initially which should cover the first three re-entry wells. . . ." Ex. 15.

### C.

▮ The first substantial expense Carver incurred in connection with the venture was a payment of $1.5 million to the Swiss bank account of Kassem Jaidah, made on January 6, 1976. The facts surrounding this payment, among the murkiest in the case, are important because the character of the payment, upon which much rides, is very much in dispute. Sedco claims that it was an illegal payoff knowingly made to Ali Jaidah for the corrupt use of his official position to secure the concession for Holcar; and that even assuming Carver would otherwise be entitled to recovery herein, the illegal payment should bar not only his recovery of the amount of the payment itself (which he claims) but also of the rest of the expenses he incurred in the attempt to exploit the concession thus corruptly and illegal obtained. Carver, on the other hand, claims that the payment was not illegal; that even if it was this fact was fraudulently concealed from him by Sedco (Amos); and that even if Carver knew or should have known the payment was improper or illegal, this should bar his recovery at most of the amount of the payment itself, but not of the rest of the expenses he incurred. On the basis of the often obscure and conflicting evidence of the facts surrounding the payment, the Court reconstructs events as follows.[35]

**34.** The contract was signed on Sedco's behalf, not by an officer of Sedco, International, but by Tom Rhodes, vice-president and general manager of Sedco, Inc.

**35.** The Court has found Amos's testimony as to his role in the payment and related matters to be untruthful or evasive at almost every point. This includes his testimony regarding his role on December 2, 1975, when the payment was solicited by Ali Jaidah; his role in demanding payment on behalf of Ali on January 5, 1976; the fact that he was a business partner of Kassem Jaidah when the payment was made

and only eight days later received $300,000 from Kassem, *see* n. 40, *infra*; and his attempt to cover up the character of the payment in the spring of 1977, *see* n. 39, *infra*. Amos admitted at trial that he lied under oath (during his deposition) as to his business relationship with Kassem and the $300,000 Kassem paid him. T. 144–45. *And see* Holley's depo. at 179–80, where Holley indicates that "maybe three or four [times] in the past year" (pre-May 21, 1979) Amos called Holley to discuss the instant litigation, his main thought evidently being to influence Holley's rememberance of Amos's role in Carver's payment to Jaidah.

It has already been observed that QOC paid the government of Qatar a $2 million "bonus" upon the signing of its concession agreement, and that Koch Industries expected to have to pay a $1 million "farm-in bonus" should it decide and the government permit it to take over from QOC. Such front-end bonus payments are regularly provided for in concession and production-sharing agreements between oil companies and OPEC countries. They are in the nature of consideration paid to the government for the right (usually exclusive) to explore for and produce oil within the concession area. There is no question that they are perfectly legal and proper. They are to be sharply distinguished from payments made privately to a government official to induce him to use his influence on behalf of an oil company competing for a concession, or to pay him off for having done so. This distinction, between a legitimate payment for a (presumedly) valuable right and a bribe, is fundamental, obvious, and well entrenched both in our law and the law of Qatar. *See post* at 298–319.

The probability that a bonus payment would have to be made to acquire the QOC concession was discussed from the beginning among those associated with the Holcar venture. The evidence indicates that those involved—Carver, Holley, Amos, Smith—thought, to begin with at least, that the bonus would simply be the normal payment to the government usually provided for by contract as consideration for the grant of the concession. Carver was assured by Amos that such payments were

usual and proper. Later in the game, however, the character of the contemplated payment turned definitely shady. The process by which this occurred is obscure; but there is no doubt that Ali Jaidah was at the bottom of it: he saw an opportunity to turn the situation to his own advantage and took it. The upshot was that no provision was made in the production-sharing agreement itself—negotiated principally by Ali on behalf of Qatar—for the payment by Holcar of an official front-end bonus.[36] But as Carver, Amos, and Holley were leaving Ali's house after the dinner party of December 2, 1975 (the day the production-sharing agreement was signed by Holley and Carver), Ali held Carver back and invited him into his private office for a short talk; Holley and Amos went ahead to the car waiting to take them back to their hotel. The substance of Ali's message was this: Ali thought he could induce the Minister of Finance and Petroleum to sign the production-sharing agreement; but to insure this Carver would be required to pay $1.5 million into the Swiss bank account of Ali's brother Kassem. T. 743f. Ali gave Carver a slip of paper bearing the name of Kassem M. Jaidah, account No. 352 723, Swiss Credit Bank, Place Bel Air, Geneva. Ex. 300. Carver protested—the amount demanded was $500,000 higher than he had most recently been expecting to pay in "front money"[37]—and went to the car to discuss the matter with Amos and Holley. Amos's advice was simple: If that's what you have to pay to get the concession, that's what you have to pay. Amos did suggest

---

The Court's duty as fact-finder has of course been to pass on the credibility of the witnesses, taking account of their appearance and conduct on the witness stand, their interest or lack of interest in the result of the trial, their motives, candor, and fairness, and the reasonableness or probability of their statements. This Court abhors attempting to justify its opinion predicated upon *obiter dicta*. As a result thereof it has not in direct findings attempted to embody all of its conclusions as to the character and credibility of the many persons who testified at the trial of this cause. The Court's judgments on these matters are amply reflected in the findings made and conclusions reached herein.

**36.** According to Robert Smith, the matter was simply not raised by the government during negotiations; nor did Holley or Smith raise it on Holcar's side. Smith depo. at 194.

**37.** Carver's expectations as to the amount he would have to pay varied: evidently the first figure mentioned was $500,000; it later went up to $2 million; and by the time of Robert Smith's November 14, 1975 report (which mentioned the bonus) it seems to have been generally assumed that it would be $1 million. The original sources of these varying figures are not clearly identified in the record; it seems reasonable to assume that the first figure was given by Amos as a guess, and that the later figures came from Ali Jaidah through Amos.

that the payment might perhaps be put off until oil was flowing and for sale. Holley also advised payment. Carver returned to the house and told Ali he was willing to pay the $1.5 million as directed; apparently it was agreed that payment would be delayed at least until the production-sharing agreement was signed by the government. This was done on January 1, 1976. The full $1.5 million, which Carver admitted at trial was "payment for services" purportedly rendered by Ali in connection with the award of the concession, T. 948-49, was paid into Kassem's account on January 6. Carver had been hoping the payment might be put off until oil was flowing, as Amos had suggested, but Ali was apparently not willing to wait that long: on January 5 Amos called to relay the message that the payment had to be made immediately, or the project would "not go forth." Carver deposited the money in Kassem's Swiss account by straightforward wire transfer from his account at the Harris Trust Bank in Chicago, and the project went forth.

There is little doubt that the $1.5 million payment was influence money paid to Ali Jaidah by Carver, with Kassem and Amos acting as intermediaries, and was as such illegal under the laws of Qatar and against the public policy of the United States. The consequences for present purposes of this improper payment turn in part on the following considerations.

Carver has implied that he thought the payment demanded by Ali was merely the usual official and perfectly proper front-end bonus that had always been contemplated. The Court believes that Carver's innocence in the matter was maintained intact—up until the evening of December 2, 1975. At that point the squeeze was applied: Carver was faced, at the last minute, with losing what he believed to be an extremely valuable right that was almost in hand, unless he acquiesced in Jaidah's demand. There appears to have been no discussion of the propriety of demanded payment on December 2 or thereafter; certainly no such question was raised by Amos. Carver may well have continued to believe, in view of past discussions and Amos's and Holley's present advice favoring acquiescence in the demand, that there would be nothing wrong with making the payment. That he did so believe is borne out by the facts that he refused to go along with Amos's 1977 attempt to cover up the character of the payment, *see* n. 39, *infra*; that in 1978 he openly mentioned to the United States' ambassador to Qatar that he had paid "front money" for the concession and was willing to pay more to keep it; and that in the subsequent investigation by the Justice Department Carver made no attempt to conceal any of the facts or circumstances of the payment.[38] Still, however new Carver may have been to the oil business in particular, he was an experienced international businessman; and the difference between an official payment to the government of Qatar in return for the concession, and a private payment to a government official in return for his help in securing the concession, should have been apparent to him, particularly in view of the extremely suspicious circumstances under which the payment was demanded and was to be made. The Court finds that Carver should have known the payment to Ali was improper.

On the other hand, it must be remembered that Carver made the payment because he believed it was necessary to do so to secure a right—the concession—whose value, the Court has already found, was deliberately misrepresented to him by Sedco, through Amos Carter and Robert Smith. Moreover, Amos's complicity in the payment itself was close. He unquestionably knew that what Ali was proposing was improper. Yet he did not advise Carver of this fact; he never suggested that Carver insist on paying only an open and legitimate bonus to the government; on the contrary,

---

38. The Justice Department ultimately filed a Complaint for Permanent Injunction against both Carver and Holley; both consented to the entry of a Final Judgment of Permanent Injunction prohibiting them from violating sections 104(a)(1) and (3) of the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd-2(a)(1) and (3) (1976 Supp. I). *United States v. Roy J. Carver and R. Eugene Holley*, Civ. Action No. 79-1768 (S.D.Fla. filed April 9, 1979).

he encouraged Carver to agree to pay the $1.5 million bribe and later demanded payment on behalf of Ali; and in 1977 he took steps—with which Carver refused to go along—to cover up the shady character of the payment.[39] Amos's motives in all this appear to have been complex. Certainly he had an interest on behalf of Sedco in the furtherance of the Holcar venture, namely, the employment of Rig 75 and of the personnel of TerraMar; and the improper payment, if necessary at all, was necessary to secure Sedco's interests as well as Holcar's. Beyond that, Amos had a variety of personal interests in the payment (and later in the concealment of its character) deriving in large part from his friendship with the Jaidahs and his business partnership with Kassem. It is not necessary to go into these matters in further detail.[40] Suffice it to say that through Amos, Sedco's complicity in the improper payment was at least as great as Carver's.

Finally, it may after all be doubted whether the improper payment was in any way necessary to the furtherance of the Holcar venture. The whole problem could probably have been dealt with to no ill effect by square confrontation, Carver insisting on paying at most a legitimate front-end bonus to the government. In any case, the production-sharing agreement was signed by the Qatar Minister of Finance and Petroleum before the payment was made; and there is no evidence that the Minister knew anything about it, benefited from it in any way, or considered the proposed agreement otherwise than on its merits as written. These considerations do not mitigate the fact that the improper payment was made; but they do bear in some measure on the severability of this fact and of its consequences from Carver's main causes of action against Sedco.

## IV.

Holcar's operations began in late January 1976. Bernie Carter arrived in Doha on around January 18, as did Robert Smith. Bernie began assembling men and materials and making other necessary arrangements; on January 24 he telexed Carver's headquarters in Muscatine to report that with the addition of one extra person whom he requested (and was granted) permission to hire, "our staff will be lean but fit and completely adequate to operate efficiently through coming months." Ex. 596. Smith again examined the QOC records at the Department of Petroleum Affairs. On February 5, Amos telexed Muscatine "to advise I am in Doha reviewing work program with Bernie and Smith. They have

---

**39.** In the early spring of 1977, at Carver's residence in Miami, Amos gave Carver's secretary a sheet of paper and asked her to type out the letter written thereon, which she did. Ex. 170. The letter purports to be an agreement between Carver and Kassem Jaidah, reached in early 1976 before Holcar's operations in Qatar commenced, establishing a $1.5 million line of credit between Holcar and Jaidah Motors & Trading Company. Jaidah Motors is represented as agreeing to order certain drilling materials required by Holcar, and Holcar, by Carver, is represented as agreeing to "deposit $1.5 million as a retention to guarantee payment for all services and materials to be supplied by the Jaidah Motor Company." The letter was presented to Carver by Amos, who indicated its purpose was "to have a better way of presenting [the $1.5 million] payment in case somebody investigated at some subsequent time." Carver's first depo. at 205. Carver's signature was solicited, but he refused to sign, on the ground that the letter misrepresented the character of the payment. Amos testified that this spurious letter was meant to protect Carver.

Amos's 2d depo. at 172. The Court believes, on the contrary, that Amos was acting mainly on behalf of the Jaidah brothers, who had become worried about the possible fallout from failure of the Holcar venture.

**40.** It may at least be mentioned that on January 14, 1976, only eight days after Carver made the payment into Kassem's account, Kassem paid $300,000 into Amos's own Swiss bank account. Carver tried to establish that this was a kickback to Amos of part of the $1.5 million paid by Carver. Amos maintained that it was merely the bulk of the money Kassem was to pay in connection with the food-processing venture that Amos and Kassem had agreed to set up, and was completely unrelated to Carver's $1.5 million payment. The Court finds the evidence insufficient to warrant the conclusion that the $300,000 was meant as a kickback to Amos, although the money may well have been derived in whole or in part from the payment made by Carver.

everything ready to start work on well A–2 when possible to move rig." Ex. 22. Rig 75 arrived at A2 on February 8. Things went downhill from there.

## A.

Rig 75 was to be used to reenter and "rework" wells A1, A2, and A4. The two wells capped at the ocean floor were to be "tied back" to the surface; cement plugs put in by QOC were to be drilled out and the wells cleaned out; casings were to be tested, and production tests done; and the wells were generally to be left in such condition that oil would flow from them into any production equipment it might prove necessary to install at the surface. Much of the work—e. g., cementing, acidizing, testing—was to be done by third party contractors, but always under the supervision of Bernie Carter and of Holcar's rig supervisors, the persons in charge of operations at the well site. Holcar's technical staff, which planned the work programs and supervised their execution, was supplied for the most part by TerraMar. See Ex. 440.

One expert who reviewed Holcar's reentry and workover operations called them "a comedy of errors," Carver-Freeze Ex. 1; and this view was also taken by other experts who testified at trial. Part of the problem was that Holcar rushed into the workover program without adequate planning or preparation. Despite Bernie's January 24 telex to Muscatine, Holcar's staff in Qatar was probably inadequate. Similarly, operations were begun without proper and complete equipment. Certain required tools and tubing were not on hand and proved difficult to obtain quickly; sufficient spare parts had not been assembled; and some equipment used was not properly treated to withstand destruction by the high quantities of $H_2S$ in the wells, which was clearly known to Holcar's technical staff before work began. The services of third party contractors were sometimes

badly scheduled and themselves of poor quality. These sorts of problems, which plagued and delayed operations throughout, were at the heart of Bernie's despairing telex to Robert Smith of April 8, 1976, when Rig 75 had already been over A2 for two months:

DUE TO REPEATED FAILURES OF OTIS GS (GOLF SIERRA) WIRELINE PULLING TOOLS IN H–2–S THE OPERATIONS HAS NOW BEEN SHUT DOWN FOR OVER 36 HOURS AND I DON'T KNOW WHEN IT CAN RESUME THE OPERATIONS.

\* \* \* \* \* \*

OTIS/BAHRAIN ADVISES THEY WILL ACCEPT NO RESPONSIBILITY OR LIABILITY FOR ANYTHING WHICH MAY OCCUR DUE TO OPERATING WITH NON H–2–S SURFACE EQUIPMENT. THEY ADVISE TO MOVE OFF WELL UNLESS WE CAN FIND H–2–S SURFACE EQUIPMENT. FLOPETROL/BAHRAIN IS TRYING TO ASSIST. ARE SENDING BY AIR THEIR H–2–S LUBRICATOR. JUST HOPE IT FITS.

FOR YOUR INFO THE ARAB 4 H–2–S CONTENT IS 31.35 PERCENT.

FOR YOUR FURTHER INFO, OTIS/BAHRAIN/DALLAS TELEXED THAT NICHOLS AND MCELROY [41] ORDERED THIS STUFF AS STANDARD REPEAT STANDARD WHICH IS NOT FOR OVER 5 (FIVE) PERCENT H–2–S. I GIVE UP.

GET HOLD OF OTIS AND SEE WHAT YOU CAN DO. RING AMOS AND EXPLAIN MESS TO HIM SO HE WILL KNOW DETAILS AND CAN DEAL WITH JOHN.[42] TELL AMOS I AM DOING EVERYTHING POSSIBLE UNDER THE WORST CONDITIONS I'VE EVER SEEN. NO USE CALLING ME AS I AM INCOHERENT.

BARR, MITCHELL, LAMOREAUX, AND KERR ON RIG TRYING TO GET

---

41. Nichols and McElroy were both TerraMar people. Bernie may have been wrong in attributing the mistake here referred to to them rather than Otis. See, e. g., T. 3460–61.

42. John Rhodes, Holley's accountant and Holcar vice president.

TEST AND HOLD THE PIECES TOGETHER. [Ex. 245].

Beyond problems with tools, equipment, third party contractors, and sometimes the weather, however, the evidence is strong, and the Court finds, that the work program itself was badly planned and executed by Holcar's own technical staff. The crux of the matter is that far more complicated, repetitive, and time-consuming workover procedures were used than were necessary to the completion of the wells, but at the same time the production testing procedures used were inadequate to establish reliable production rate figures. For details *see* T. 1599–1625 (Luck); T. 1983–87 (Crow); T. 547–52 (Charles Smith); T. 2523–27 (Brennan); Carver-Freeze Ex. 1.[43] The net effect of all the problems was that six months were consumed where three at most should have been sufficient; in the end, although between $7 and $8 million had been spent on reentries and workovers alone (which cost between $40,000 and $45,000 per day), none of the wells was left ready to begin production without further workover; excessive acidization and related procedures were carried out to the probable detriment of the ultimate producibility of the wells; the production tests done were inadequate for predictive purposes both because they were too short and because it was often not clear what zones were being produced or whether there was impermissible communication between zones; the tests done on A1, insofar as they were useful at all, simply confirmed what had long been known, that because of the limited reserves and high water content of the well it would probably not be worth the money required to put it on production; and A2, the best producer of the three, was probably "junked," i. e., put and left in such bad condition during the three months spent on it that it would be cheaper to drill another well than try to complete A2's workover and produce it. In short, when Rig 75 left A1 on August 6, 1976 for rental to another customer, Holcar had little to show for the considerable amounts of money that had been spent. *Cf.* Carver-Freeze Ex. 1.

One of Carver's defenses to Sedco International's claim against him for monies due and owing under the contract for Rig 75's services is that "Plaintiff charged for work not properly done or completed." The Court has no doubt that much of the work on the wells was not properly done or completed; but it is less clear that fault for this is attributable specifically to Sedco International, the lessor of Rig 75, as opposed to TerraMar, certain third party contractors, and perhaps Bernie Carter; and the Court does not construe the counterclaim defendants' agreement to stand together in respect of any judgment rendered on the counterclaim, to extend to Carver's defense of improper and incomplete workmanship against Sedco International's claim against him. Even considering Amos Carter's intermittent involvement in the workover operations, the Court finds little evidence that Sedco International itself was responsible for the problems Holcar encountered during the reentry and reworking of the wells.

In keeping with the pattern of misrepresentation that pervades this case, the true state of affairs at the well sites was never fully disclosed and was sometimes affirmatively misrepresented to Carver during the workover period. For example, on April 8, the date of Bernie Carter's despairing telex, Amos called John Rhodes to "deal with" him as Bernie had suggested. Amos's false message, which was in substance relayed to Muscatine, was that "Bernie has a set of the necessary wireline parts on the rig now and these are being installed;" that "with the parts now on the rig, the tests will take

43. It should also be noted that Holcar's field managers permitted Carver to proceed through the entire workover program without ever preparing for him an "Authorized Field Expenditure" (AFE). This is a detailed explanation of costs to be incurred, which is supplemented as costs change; its purpose is to provide full, fair, and complete cost estimates; and it is a practice in the petroleum industry for consultants who are hired to serve clients without expertise or knowledge of the industry to prepare AFEs for their clients. Holcar's managers violated professional standards by providing no AFEs for Carver. *See* T. 1595–97 (Luck); T. 1982–88 (Crow).

about three days to complete" (Rig 75 remained on A2 for 26 more days); and that "things are looking great." Exs. 246 and 247. On May 27, during a conference call in which both Carver and Robert Smith took part, Carver expressed the belief that "We have something like 9,000 barrels a day that is ready right now to be sold." Smith, who knew that none of the wells was then in condition to produce oil, did not disabuse him. Ex. 427. On July 12, Smith wrote to Holley, in a letter a copy or the substance of which was probably passed on to Carver, to say that "The successful re-entry *and completion* of Wells A–2, A–4 and A–1 has proved producing rates which are listed [totalling 12,022 BOPD]." Ex. 84–3; emphasis added. Carver did not learn until the summer of 1977 that all the wells would require further workover before production from them could begin, or that A2 had probably been junked. He was undoubtedly aware during the workover period that many problems had been encountered, but he was consistently assured that work was on the whole proceeding satisfactorily and that oil could be flowing any day, i. e., once production facilities were in place.

### B.

Holcar's greatest crisis during the first half of 1976 did not derive from operational problems at the well sites; it arose from the "discovery" that production facilities costing tens of millions of dollars and from nine months to a year to install would be required before any oil could be sold. This problem was dealt with as follows.

Bernie Carter knew almost as soon as he arrived in Doha that production of the oil would not be as simple and straightforward as Carver had been led to believe. He was quickly told by Robert Smith about the large quantities of $H_2S$ and other gasses in the wells; and by January he was discussing with Amos the need for separation and other production equipment, protective well jackets, and expert consultants to help with production facilities design. Ex. 233. The firm brought in was Earl and Wright Consulting Engineers, another wholly-owned subsidiary of Sedco, Inc. Bernie, Amos, and Smith quickly met in Doha with Jack Melder, an Earl and Wright representative; on February 12 Melder telexed his headquarters in Houston to say that Bernie had authorized Earl and Wright to spend $2000 to conduct a preliminary investigation of Holcar's production problems. Ex. 432. On February 19 eight Earl and Wright personnel met in Houston to discuss the matter; the initial focus was on Holcar's desire, as expressed by Amos and Bernie, to "get well A2 onstream as soon as possible with a temporary early production system," with later installation of a " 'permanent' [unitized] floating production and storage facility to produce three wells." Ex. 143–1. By February 25, Earl and Wright had put together a preliminary report, Ex. 160, which was presented to Carver and Holley that day at a meeting in Atlanta, Georgia. The report emphasized the seriousness of the $H_2S$ problem and discussed the pros and cons of three possible production systems, the second two of which involved unitized floating production and storage facilities:

Case 1 consists of developing the three wells by locating a 4-leg structure adjacent to each existing well. Minimum separation equipment will be placed on single-deck structures A1 and A4. The majority of the produced gas at these locations will be separated and flared. The product will then be piped by subsea pipeline to the structure at A2, where the production of A1, A4 and A2 will be combined, processed to saleable quality, all separated gas flared, and the sales crude pumped through a subsea pipeline to the storage vessel. The A2 structure is a 2-deck platform with flare boom.

Case 2 is similar to case 1 with the exception that minimum separation is achieved at all three well locations. The production from A1, A2 and A4 is combined at the storage vessel where the final processing is accomplished prior to product storage. Flaring of the final separation gas is required at the storage vessel, which presents a significant personnel hazard.

Case 3 was discarded as a viable alternative after considerable deliberation. All aspects were considered, and it proved to be a greater risk than warranted. Three similar tripod structures would be installed—one at each well location. These would serve merely as well guards, and a work platform for wireline operations. All production would be piped by subsea pipeline to the processing facilities located on the storage vessel. All processing would be performed on the vessel, and a fourth tripod structure would be required as a flare for produced gas. This presents an extreme hazard to operating personnel both working and living on the storage vessel.

Earl and Wright unequivocally recommended that the Case 1 system be adopted. This recommendation was based on two main considerations: the Case 1 system presented the fewest hazards to personnel and was environmentally the soundest; and "[t]he costs of each development plan compared favorably with one another, so the selection of the recommended plan was based on overall field development plan desirability." It was estimated that installation of the system would cost between $13 and $14 million and take nine months from the time work was begun.[44] Earl and Wright also investigated the costs of (initially) putting A2 only on production; these were estimated at $9 million and six to seven months. These figures did not include the separate costs of reentering and

reworking the wells. The evidence in the record overwhelmingly supports the conclusion, and the Court finds, that no significant savings of time or money could have been achieved by proceeding otherwise than as recommended by Earl and Wright on February 25.

The February 25 meeting should have been a critical event in Holcar's history. At the time of the meeting at most $2.5 million had been committed to the venture, including the $1.5 million payment to Ali Jaidah and reentry costs incurred to date. At the meeting Carver was in general made aware of the previously undisclosed $H_2S$ problem,[45] and that in Earl and Wright's opinion, at any rate, he would have to invest $13 to $14 million and nine months in completely unforeseen costs to bring the venture to fruition, on top of whatever it might cost to complete the reentry and workover of the wells. This was the first time Carver was given anything like a true estimate of the magnitude of the venture he had undertaken. Yet after the meeting Carver did not call a halt, or even a pause, for reconsideration of the venture. Instead the reentry and workover program was allowed to continue, and Earl and Wright was commissioned (among other things) to do a further study of its Case 1 system. The question arises whether by electing to proceed as he did Carver did not in effect waive the misrepresentations on the basis of which he had been induced to join the venture in the first place. Deciding to pour ·$15 to ·$20 million of good money (including further

---

**44.** *See* T. 3331–32 (Elson): "[W]e had estimated, I believe, in our preliminary report that our involvement in the engineering would take approximately five months; that in any project of this nature, there are ongoing activities simultaneously; . . . within the first 30 days or so, we would have generated the specifications for the major equipment and the ancillary equipment, concentrating on anything that would be long delivery items; and within the first 30 days, 45 days, we would have been ready to purchase these items, at least solicit bids for them. This would be necessary because the vendors of this equipment have to supply us with certified drawings of the equipment that we can then use to incorporate in our design; so in fact your engineering phase is not complete until after you have completed all your

purchasing; but the main thrust of the engineering would have been completed within the five months. The procurement activities could have started the second month, and equipment been bought and been in manufacture after that period."

**45.** The Court recognizes that Bernie Carter mentioned $H_2S$ to Rhodes and McKillip on or about February 3, *see* Exs. 613 and 614. The Court rejects Sedco's contention that these brief mentions, in the context of what was made to seem a minor problem about drill pipe, constituted anything like disclosure to any of Holcar's officers of the real magnitude of the $H_2S$ problem.

workover costs) after $2.5 million of bad could hardly be characterized as a reasonable attempt to mitigate damages already incurred when the fraud was discovered.

The fact is that Carver was faced with no such clear-cut choice at the February 25 meeting. The meeting itself was bifurcated: Amos Carter first met for about an hour with Carver, Holley, McKillip, and Rhodes; during this time Bernie, Robert Smith, and Walt Elson, the Earl and Wright engineer who was to present the Earl and Wright report to Carver and Holley, were kept waiting in another room. Amos had had advance notice of the contents of the report: it had been discussed at a meeting in Houston the previous day attended by Bernie, Smith, Elson, McKillip, and Rhodes; and Amos had flown to Atlanta from Texas with this group. By the time Elson was called in to make his presentation, Amos had already discussed the Earl and Wright report with Carver and Holley. Prior and subsequent events support only one conclusion about what he said: he discredited the report, minimized the $H_2S$ problem it made so much of, and convinced Carver that sale of oil from the A structure could begin much sooner and for a much smaller investment than Earl and Wright projected. The result was that Carver did not have ears to hear what Elson said to him, and he came away from the meeting believing essentially what he had believed when he went in. There is sufficient proof of this in the fact that as late as May 27 Carver still believed the effluent of the wells could be pumped straight into barges and transported to market. Ex. 427. With the exception of Elson, see T. 3124, no one who attended the meeting—not Amos, or Bernie, or Robert Smith in particular—advised Carver to suspend the reentry program and undertake a complete reevaluation of the venture in the light of the crucial "new information" that had become available; on the contrary. The February 25 meeting, which should have been pivotal, was not. The misrepresentations underlying Carver's participation in the venture were successfully concealed, and their force and effects continued unabated.

Following this meeting, concentrated efforts were undertaken to find some quick, cheap production solution. The services of Earl and Wright were retained; Elson was dispatched to the Middle East to look into the possibilities. He understood his primary mission to be the investigation of the quickest possible means of implementing the Case 1 plan recommended by Earl and Wright. To this end he searched for suitable used equipment and for companies in the Middle East capable of fabricating and installing equipment, including fixed platforms, on short order; and he checked into the availability of surplus tankers in the area. The possibility of using Rig 75 to erect the platforms, rather than a heavier and more expensive derrick barge, was briefly considered but rejected. Other plans than Earl and Wright's were also looked into. One was piping the effluent of the wells to El Bunduq or Idd El Shargi for processing and sale—the same idea rejected by QOC several years before. Holcar rejected it partly for technical reasons (deriving from the water cut in the well effluents), partly because no savings would have been effected, and partly (in the case of El Bunduq) because of the political difficulties attendant on piping the raw effluent into another country (Abu Dhabi). As late as May 10 Amos was still promoting the use of barge-mounted production facilities, see Ex. 715, an idea to which Earl and Wright remained adamantly opposed because the savings in time and money were insignificant and the risks unacceptable. Finally, Bernie suggested the use of used "jack-up rigs" rather than fixed platforms for the support of the production equipment. This idea survived into early 1977.

On Elson's return from the Middle East, Earl and Wright prepared a second, more detailed "Field Development Facilities Study for Holcar Oil Company," which included a "Tanker Survey Report" and a "Mid East Survey Report." Ex. 159. The conclusions therein drawn confirmed the report of February 25: (1) "[A]n 'early-on' system is not a viable solution for the development of Well A2. All the necessary pro-

duction equipment is not readily available. The specialized pieces of equipment which would have to be fabricated have deliveries which would cause the installation schedule for the 'early-on' system to closely duplicate that for a permanent installation." (2) Installation of a minimally acceptable system for the production *only* of A1 and A2 would take about $13.4 million and *11* months. (3) Installation of an adequate system for the production of all three wells would take $15 million and at least a year. This second Earl and Wright study recommended the adoption of one or another system depending on the final results of the flow tests being done on the wells, and included schematic drawings of the alternative production systems and the platforms on which they would be located. Earl and Wright considered the study to be "strictly a report. It was not a design." Kirkpatrick depo. at 189. Further detailed design work remained to be done, once a definite plan was adopted, before equipment could be purchased and contracts let for the installation of a production system.

The second Earl and Wright report was sent to Bernie Carter on April 22; it finally reached Carver in late May, coming, as he said, "out of the blue sky." For the first time, in conference calls made on May 26 and 27 (Exs. 431 and 427), Carver dealt directly with Earl and Wright (with Robert Smith also taking part on May 27). Although he "started out on a very high plan of ass chewing," Ex. 434, finding "the preliminary study you made completely unacceptable" and demanding "an immediate solution to this problem" so that "we can get the oil [to market] that we have now," Carver was apparently finally impressed after considerable discussion that "very optimistic[ally] it would take you nine months [and] it will probably take you twelve; and very optimistically it is going to cost you fifteen million dollars. It is just that kind of a problem. It is not a three month, million dollar problem." The May 27 call

ended with Carver's promising to get back to Earl and Wright after consulting Holley. In an immediately following conversation between Robert Smith in Dallas and Earl and Wright personnel in Houston, Ex. 427 at 7–11, the participants congratulated themselves on having finally "got his attention;" "I think he finally has gotten the message[.]" They also reflected on what had been going wrong:

> Smith: [W]e have had a lot of input from the outside too which has always gotten us sidetracked.
>
> Kirkpatrick: He sounds to me like someone who has been given some other advice and he has let himself get it because it matched his interest, and he sounds to me like someone a little bit confused, he has gotten conflicting advice now and he doesn't know quite what to do.
>
> Smith: I think that is right. He has been sheltered a bit by the Carters and also by Gene Holley.[46]
>
> * * * * * *
>
> Hays [president of Earl and Wright]: Obviously, he is an industrialist, he is not dumb, and it looks to me like if someone could sit with him, and he doesn't have time to go through that damn volume himself and he doesn't have anyone else competent to make a reasonable recommendation or a reasonable evaluation, or if they are competent, they're going to protect their ass because they have told him other things.
>
> Smith: Yeah, well, that's the whole problem in a nutshell.
>
> * * * * * *
>
> Smith: [E]very time we have bowed our necks to the floor, well Walt [Elson] went through this, in Atlanta in February, it's already too late, he has already been given some other information which says, there is some hope, we can do temporary facility work.
>
> * * * * * *

---

46. *Cf.* Ex. 715, second call between Smith, Elson, and Kirkpatrick on May 26: Smith: "Yeah, but I'll tell you what I think is happening here. Amos and Gene [Holley] are pretty close and they are trying to keep bad news, bad news is anything that will take a lot of time, try to keep it away from Carver as long as possible . . . ."

Smith: ... But this is the first time where there hasn't been someone in on the conversation that would say "Oh yeah Roy, we can do that."

Kirkpatrick: Or ["]there is a chance we can do this.["]

Smith: Because as soon as he gets that part, then we don't talk about the problem anymore, we concentrate on how we are going to cut the corners.

Smith did not reveal his continuing role in deceiving and confusing Carver.

The self-congratulations of May 27 were premature. Before Carver got back to Earl and Wright, he talked with Amos; and Amos once again succeeded in discrediting Earl and Wright. He told Carver that they always over-engineered things; that they were in the habit of designing "Cadillacs" where "Fords" would do; that "Earl and Wright are not to be believed;" and that "I [Amos] can get it done for a lot less. Just trust me, and don't pay any attention to Earl and Wright's report. I will get it done for a very realistic amount. Give me a chance, and I will do it." T. 752; cf. T. 1247–48 (Holley); T. 1851 (McKillip). When Carver called back to Earl and Wright on June 7, it was only to say that Amos had brought in one Nick Popich of International Marine Services

to implement [Earl and Wright's] designs to fabricate, install, and start up equipment to produce the oil from the field— possibly on a lease basis—for Holcar. Mr. Popich has held out the possibility of implementing these plans and finalizing the installation within a period of six months. [Ex. 715].

Earl and Wright's further participation in the venture was cut to a minimum, and Amos, Popich, and Bernie began to assemble odds and ends of production equipment, basing their actions on Earl and Wright's preliminary study. When Earl and Wright learned of this they tried several times to warn Holcar that "this piecemeal approach to your project is wrong and will lead to further loss of time and additional cost." Ex. 436; cf. Ex. 435.

We were at this time quite concerned about that. Obviously they were going about the implementation of the project in a very piecemeal manner, and contracting with International Marine to design, fabricate and supply the equipment; contracting with various and sundry other people to do other things, and there did not seem to us to be anyone in a central position of control of the project. * * * Our concern, of course, was that they were going to come up with a hodge-podge—you could say an imminent disaster, and we really weren't interested in being a party to that, and were trying, as professional people, to advise them that they were heading in a bad direction, and would like to help them turn it around. [T. 3320–21 (Elson)].

Finding themselves unable to influence the direction of the project, Earl and Wright finally withdrew by letter to Carver and Holley of July 23. Ex. 168.

Carver took Earl and Wright's withdrawal to heart. By the end of July he had upwards of $10 million committed to the project, including the influence payment, the constantly mounting workover costs, and the expenses of work done on the production problem; he was convinced the wells were capable of producing some 12,-000 barrels of oil per day if only production facilities were ever installed; and he desperately wanted to start generating some income. Apparently shocked by Earl and Wright's withdrawal into the realization that there would be no quick and painless means to this end, he concluded that the only way to salvage the venture would be to regroup and proceed on a sounder footing. Carver hired Rudy Luedtke, an engineer earlier recommended by Earl and Wright, to oversee and coordinate the purchase and installation of production facilities; Luedtke was to be made a vice president of Holcar, "and run Holcar for them." T. 1687. Earl and Wright were brought back in, as they understood it "to [take] full charge of the planning and engineering of the project so that the final would be a safe and workable plant." Ex. 715 (August 2, 1976). Bernie was to be "retained as a

drilling consultant but would not have any authority or capacity in the production end of the business." *Ibid.* Significantly, Luedtke "was supposed to work with Amos . . . on this project." T. 1687. As time went on, Luedtke found out what this meant: "It seemed to me that I wasn't advising Mr. Carver, that Amos Carter was advising Mr. Carver." T. 1693.

When Luedtke went to work he found the project in disarray.

> [W]e had three companies furnishing individual pieces of equipment, and there was no interfacing or interconnecting. I think I used the terminology once before, somebody bought seven yards of material and no thread, no buttons, no nothing, and that's the situation I found the project in . . . ." [T. 1691].

Earl and Wright reviewed the designs done by other companies and found them unacceptable in many respects. *See* Kirkpatrick depo. at 161. The companies were instructed to stop work until further notice. Luedtke solicited a total cost figure from a single contractor. The estimate made was $16 to $16.5 million. Upon Luedtke's inquiry as to why Carver had been given piecemeal prices rather than being told what the entire project would probably cost, Amos's reply was that if the total cost were presented to Carver, "It may scare the old man off." T. 1692.

In fact, Amos still had Carver's ear, and he continued to oppose implementation of the Earl and Wright design, still arguing that the project could be completed much more cheaply and quickly. The result was that while Luedtke proceeded on the assumption that the Earl and Wright plan was to be followed and in September submitted a "Project Execution Report" to the Department of Petroleum Affairs incorporating that plan, Ex. 158, Amos pursued other avenues of approach and urged Carver to hold the project mainly in abeyance until "I get all this down for him." [47] Amos ultimately went so far as to accuse Luedtke of promoting the Earl and Wright plan for his own profit: "Amos swears that Rudi has a handout on every deal he is involved in to make himself a big fat commission from everyone. . . . Rudi should be kept on for a couple of months and then eased out." Ex. 253 (Carver's memo of November 12, 1976). Only three positive steps toward implementation of the project were taken through the fall and early winter of 1976–77: Luedtke purchased a tanker for use as a storage vessel; [48] fabrication of a "single buoy mooring" system for the tanker was allowed to go forward; and so was fabrication of certain separation equipment. Aside from that, work on the installation of production facilities essentially came to a halt. No further planning was done by Earl and Wright, and no further contracts were let or equipment purchased. The main activity was Amos's: he (partly through Bernie and Luedtke) was negotiating for the purchase of two used jack-up rigs to be used as production platforms—rigs that had previously been condemned by the Qatar government, were inconsistent with the "Project Execution Report" submitted to the government, whose use seemed to Luedtke unlikely to be approved. Amos was also suggesting schemes for fi-

---

47. "STRONGLY ADVISE YOU DO NOT MAKE ANY FURTHER COMMITMENTS UNTIL [I] TALK WITH YOU AFTER MEETING IN DOHA." Ex. 250, telex between Amos and Carver of October 24, 1976. "And, what he needs to do is to just hold tight, and do nothing further and [when] he's got the whole thing on paper and reviewed it and reviewed it with respect to his other interests, and then, [make] his decision on which route he wants to go." Ex. 178, telephone conversation between Amos and McKillip of November 17, 1976.

48. The tanker was purchased by a separate corporation set up by Carver specifically for the purpose, Isamar Ltd. (incorporated in Liberia). The plan was to lease the tanker to Holcar, presumably for some nominal sum. The tanker remained at anchor in Greece throughout its ownership by Isamar, and was ultimately sold at a loss. The amount of the loss, plus other expenses incurred in the purchase, maintenance, and sale of the tanker, are claimed herein as part of Carver's damages. Despite Sedco's arguments to the contrary, the Court finds that these expenditures were reasonably related to Carver's attempt to bring the venture to fruition.

nancing the project that would have kept Carver's further investment to a minimum, and negotiating with the government, through Ali Jaidah, for modification of the production-sharing agreement in Holcar's favor. This is where matters stood when Carver decided in early 1977 to go no further on his own and to try to find another partner capable of financing and managing the remainder of the venture. Carver's decision came after he discovered he would have difficulty borrowing the further sums needed on terms acceptable to him, after it became clear that Holley was incapable of contributing anything toward the costs of the project, and after he was given good reason to believe that the estimates of recoverable reserves and production rates on the basis of which he had been proceeding were very likely very much too high.

### C.

Robert Smith began making reserve and production rate estimates from the time he was first associated with the venture in August 1975. By January 12, 1976 he was saying that some 15,420,000 barrels of oil could be produced *from the three existing wells*, Ex. 82–90. By April 20 this figure had gone up to 17,670,782 barrels, Ex. 63A, where it stayed. As flow test data came in from the well site operations, Smith firmed up his production rate estimates. On April 20 he represented that:

> The successful re-entry and testing of Holcar's Well A–2 has proved producing rates of 3,065 and 2,750 barrels of oil per day from the Arab 3 and Arab 4 zones respectively. It now appears that initial daily production from the three A structure wells may be 11,750 barrels of oil per day as compared to 10,500 barrels per day originally estimated. We, therefore, see no reason to change our original estimate of $504,336 per month net to Holcar Oil Company for the first year of production. [Ex. 64A].

On May 29 he added that "Well A–4 has proved a producing rate of 2622 barrels of oil per day from the Arab III zone. This is somewhat greater than anticipated.... It

now appears that the initial daily production from the three 'A' structure wells may be 11,937...." This series of projections culminated on July 12 in the following letter to Holley:

> We estimate the proved reserves of the Holcar Oil Company production sharing area in Qatar to be 17,670,782 barrels of oil, of which 2,394,854 barrels are net to Holcar Oil Company. The production of this reserve from the three wells which have been re-entered will yield a future net revenue to Holcar Oil Company of $28,379,020.
>
> The successful re-entry and completion of Wells A–2, A–4 and A–1 has proved producing rates which are listed.

| Well | Rate B/D | Zone |
|------|----------|------|
| A–2 | 3065 | Arab III |
| | 2750 | Arab IV |
| A–4 | 2622 | Arab III |
| A–1 | 1357 | Upper Arab III |
| | 290 | Lower Arab III |
| | 1938 | Arab IV |
| TOTAL | 12022 | |

> The daily production of 12,022 barrels of oil per day from these three wells will yield a monthly net income of $512,859 to Holcar Oil Company for the first year of production.
>
> This monthly net income figure does not include cost recovery crude oil income which Holcar Oil Company will receive upon sale of oil and from which Holcar will receive repayment of all costs. [Ex. 84–3].

The same "proved reserve" and "proved producing rate" figures were recited by Smith as late as December 29, 1976. Ex. 223. The "monthly net income" figure was derived by multiplying 12,022 BOPD times an assumed price per barrel of $11.85, subtracting 40% of the resulting "gross sales per day" (for cost recovery), multiplying the result times 20% to get Holcar's share per day, and multiplying times 30 days. *See* Ex. 84–4.

These figures are subject to the following serious criticisms.

1. Based on the testimony of Charles Smith (T. 620), Walter Crow (T. 1981f), and

Alexander Erickson (T. 2167), the Court believes Robert Smith's estimate of 17,670,-782 barrels of "proved reserves" to be too high by at least two times. Nevertheless, given the inherently speculative nature of reserve estimates and the vagaries of ·the word 'proved,' the Court shall make no formal finding to that effect.

2. The Court does find that even if the "proved reserves" are as Smith estimated them to be, these reserves could not all be produced from wells A1, A2, and A4, as Smith clearly implied they could in his letter of July 12[49] and other letters. First, Smith's implication is inconsistent with the fact that A2 had probably been junked and would never produce any oil; in fact, as has already been noted, Smith's July 12 letter falsely represented that A2 had then been successfully reentered and completed. Second, the evidence is overwhelmingly to the effect that "to obtain any appreciable amount of [the] oil reserve, which is shown as either proven, probable or potentially recoverable, . . . over whatever period, will require the drilling of a number of wells throughout the field." T. 2524.

3. It follows that even assuming the production rates given by Smith, the resulting "monthly net income" given for the first year of production is misleading at best. It does not reflect the fact that much of Holcar's "net income" over a significant period would have had to be immediately reinvested in operating costs and the new wells Holcar was in any event required to drill. It is true that these investments too would ultimately have been recovered out of cost recovery money (assuming all went well); but the time lag would have been significant.

4. Most seriously, the production rate figures given by Smith in the July 12 letter are bogus, for the following reasons:

a. They are based on the extremely unreliable short-term testing done by Holcar.

b. They· are based on the *highest* test rates ever achieved, not the *latest.* In oth-er words, even the test rates are overstated. T. 1981.

c. They assume initial sustained production at the full test rates, an unlikely outcome. T. 546; T. 1980.

d. They assume production for the whole first year at the assumed initial rate, an outcome even Robert Smith admitted was "highly unlikely." T. 3640. In fact, given the small pay and porous zone thicknesses disclosed by the wells and the bottom water in the Arab IV zone, decline during the first year in production of oil, coupled with increased production of water, was certain. T. 543.

e. In the case of A1 and A2, Smith's figures assume simultaneous production from different zones. Absent "dual completion" of the wells, i.e., installation· of separate strings of tubing for the production of the separate zones, such production could only be achieved by "commingling," i.e., simultaneous production from different zones through a single string of tubing. To the extent A1 and A2 were completed at all, they were completed with single strings of tubing; hence to achieve Smith's projected production rates commingling would have been required. For various technical reasons commingling is viewed as an unsound oil field practice, and a special dispensation would have been required from the Qatar government to permit it. Although Amos secured from Ali Jaidah "his assurance that Holcar can co-mingle," this was "unofficial until proper request made with technical justification . . . at lower level of ministry." Ex. 23. Official permission to commingle had not been obtained when Smith wrote his letter of July 12, and was never obtained. T. 3647.

f. Finally, even given permission to commingle, Smith admitted at trial that he "doubt[ed] very. seriously" that the total of the three figures given for A1 could have been produced through a single string of tubing. T. 3645. The same doubtless follows for A2.

---

**49.** *Cf.* T. 3634 (Smith): "Q. Are you assuming here that this reserve will be produced by these three wells? A. Yes, in this particular letter I would say that that is the assumption."

In short, even assuming production from A2, Holcar would have been very lucky to achieve half the production—hence the "monthly net income"—projected by Robert Smith for the first year.

The reserve and production rate estimates that have just been considered were made by Smith in letters to Holley, which, as Smith knew, were being used by Holley to shore up his position with his banks. There is some question as to whether Carver received and relied on either the letters or the estimates at the time they were made. There is no conclusive evidence that he received the letters, although John Rhodes testified that "I would assume that most, if not all, were passed on to Mr. Carver." T. 2795. In any case there can be no doubt that Carver was aware of Smith's figures. Holley must have kept him posted, even if only orally. Additionally, Smith kept Earl and Wright informed (they needed production rate information to size the production equipment); and in the May 26 telephone conversation between Carver (and Holley) and Kirkpatrick of Earl and Wright, when Carver asked, "If these wells were your own, what would you do? That's the thing—," Kirkpatrick's answer (in part) was: "[I]f the reserves are there, I would go get them. I understand from talking to Mr. Smith, who has the handle on the reservoir work, the reserves are there . . . ." Ex. 431. The next day Carver demonstrated a fairly accurate grasp of the current production rate figures when he asserted that "We have something like 9,000 barrels a day that is ready right now to be sold." Ex. 427. Smith's rates for A2 and A4, both by then supposedly completed, totalled 8437 BOPD. Finally, in a June 1 letter to the Harris Trust Bank, where Carver was then seeking to borrow $4 million to finance the project, Smith estimated production from the three wells at 11,937 BOPD; and a copy of this letter was sent to Carver. Ex. 89. The bank made the loan, and Carver continued to pay the bills.

Serious doubts about Smith's figures were first raised in a July 20, 1976 report prepared by Walter Crow of Miller and Lents, Ltd., a Houston oil and gas consulting firm. Ex. 171. This report was prepared at the request of Carver's attorney, David M. Elderkin, who asked Miller and Lents "to investigate the reserves attributable to Wells A–1, A–2 and A–4 ... to determine if an additional 15 million dollars were invested, was there any chance of getting that money back." T. 1969. TerraMar was asked to furnish Miller and Lents with relevant information in its possession, and appeared to have done so. Ex. 447. On the basis of that information Crow estimated (in a letter to Elderkin) that "the proved recoverable reserves from Wells A–1, A–2, and A–4 are on the order of 7,692,000 barrels of oil;" he considered this estimate "to be realistic and the TerraMar estimate [of over 17 million barrels] to be the maximum that might be anticipated." Exs. 171 and 720. Crow concluded that Holcar could get its money back even if the reserves were only half of *his* estimate; but as he said at trial, even assuming 7,692,000 barrels recoverable from the three wells, he would not have advised Carver to undertake the project had he been advising from the beginning. "I would not recommend that to—that any person invest his money in that sort of venture, knowing the political risk, the normal risk associated with development of oil properties. I just wouldn't ever recommend that." [50] T. 1971–72.

Significantly, matters were worse than Crow knew when he wrote his July 20 report. As he learned several years later, TerraMar had not made complete disclosure to him of the relevant information in its possession: "[W]hat I found was that TerraMar had sent me only the test data that

50. T. 2488–89 (Brennan): "Companies are well aware of political risks, even in relatively stable overseas countries. So generally speaking, the criteria for foreign oil operations are that you can at least have the chance of establishing high volume production, which would allow you to obtain the return of your investment very quickly; and of course, show a substantial profit. This relates in turn to the fact that your front-end investment, in the average overseas oil venture, is very large."

showed no water production from the wells; and, furthermore, had not advised that Well A–2 was incapable of production at this time." *See* T. 1973–78. Even when Crow met with Robert Smith in Houston in early July to discuss the project and explore the reasons for their differences, Smith made no disclosure of the information. Crow found this "despicable," T. 1980, saying "That data—any engineer would have given that to another engineer."[51] T. 2009. Had complete disclosure been made to Crow in 1976, his estimate of the reserves recoverable from the three wells would have been, "at the maximum, . . . roughly 2.7 million barrels." T. 1982.

Carver learned of Crow's July 20 estimate soon after it was made, and called Crow on July 28 to discuss the matter. Ex. 720. Crow's estimate was brought up at an August 1 meeting at the Harris Trust Bank in Chicago, where Carver had gone to try to borrow another $4 million. Besides Carver, Holley, and bank officials, Elderkin and Robert Smith were also present. Smith made a presentation of Holcar's prospects, reiterating his previous estimate of reserves recoverable from A1, A2, and A4. Elderkin, however, advised the bank of Crow's much lower estimate, and evidently implied that pertinent information was being withheld by Smith, *see* Ex. 82–50; and the bank declined to make a further loan. Carver, who was not pleased with Elderkin, continued to entertain "hopes of obtaining the necessary financing elsewhere." Ex. 724. In fact, Marcella McKillip, Larry Griffith (Carver's accountant), and Smith immediately flew to New York, and on the strength of Smith's presentation and Carver's personal guaranty persuaded Manufacturers Hanover Trust Company to loan Carver $4 million toward the project. This was used to pay bills already coming due.

Smith's reaction to Elderkin's comments at the August 1 meeting was to write a letter to Carver and Holley. Ex. 82–53 (August 11, 1976). For the first time Smith himself expressed some reservations about what he had been saying, as follows: (1) He suggested that "a prudent operator would drill at least two additional wells, one on each of the two structures," to recover the "proved reserves" of 17.6 million barrels of oil. (2) He said that certain new information might mean "there is a risk that the Arab IV accumulations in well A–1 [are] more limited in size than anticipated," and suggested that in view of "the high water content of well A–1, Holcar should [perhaps] not produce this well at all." (3) He suggested that "Holcar should consider ordering a dual Christmas Tree, dual packers and dual strings of tubing in order that the two zones in A–2 could be produced separately rather than comingled [sic]." While this letter was very far from a complete disclosure of the fallacies inherent in Smith's previous estimates particularly of production rates, it was a step in the right direction. On the other hand, in the same letter Smith demonstrated his continuing willingness to conceal information by saying that "For obvious reasons this could not be presented to the Harris Bank and has not been presented to the other banks;" he said "Holcar has been extremely fortunate in their operation in Qatar to date;" he later concluded that there was after all "insufficient data to warrant the statement that the Arab IV zone in Well A–1 is a limited reservoir" (Ex. 82–50); and as has already been noted, he reaffirmed all his former projections in a December 29 letter to Holley. Indeed, in that letter he was willing to assume "that oil production will commence on May 1, 1977 from three wells [totalling 12022 BOPD], that [a] fourth well will be on production June 1, 1977, and that [a] fifth well will be on production on August 1, 1977," the two new wells having initial producing rates of 6000 BOPD each;

---

**51.** Soon after Smith met with Crow, he wrote to one of his colleagues working on the Holcar project in Doha as follows: "Bernie will probably tell you that we sat down with Miller & Lents in Houston to talk about this Holcar project. On the surface they appeared very pessimistic but we are just kinda holding our breath now. I am hopeful that they will say it looks at least like Holcar will be able to get their money back, if not make a significant profit on the operation." Ex. 69.

and he said "If the wells produce as anticipated, the average monthly net income to Holcar Oil Company during the first year of production will be approximately $1,090,000." Ex. 220. There is reason to believe that Carver knew of these projections, since he met with Holley on January 15, 1977, see Ex. 626; and although by then he had even more reason to doubt what Smith was saying, he subsequently made one more effort to finance the project.

Carver's efforts to borrow the full amount required to install production facilities began in September 1976, when he instructed Luedtke to seek a loan from Manufacturers Hanover for that purpose. Manufacturers Hanover proved willing to loan an additional $15 million toward the project, not against oil in the ground or Carver's personal guaranty, but only against a pledge of Carver's Bandag stock two-for-one against the amount of the loan. Although Carver at first seemed willing to do this, after consulting with his accountant and an attorney, he backed off. "Larry Griffith told me I shouldn't do it for fear of a conflict with my family, and Mr. Brown said that if I did it, I would be in trouble with the SEC.... If it went sour, I would lose control of Bandag, and it was a very dubious thing, and they recommended, both of them, not to do it." T. 759.

In late October Carver apparently approached Dick Bick, president of Koch International, for advice. It was then that Carver first learned that Koch had contemplated taking over the QOC concession in 1973 and 1974 but had decided against it. Bick told Carver he "wouldn't give five cents for the concession," T. 766, and apparently referred him to Alexander Erickson for further information. Carver and Luedtke talked with Erickson on the telephone; Erickson agreed to take another look at the project. Luedtke supplied him with the latest cost data (based on the Earl and Wright design) and with some of Holcar's well test data.[52] Erickson's conclusions were again negative: he estimated "proved" reserves at 8.35 million barrels of oil, again finding the Arab IV zone's reserve potential minimal because of low permeability and bottom water; he estimated peak productivity from the three wells at 8,400 BOPD; he concluded that the rate of return on investment was very sensitive to capital costs because of the minimal reserves and probable short producing lives of the wells, and that any investment of over $17 million would not realize a reasonable rate of return; and he consequently concluded that the proved reserves were insufficient to justify the projected development costs. See T. 2161–73. This was Luedtke's first hint that the reserve and production rate figures given by Robert Smith might not be entirely reasonable. T. 1708–09.

On Carver's instructions, T. 1814, Luedtke sought another opinion. On November 9 he asked Charles R. Smith, another oil and gas consultant working in Houston, to make an independent analysis of the producing capability and producible oil reserves in the A structure. Luedtke and Charles Smith went to Dallas, where Smith spent two days in the office of TerraMar examining the files, copying information and asking questions.[53] Charles Smith ultimately sent two letters to Carver reporting his findings, one dated November 17, the other dated December 14, written after further seismic data came in and was interpreted. Exs. 172 and 173. The bottom lines were these: "We calculated a proved producible oil reserve of 7,209,000 STB;" "we indicate a first year's average producing rate of 5,650 BOPD;" and "it is my opinion that the current wells are uneconomic under present conditions. Additional drilling also has an element of risk, since the [new] wells may be no better." Charles Smith's advice to Carver, via telephone, was "to cut and run, or [in] more gentlemanly-

---

**52.** It is doubtful that Luedtke supplied Erickson with all the relevant data, not through any fault of his own, but simply because he didn't have it. For example, Luedtke did not learn until later that A2 had not been completed. T. 1705.

**53.** "Mr. Bob Smith and the TerraMar personnel were most hospitable, answered questions directly, and made the files available." Ex. 172.

like language, to cut his expenditures to zero, and find someone else to take this load over, if he could." T. 606. He indicated that "sufficient exploratory potential would seem to exist [in the concession area] which would be attractive to those with an exploratory interest in the Middle East." Ex. 173.

Carver eventually took Charles Smith's advice, but not before making one last attempt to finance the installation of production facilities at the three existing wells. Amos continued optimistic, telling Carver on November 15 that "there is no way in hell that you could lose money on ... this deal the way it's structured now," Ex. 167, and telling McKillip on November 17:

> [H]e's got 90% of the risk behind him and the decision has to be does he want to take this other 10% or hedge his bet now and if he does then there are people that would be interested in it and I don't think, given, say, three months, there will be a problem in finding someone that would take it off his hands for what he's got in it. [Ex. 178].

As has been observed, Robert Smith too continued to have some input on the issues of recoverable reserves, production rates, and future net income.[54] At Amos's suggestion, in January 1977, Carver approached a bank in Dallas (through Luedtke, McKillip, and Griffith), proposing that the bank loan him 80% of the cost of the production facilities against the equipment itself, leaving only 20% for Carver to come up with on his own. This the bank declined to do: "[T]hey wouldn't lend money regardless of how much collateral Mr. Carver would put up. They said they needed reserves in the ground, and of sufficient quantities. They were talking first stage recoverable of about 50 million barrels, and we weren't even close to it." T. 1699 (Luedtke).

---

**54.** Luedtke: "I feel Roy always believed to a great extent what TerraMar told him." T. 1101.

**55.** He and a number of his corporations had incurred some $32 million in note obligations to about 20 banks. T. 2773; 2754; Ex. 62. Most

### D.

Sedco argues that Carver did not do all he should have done to see the project through on his own. The Court finds no merit whatever in this argument. Sedco also argues that Carver's own actions, particularly vis-á-vis Holley, contributed substantially to the delays during the second half of 1976 in getting production facilities installed.

> MR. McELHANEY: ... [I]t's our position that Carver and Holley argued, and Carver threatened to cut off funds, delaying the project, ultimately resulting in losing the project, and that the ultimate loss of this concession and the consequential lawsuit against us is of Carver's own making. [T. 2715; *cf.* Sedco's post-trial reply brief at 8; Sedco's proposed findings and conclusions at 28].

This argument is without basis in the record.

It is true that Carver and Holley fell out during the second half of 1976. As Carver said, by the middle of the year the venture was "a new ball game," T. 1001, "and I had every right to tell Mr. Holley that the 50–50 arrangement was ridiculous unless he was going to put some of his $50 million he said he had in this project." T. 1005. But it soon became clear that Holley could contribute nothing. Carver's first sign of this was apparently Holley's August 13 default on the loan used for the purchase of Carver's airplane. Carver was forced to repossess the plane and pay off the loan himself, and "he seemed to think somehow I had misled him, which was definitely not the truth .... [H]e didn't expect me to default and neither did I." T. 4167 (Holley). In fact Holley was deeply in debt;[55] he suddenly lost his income from his Texas oil properties and was unable to pay on any of

of these debts had been incurred before Holcar was formed, but Holley had also borrowed $800,000 collateralized by his Holcar stock on the strength of representations made by Robert Smith about Holcar's future income. Holley depo. at 298–99.

his loans;[56] and he was faced with the direct threat of bankruptcy. Carver learned the full extent of these problems at a September meeting with Holley's bankers, where Carver, in an effort to keep his partner out of bankruptcy, agreed to loan Holley $8 million himself.[57] This offer fell through because of overreaching on the part of Holley's bankers.[58] Subsequent negotiations with Holley and his banks proved equally fruitless.[59] In particular, despite Carver's undoubted threats to withhold further funding of the Holcar venture and his February 7, 1977 suit against Holley seeking a declaration that "Carver has no obligation to make any additional contributions or advances in any amount to Holcar unless and until he 'mutually agrees' with Holley as to said contributions or advances,"[60] Holley (or his banks) proved unwilling to agree to any modification in the ownership of Holcar and unable to satisfy Carver that Holley could even pay off the promissory notes delivered so far in the course of the Holcar venture.[61]

The Court has no fault to find with Carver's behavior toward Holley. Moreover there is no evidence that the dispute between them measurably delayed Carver's efforts, while they continued, to see the project through on his own. On the one hand, Carver's efforts did continue; the threat to discontinue funding was not carried out until early 1977. In the meantime, during the height of the dispute, the workover of the wells was supposedly completed, production equipment was contracted for and fabricated, a tanker was purchased, negotiations were underway for the purchase of platforms, and financing was actively sought, all by Carver's leave and at his expense. On the other hand, any delay there may have been is squarely attributable to Amos: he persuaded Carver not to proceed immediately and singlemindedly with the Earl and Wright plan but to search for other solutions; and in the fall of 1976 he advised Carver to hold off until he had put the project together for him. Amos admitted that this advice was unrelated to Carver's dispute with Holley. T.

56. An audit revealed that the operator of Holley's wells had not been paying royalties due the owners of the property on which the wells were situated. Holley's income was diverted to pay these royalties. T. 4072–73.

57. "I didn't want a partner being a receiver of Holley's stock. I wanted to keep him out of the Bankruptcy Court, if at all possible. I also wanted to try to get a partner with some money into this deal, and nobody would want to get a partnership with a bankruptcy referee, so I was in a bad spot." T. 762–63 (Carver).

58. Upon witnessing Carver's generosity, the bankers wanted Holley to ask him for $10 million; later, they suggested even more: "I think they thought they had found a Santa Claus because what they wanted then, they said, 'What you should do, Gene, you're being greedy trying to make all this money in the concession. Instead of you borrowing ten million, you should borrow twenty million from Roy Carver. And, in fact, if you can't do that, you ought to sell him your stock for 25 million dollars.'" Holley depo. at 295. Holley refused to press Carver, but his bankers made the proposal with predictable results: Carver refused to make the loan or buy Holley's stock at the quoted price and he "became very angry about it, and I don't much blame him." Holley depo. at 296.

59. Among other things, Carver offered to buy one percent of Holley's Holcar stock for $1 million, but Holley refused. T. 762; Ex. 632. He also tried to buy Holley's $800,000 note secured by his Holcar stock, but Holley blocked this by warning his other creditors that if Carver owned the note, he could foreclose and take control of Holcar. T. 762; Holley depo. at 299–300; Ex. 633. Holley's three major creditors promptly bought the note.

60. *Carver v. Holley*, No. 77–10–D (S.D.Iowa filed February 7, 1977), *dism. per stipulation*, January 4, 1979.

61. Holley ultimately faced an avalanche of litigation as a result of his defaults on his numerous loans. After it became apparent that the Holcar venture would never come to fruition, Holley's creditors foreclosed and sued him. Holley initially counterclaimed ("that had to do with broken promises on the parts of the banks where they had told me they would not sue me and they did anyway." Holley depo. at 320) for over $100 million "based on a geological report of Bob Smith as to what I could expect to make [from Holcar]." *Ibid.* Eventually Holley dropped the counterclaims and allowed millions of dollars in judgments to be taken against him. In connection with his numerous loan transactions he was tried and convicted of bank fraud. T. 2789–90.

418. While Carver's decision to "cut and run, and find someone else to take this load over, if he could" was probably based in part on Holley's obvious shortcomings as a partner, his prior decisions regarding the direction Holcar should take were not.

## V.

In the early months of 1977 Carver terminated all of Holcar's Doha-based staff, leaving nothing but a caretaker in the Middle East. T. 2493; 4092. The balance of 1977 was given over to two things: trying to find a venture partner willing and able to finance and manage the remainder of the project on acceptable terms; and trying to placate the government, which was showing definite signs of displeasure with Holcar. The former effort bore fruit, but the latter did not.

## A.

Holley and Carver both worked to find a venture partner. There continued to be some friction between them, of which much is made by Sedco; but it is apparent that the main reason for the difficulties in finding a partner was the infirmities of the concession itself. Rudy Luedtke "talked to Koch, Cities Service, Occidental, and two or three more different groups.... Pretty much everybody agreed that the reserves were very small, that the project was in kind of a messed-up stage ...." T. 1713. Philip Brennan, a broker/consultant hired by Carver in March 1977, contacted 18 American companies and failed to interest anyone.

> In every case, the interest floundered on the tight economics imposed by the minimal oil reserve which is indicated to exist in the A structure, coupled with the remaining high cost to place that field on production, and the obvious need for drilling an unspecified number of additional wells in the field to allow us to recover the crude from that very thin, and probably discontinuous, oil reservoir. [T. 2491].

Bernie Carter succeeded in obtaining the first offer, from Northern Offshore, Ltd. of London, which made three different proposals in March 1977. Initially, Northern Offshore proposed to put the field onstream for a total of $23 million to be paid by Holcar at a daily work rate of $60,000. Ex. 654. Later, the company broke its original offer down into one proposal to provide "equipment only" to Holcar at a day rate of $16,000 payable over a minimum period of five years, and another to serve as operator of the equipment at a day rate of $27,000. Exs. 659, 662. Carver and Holley agreed that Northern Offshore's proposals were unacceptable because "the cost of doing business with them was greater than we could possibly reasonably pay for through oil sales." T. 1049 (Carver).

Holley enjoyed better luck in finding an interested party, but only because he represented the venture in the glowing terms in which Robert Smith continued to represent it to him and Carver. He concentrated his efforts in London where he was working with a Pakistani banker, one Mr. Abedei, who told Holley, "If things are as good as you represent them to be, I may have some clients of the bank who might be interested in making this investment." T. 4100–01 (Holley). Holley succeeded in interesting a group of Middle Eastern investors, the Kuwait International Finance Company (KIF). KIF at this time was in the process of purchasing a majority share of Attock Oil Company, a Pakistani corporation, and Holley and Smith traveled to Pakistan to meet with KIF representatives in late February 1977. They provided KIF with Smith's "proved" reserve and production rate estimates and when asked about "potential" reserves, "we ended up assigning numbers to those." T. 3726 (Smith). The numbers assigned by Smith and provided to KIF were incorporated in a letter Smith wrote to Holley on March 9 upon their return from Pakistan. Ex. 71. Smith represented that he was "setting out accurate information" and estimated that "the total potential reserve outside the proved area [was] 114,829,000 barrels of oil." Ex. 71.[62] Ap-

62. Q (By Mr. Elderkin) Do you think any rational person, Mr. Smith, would assume that your potential reserves in here would be economically recoverable?

parently on the basis of these representations, KIF entered into an option agreement with Holcar at the end of March 1977 giving KIF a month to decide whether to participate in the venture on stated terms. Ex. 175. Sedco, relying on Carver's incorrect recollection at trial that he did not sign the letter of intent incorporating the option agreement, (T. 4246), cites the KIF proposal as an example of Carver's frustration of Holley's efforts to find a partner. But the letter itself and other documentary evidence, see Exs. 175 and 176, indicate that Carver did sign it at Holley's insistence, apparently without fully realizing the unfavorable terms to which he would be bound if KIF chose to exercise its option.[63] The option went unexercised by KIF for reasons unknown. The Court fails to see how Carver frustrated this negotiation. Even after the expiration of the option, KIF continued to express interest in entering a partnership with Holcar through Attock.

Carver is also accused by Sedco of impeding Holley's efforts to deal with Attock. The Court finds that any "frustration and delay" caused by Carver were due to his efforts to enable Attock to make a fair and honest evaluation of the concession's prospects. Much to the exasperation of Holley and Smith, Carver was unwilling to support their representations about the great economic potential of the project: "I was there with some people who were willing to invest about $14 million in the concession, and he [Carver] was at that time running the concession down." T. 4103 (Holley). Smith

> A I think I testified that I didn't think any rational person would think that all of them would become proved reserves. [T. 3731].

63. After signing the letter, Carver sent it to Brennan for his evaluation. Brennan concluded, "I do not consider it a very good deal for you. In effect, it leaves you in a minority position within Holcar, and yet it obligates you to provide additional funding in the amount of $12.5-million, being your own one-third plus one half of the Holley one-third (i. e., three-sixths) of the total (approximately $25-million) to be subscribed." Ex. 176.

64. Sedco also claims that Carver represented to Attock in both the Letter of Intent and the

brought this "problem" to Marcella McKillip's attention in a May phone call:

> RLS [Smith]: I feel like these . . . people in Pakistan are very . . . likely, although Roy has created some problems in talkin' to 'em.
>
> MM: With the Pakistanians?
>
> RLS: Yeah.
>
> MM: How?
>
> RLS: Well, you know, I mean, ah, they've gone over they've looked over this whole thing and they said, well we kinda agree with TerraMar on what's there and Roy said, ah hell that's not there. Now that's, ah, you don't sell deals like that. You know?
>
> MM: Uh huh.
>
> RLS: It weakens your position.

Ex. 183. Throughout the Attock negotiations, which took place between May and November, Carver and his representatives fully disclosed the bad as well as the good. Brennan and Donald Parnell, another independent consultant, were charged by Carver with supplying information to Attock's technical advisor, Zamir Jafri; Brennan testified that "Among other things, we supplied Mr. Jafri with the extremely conservative reserve figures, and the rather negative evaluation of the project developed by Dr. Charles Smith." T. 2531. Holley and Robert Smith continued to differ; but the Court finds it rather incredible for Sedco to argue that Carver somehow improperly delayed the negotiations because he and his representatives insisted on dealing honestly with Attock.[64]

Definitive Agreement that TerraMar's reserve figures were true and correct because both documents stated:

> [Holcar] hereby represents that to the best of its knowledge the reports prepared by Terra-Mar consultants, Rig Design Services, Limited, and other service companies associated with the project (all of which have been delivered to Attock, FILL and Overseas) are true and correct and do not omit any material information concerning the project. [Ex. 784 at 4; Ex. 786 at 14–15].

Consequently, Sedco argues, "It is simply wrong for Carver to now attempt, as he does in this suit, to claim that Charles Smith's reports

By September 16, 1977, Carver and Holley had signed a Letter of Intent with Attock, Ex. 784, and on October 22, representatives of Attock, Holcar, and the government met to discuss the prospective partnership. Brennan and Holley were present on behalf of Holcar and they left the meeting "extremely encouraged" in the belief that the government would permit Attock to become Holcar's partner and the project to continue on this basis. T. 2513 (Brennan). The two oil companies completed and signed their Definitive Agreement, Exs. 104, 351, 386, in November,[65] and another meeting with the government was scheduled for January 26, 1978, at which Holcar and Attock anticipated finalizing the matter. The meeting turned out otherwise:

> We were shocked to have a complete change of attitude on the part of the government, and at the meeting the Attock deal was rejected by the Qatar government, that is, the participation of Attock in the Holcar deal was rejected quite categorically, and we were advised that the Holcar production-sharing contract agreement was being unilaterally terminated by the government. [T. 2515 (Brennan)].

### B.

Certainly the Qatar government had ample justification for terminating the production-sharing agreement. Holcar had fallen far short of its work obligations: only three of the required five QOC wells had been reentered and just two of them had been completed; and none of the promised three new wells had been drilled. This by itself was sufficient under the terms of the agreement to permit unilateral termination by the government. Evidently Holcar's hope that the Attock deal would be approved arose because Brennan misread the government's enthusiasm about Attock's interest in the concession as a favorable response to the proposed Attock-Holcar union. After Attock's managing director, Mr. T. A. T. Lodhi, met with the government in October, he observed, "The officials appear to be impressed with our approach and the blend of Arab investment and Pakistani personnel," but "it was Holcar's future status which was still causing concern to [the] government." Ex. 789. This concern had been growing since August 1976, when the well workover phase of the Holcar effort ended and the government presumed that the production phase would begin.

The production-sharing agreement required Holcar to provide the government with a "Development and Production Program and Budget" before beginning the production phase, and to this end, Luedtke submitted his September report based on the work of Earl and Wright for the government's review and approval. Exs. 155–1, 771. As has been seen, material departures from that report were contem-

---

are correct and that Bob Smith's reports and projections are incorrect." Sedco's post trial brief at 49. There is, however, substantial evidence indicating that Carver never put forth in any negotiation with Attock that he believed Bob Smith's reserve figures to be accurate, and that he, Brennan, and Parnell discussed only Dr. Charles Smith's reserve estimates. Brennan categorically stated, "The only reserve figure quoted and left, as far as Holcar was concerned, at the 22nd of June meeting [with Jafri] was Dr. Charles Smith's figure of seven million, two hundred and some thousand barrels." T. 2582. In addition, the above-mentioned Rig Designs report, Carver-Freeze Ex. 1, commissioned by Carver in June 1977, was an extremely pessimistic evaluation of the project. It referred to Holcar's reentry program as a "comedy of errors" and concluded, "[W]e cannot recommend the expenditure of any further money until more reliable production testing and performance data for the Wells is obtained." Finally, the testimony of both Holley and Smith indicates that Carver was openly at odds with TerraMar's evaluation. The information provided by Carver to Attock dispelled the misleading nature of the information supplied by Smith and Holley; indeed, absent the information supplied by Carver, Brennan, and Parnell, Holcar would have been in breach of the above warranty clause.

65. The Attock-Holcar agreement was contingent, of course, upon the government's approval of Attock's participation, and also government approval of a proposed reduction in the work program. *See* Ex. 785 at 5. The heart of the agreement provided that Holcar would assign 52% of its interest to Attock in exchange for which Attock would initially invest $14 million.

plated; Luedtke and Amos "had a pretty good argument" about Amos's alternative production plans because, Luedtke felt, "turning the project around in the middle of the stream would not very well please the Government, and contractually we needed approval from the Government to do so." T. 1695. Amos, however, assured Luedtke that he would handle any problems with the government. "Amos indicated to me that he could straighten it out with Ali Jaidah." T. 1707. The same assurances were given to Carver through Marcella McKillip:

> He [Amos] was giving me information to pass on to Mr. Carver at that time, and he was preparing to go over to Qatar himself, and he was going to meet with the government and, in a sense, he was telling us not to worry, that he would take care of it. [T. 1844–45].

Amos did make an attempt to renegotiate the production-sharing agreement, see Exs. 250 and 411, and he also discussed his production plans with Ali Jaidah, Ex. 253, but the government approved neither proposal. T. 1696. If nothing else, Amos's overtures put the government on notice that Holcar was suffering serious problems.

Abdulla Salatt, deputy director of the Department of Petroleum Affairs, called Carver, Holley, and Luedtke to a meeting in January 1977. "The government was a little bit, to say the least, upset with our performance." T. 1774 (Luedtke). Its major concerns were that Holcar had yet to begin drilling new wells, that no major construction of production equipment had begun, and that Holcar had not increased the size of its Doha staff as had been requested. T. 1774. Over the next several months, relations with the government continued to deteriorate as expected reports on Holcar's progress were not forthcoming because work had stopped and Holcar's efforts were being directed toward finding a partner. Luedtke met again with the government in February, when it was "extremely disappointed" because he had failed to bring to the meeting certain requested reports. In March, Luedtke sensed that termination was a distinct possibility: "There was never anything said that our agreement would be cancelled, but, I mean, if you read the agreement, and if you hadn't done anything by March, we only basically had six or eight months left to comply with the complete agreement." T. 1780. Luedtke passed the word to Carver: "He indicated to me that he was trying to do the best he can, but the project has gone so far out of initial cost estimates, that he really doesn't know which way to turn right now." T. 1781.

Holcar attempted some sort of reparation of its relationship with the government in May 1977. By this time, negotiations with Attock had begun and it was critical to any future agreement that the government permit an extension of time for completion of Holcar's work program. T. 2501. On May 15, Carver, Holley, Luedtke, and Smith met with the government, submitted a report prepared by Luedtke, and requested an extension of time to facilitate its negotiations with Attock. The request was taken under advisement, and Carver and Holley signed a letter committing Holcar to provide the government by July 1 with a report concerning Holcar's activities to date and a proposed program for future activities.[66] Shortly after this meeting, Smith solicited Carver and Holley for the job of compiling the requested information. Exs. 82–13 and 672. Holley promptly authorized Smith to proceed, Ex. 675, but Carver, "to stanch the flow of blood out of my bank account," T. 4243, countermanded Holley via telex to Smith:

> I REALIZE THAT HOLLEY HAS BEEN FURNISHING YOU WITH INSTRUCTIONS ON BEHALF OF HOLCAR. I AND HOLLEY ARE NOT IN AGREEMENT ON THE COURSE OF ACTION ON THIS MATTER AND YOU WILL RECEIVE NO PAYMENT FOR YOUR SERVICES OR EXPENSES FOR ANY WORK DONE PURSUANT TO INSTRUCTIONS FROM HOLLEY. [Ex. 79].

---

66. Bob Smith wrote this letter in collaboration with a government official. According to Smith, he did so at the request of Carver and Holley. T. 3504.

Because Smith was well aware of Holley's inability to pay him, he did nothing further. Carver intended to have Brennan and Parnell prepare the report, but negotiations with Attock occupied the interim from May to July and Carver admits that the reporting commitment was never fulfilled. T. 4243.

While Holcar and Attock were coming to terms, the government in September invited a German oil company, Wintershall Aktiengesellschaft, to examine all its data on the Holcar concession, apparently in the hope that Wintershall might work the concession after Holcar's contract was terminated. Thus it appears that the government, despite its apparently receptive attitude toward Holcar's partnership with Attock, might have concluded by September 1977 that it no longer wished to deal with Holcar. Wintershall's conclusions, contained in a report of October 4, 1977, were negative: "there is no incitement to explore" structures outside the A structure; the A structure contains only small reserves; "the production has a certain water-cut from the beginning;" and "[t]he solution-gas contains high quantities of $H_2S$. Therefore the development costs will be considerably higher than in normal offshore field development." Ex. 110. Wintershall expressed no further interest in the area.

True to its word given to Holcar at the January 26, 1978 meeting, the government terminated the production-sharing agreement. The Minister of Finance and Petroleum sent Holcar the official termination notice on March 25, 1978, citing Holcar's breach of its work obligations and its obligations to submit regular reports to the government as reasons for the termination. Ex. 303.

As part of its attempt to pin responsibility for the loss of the concession on Carver, Sedco blames him for Holcar's breach of the reporting requirements and argues that

Carver's actions in this regard were a proximate cause of the loss of the concession and Holcar's resulting inability to repay his loans. Sedco's post trial brief at 107–08; reply brief at 9–11. In particular, Sedco cites Carver's failure to comply with his written commitment to the government to provide certain information by July.[67] Reply brief at 9–10. Sedco claims that "Carver purposely caused this default by overruling Bob Smith's offer to coordinate the considerable efforts needed to comply." Post trial brief at 107. But by this time Carver was well aware of the misrepresentations that had filled previous Smith reports. It must have been clear to Carver, as it is to this Court, that Smith would have prepared any type of report necessary, regardless of the truth, in order to perpetuate his business with Holcar. No doubt Holcar's failure to submit this report further damaged relations with the government, but the Court rejects Sedco's contention that the concession would have been saved or lost on the basis of whether Holcar had adequately fulfilled its reporting requirements. It was the failure to perform the work obligations that concerned the government, and the blame for this failure lies with Sedco. The reports were important principally because they were to inform the government of Holcar's progress in satisfying its work obligations. The Court finds that Holcar's breach of the reporting requirements was simply another result of the initial and continuing fraud that was perpetrated on Carver and that caused Holcar's failure to fulfill its work obligations. *See* section VII, *infra.* The disarray into which the project fell and the consequent lapses in communication with the government were caused by the disparity between the venture as it was misrepresented by Sedco through Amos and Smith and as it existed in fact.

---

**67.** Sedco also blames Carver for Luedtke's failure *to submit a report to the government at the February 1977 meeting and for submitting to the government in May Luedtke's admittedly "makeshift" report. As to the former, the Court finds that Luedtke was responsible for*

submitting the report—there is no evidence indicating that Carver even knew about this. As to the latter, there is no evidence indicating that the government found the May report to be unsatisfactory.

### C.

It remains to determine the amounts lost by Carver in connection with the failed venture. It should be noted that although Carver began by claiming as actual damages not only his out-of-pocket losses, but also lost profits and amounts still owing by Holcar to various other creditors, the latter two claims have apparently been dropped: no evidence on them was adduced at trial; and see Carver's post trial brief at 282–88 and Carver's proposed findings and conclusions at 59, 72–75, and 94–95. Accordingly, the Court deems it necessary to here address only the evidence of Carver's out-of-pocket losses. To this end the Court has carefully examined the voluminous evidence of his Holcar-related expenditures submitted by Carver, and on the basis of that examination finds as follows.

Money to fund the venture came from three sources: loans to Carver from the Harris Trust Bank ($4.3 million), loans to Carver from Manufacturers Hanover ($3.2 million), and Carver's personal accounts at Harris Trust and the First National Bank of Rock Island, Illinois (the balance). Bills were paid from three accounts: Carver's personal account at the Rock Island bank; Holcar's account at Citibank in New York, to which money transfers were periodically made from Harris Trust and Manufacturers Hanover; and Holcar's two accounts at the First National City Bank branch office in Doha, Qatar, to which money transfers were periodically made from Harris Trust and Citibank. The only apparent exception to this latter rule is that the $1.5 million payment to Ali Jaidah was made directly from Carver's personal account at Harris Trust.

Evidence of the amounts borrowed from Harris Trust and Manufacturers Hanover, and of the interest paid thereon, is in the form of bank statements, payment orders, account debit notices, and letters from the two banks dated April 14, 1980, and April 30, 1980, respectively, detailing these matters. Exs. 337, 345, and 366. Evidence of the amounts transferred to and paid out of Holcar's accounts at First National City Bank in Doha is in the form of invoices, check stubs, bank statements, and Holcar's Doha books and statements of account. Ex. 348. Evidence of the amounts transferred to and paid out of Holcar's account at Citibank is in the form of bank statements with attached credit and debit tickets, cancelled checks, and a book of check copies or stubs which includes brief descriptions of the payments made. Ex. 339. Evidence of the amounts paid out of Carver's personal account at the Rock Island bank is in the form of cancelled checks and copies of cancelled checks, most of which bear on their faces brief notations of the accounts or invoices paid, and copies of debit advice slips. Ex. 338. All of the exhibits just referred to were made available for Sedco's examination well before trial and were received in evidence without objection.[68]

Carver's proof of his Holcar-related expenditures was less than plenary in only one respect: with few exceptions he failed to produce for Sedco's examination, or to offer at trial, the invoices for the payments made from Holcar's account at Citibank and from his personal account at the Rock Island bank.[69] The payments made from these two accounts constitute by far the bulk of all the money spent; and the lack of invoices made it difficult for Sedco, and in some instances has made it difficult for the Court, to verify that the payments made were in all instances reasonably related to Carver's attempt to bring the Holcar venture to fruition. The invoices in question (along with the originals of most of the Rock Island checks) were apparently somehow lost in the pre-trial shuffle. See T. 4320–23 (portions of Griffith's depo. read into the record); T. 2637–56 (Griffith); T.

---

**68.** Sedco specifically did not object to Ex. 338 on the ground that it consists largely of copies of checks and debit advice slips, rather than the originals. T. 2228.

**69.** For the exceptions see Exs. 338 (one Blanchard & Calhoun invoice included); 340 (Western Union invoice with attachments); 341 (Moseback, Griffith invoice); 342 (Sooner Pipe invoice); and 368–73 (documents pertaining to the tanker Isabel Z, including invoices).

4207–22 (Sauer). The Court specifically finds that there was no bad faith involved. *Cf.* T. 4227. Although at trial the Court reserved the right to bifurcate the issue of damages and to permit the introduction of further evidence on the matter should it believe, upon close scrutiny of the record, that this was necessary, *see* T. 4224–28, the Court now finds no reason for further delay. The record now in existence provides a reasonable and sufficient basis for the determination of Carver's Holcar-related expenditures.

■ Besides the exhibits already enumerated, Carver offered on the issue of damages two computer print-outs, Exs. 573 and 574, which purport to be chronological lists or summaries (with running totals) of the financial transactions evidenced by the checks, bank statements, etc., which were received in evidence without objection. Sedco objected to the admission of the summaries on the ground that without the invoices for the payments made from Citibank and the Rock Island bank, no sufficient foundation existed for the introduction of the summaries of the payments themselves. T. 1856–61; T. 2215–18. The Court received the summaries subject to the objection, and now overrules the objection in its entirety. The Court views Exs. 573 and 574, not as proof that any alleged money transfer or payment therein listed was actually made, and not as proof that any alleged transfer or payment therein listed and actually made was reasonably related to Carver's attempt to bring the Holcar venture to fruition, but merely as summaries of the actual transactions for the most part amply evidenced by other documents made available for Sedco's examination and received in evidence without objection. *See* Rule 1006, F.R.Evid. The Court has found the summaries to be useful guides to the evidence, but has absolutely relied on them in only one particular: that is for the mathematical total of the alleged payments listed in Ex. 574. Considering the summaries then as consisting of allegations requiring proof, the Court finds as follows.

1. All sums allegedly borrowed by Carver from Harris Trust and Manufacturers Hanover and transferred to Holcar's accounts at other banks were so borrowed and transferred. The loans have been repaid. Carver borrowed other sums from both banks during the relevant period. The interest allegedly paid by Carver on the Holcar-related loans was paid; and no more interest on sums borrowed from the two banks is claimed herein than is properly allocable to the sums borrowed on behalf of and advanced to Holcar.

2. All sums allegedly transferred by Carver to Holcar's account at Citibank were so transferred.

3. The alleged transfer of $1.5 million from Carver's personal account at Harris Trust to Kassem Jaidah's account in Switzerland was made.

4. With one exception, the sums allegedly transferred to Holcar's accounts at the First National City Bank in Doha were so transferred. The exception is the alleged transfer of $12,300 from the Rock Island bank to Citibank to Doha on 1/16/78. The Citibank debit tickets attached to the statement dated 1/3/78 show that the $12,300 was transferred from Citibank to a tire company in Haiti, not to Doha. The Court does not consider the $12,300 to be a proved Holcar-related expenditure.

5. Contrary to Sedco's suggestion at trial, T. 2234f, no transfer or payment is added in more than once in the total stated on the last page of Ex. 574.

6. The Court has satisfied itself that all the money transferred to the First National City Bank in Doha was paid out to satisfy debts legitimately incurred by Holcar.

7. That brings us to the alleged payments made directly out of Holcar's account at Citibank and Carver's personal account at the Rock Island bank, for which most invoices are lacking.

a. No proof of the following alleged payments, by way of cancelled check, debit advice, or otherwise, was found, and the Court does not consider them to be proved Holcar-related expenditures: to Wads-

worth, Elderkin, Pirnie dated 11/18/78 and 1/26/78;[70] to Carver Aero dated 12/31/76 and 12/31/77;[71] to Angelo Maritime dated 3/4/77; and to Agence Montfleuri dated 3/10/78. Total: $53,687.47. There is satisfactory proof of payment of all other amounts claimed.

b. Despite the lack of invoices, the Court is convinced and finds that most by far of the payments made from the two accounts were reasonably related to Carver's attempt to bring the Holcar venture to fruition. The vast bulk of them (in amount, certainly) were made to companies or individuals that supplied goods or services clearly used during the reentry and workover of the wells or intended for use in connection with the installation of production facilities. Further substantial sums were paid to persons or firms known to the Court from the evidence to have been closely connected with the venture as consultants or agents of one kind or another. The trouble is with the relatively small payments made to persons or firms having no unambiguous or intrinsic or other evident connection with the venture, e.g., law firms, travel agencies, airlines, American Express, Western Union, Ahmed El-Dib, the Bank of Oman, etc. On the one hand there is no doubt that the venture generated legal fees, travel and communication expenses, and other costs not all of which were specifically mentioned at trial or elsewhere in the evidence; but on the other hand Carver must have incurred similar expenses totally unrelated to Holcar during the relevant period; and it has not always proved possible for the Court to verify that the questionable payments made and claimed herein were Holcar-related. The lack of the invoices and other supporting documents amounts simply to a failure of proof on this issue; and the Court is not inclined to regard the generalized testimony of McKillip and Griffith that all payments were Holcar-related

as supplying the deficiency. The Court has determined to disallow recovery of what it considers to be questionable payments unless it has found, on the faces of the checks or check stubs or elsewhere in the record, some clear indication that each specific payment was for debts incurred on behalf of the Holcar venture while it was still a going concern. The Court has not considered the mere fact that a check was written on Holcar's account at Citibank to be such clear indication. On the other hand, amounts paid by checks bearing the notation "Holcar," for example, will be considered Holcar-related. This method of disposing of the questionable payments is perhaps a little rough; but the Court believes that it strikes a reasonable balance on the issue.

■ The result of the exercise is that the Court does not consider the following to be proved Holcar-related expenditures.

To Wadsworth, Elderkin, Pirnie dated 1/16/76; 8/5/77; 11/8/77; 3/16/78; 3/31/78; 7/11/78; 8/1/78; 11/2/78. To Chapman & Cutler dated 12/30/76; 2/9/77; 3/4/77; 5/13/77; 10/4/77. To AAA World Travel dated 2/2/76; 3/25/76; 4/21/76; 8/9/77 (part allowed); 8/19/77; 10/25/77; 4/25/78; 9/21/78; 6/21/76; 8/10/76; 8/17/76; 10/18/76; 12/29/76; 1/20/77; 3/2/77. To American Express dated 6/21/76; 8/10/76; 10/29/76. To Western Union dated 2/25/77; 3/11/77; 5/25/77; 8/2/77; 8/23/77; 9/9/77; 9/16/77; 10/17/77; 11/18/77; 12/29/76. To Mosebach, Griffith dated 1/20/77; 3/2/77. To Miller & Lents dated 11/28/78. To the Bank of Oman dated 7/6/77; 9/7/77; 12/8/77. To Diners Club dated 11/14/75; 11/18/76; 5/12/78. To BankAmericard dated 12/31/75; 10/15/76. To Federal Express dated 12/17/75; 3/2/77. To

**70.** Even given proof of payment, these amounts might well be disallowed for the additional reason that there is no sufficient proof that the alleged payments were Holcar-related; and, in the case of the alleged payment of 1/26/78, for the reason that there is no proof that it was not for services rendered in connection with this suit.

**71.** Even given proof of payment, these amounts might well be disallowed for the additional reason that there is no sufficient proof that the alleged payments were Holcar-related.

Marcella McKillip dated 11/18/76; 12/14/76; 4/21/77; 6/30/77; 11/3/76. To Port City Flying Service dated 11/18/76. To Transair France dated 12/17/75. To Bandag dated 1/13/76; 9/17/76; 12/14/76. To Dept. of Transportation dated 12/17/75; 8/3/76. To Civil Aviation Authority dated 2/23/76. To Air Azure dated 3/5/76. To Eurocontrol dated 8/3/76. To Canterbury Inn dated 11/18/76. To Holiday Inn, Grand Cayman dated 6/17/77; 10/15/76. To Palmer House dated 12/29/76; 3/2/77. To RCA Global Communications dated 5/25/77; 6/17/77; 8/9/77. To George Trauten dated 8/25/77. To Guides to Multinational Business dated 12/14/77. To ITT World Communications dated 2/24/78. To Ahmed El-Dib dated 3/31/78. To the Madison dated 5/12/78. To Baker & Botts dated 10/15/76; 4/20/78. To Des Moines Register dated 6/8/76. To TWA dated 8/10/76. To Douglas Leach dated 9/21/76; 10/6/76. To Fidlar & Chambers dated 10/15/76. To Lane Aviation dated 10/15/76. To Elias Ullman dated 11/3/76.

Total: $230,946.55. Grand total including other unproved claims: $296,934.20. Hence, Carver proved the loss of $14,706,-081.25, out of the $15,003,015.27 in total alleged losses listed in Ex. 574. The recoverability of the $1.5 million payment to Ali Jaidah, or indeed of any of the proved loss of $14,706,081.25, has yet to be addressed.

## VI.

Sedco argues that, quite- apart from the merits of the counterclaims asserted herein, Carver during his lifetime, and now his executors, should be debarred from recovery either in whole or in part for three independent reasons: (1) During his lifetime Carver lacked "standing" to assert the counterclaims, and his executors are no better placed in that respect than he was; (2) The applicable statutes of limitations ran on at least part of the counterclaims before they were asserted; and (3) *Ex dolo malo (viz.,* the illegal payment to Ali Jaidah) *non oritur actio.* The Court next addresses these three issues. Relevant choice of law

questions are discussed issue by issue. In cases like this one, of course, where the subject matter jurisdiction of the Court is founded on diversity- of citizenship, the Court, sitting as it is in Iowa, must apply the laws of Iowa, including the Iowa rules on choice of applicable 'law where relevant conflicts have been shown to exist between the law of Iowa and that of other jurisdictions with an interest in the outcome of the litigation. *Klaxton Co. v. Stentor,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Bankord v. DeRoch,* 423 F.Supp. 602 (N.D. Iowa 1976). The Iowa courts have generally adopted the "most significant relationship" rule in the choice of law area: The Court is "to apply to any issue in litigation the law of the [jurisdiction] which has the most significant relationship with the parties and the principal interest in the issue . . . ." *Berghammer v. Smith,* 185 N.W.2d 226, 230 (Iowa 1971); *cf. Fuerste v. Bemis,* 156 N.W.2d 831 (Iowa 1968); *Bankord v. DeRoch, supra; Conradi v. Boone,* 316 F.Supp. 918 (S.D. Iowa 1970); Restatement (Second) of Conflicts (1971). This rule does, however, have its limitations, as will be seen.

### A.

Sedco's "standing" argument comes to this: By. way of his counterclaims, Carver has sought to enforce rights and recover damages that properly belong to Holcar, if anyone, not to him personally.

In the case at bar, Carver is individually attempting to assert a claim and to personally recover, although only the corporation, Holcar, if anyone, has standing or capacity to recover. Carver does not have standing to sue because an individual shareholder does not have standing to sue for losses allegedly suffered by the corporation. [Citations]. Therefore, any action to recover for wrongs to the corporation must be brought by or on behalf of the corporation. *Id.* This is true even though the plaintiff shareholder owns all or most of the stock in the corporation. [Citations.] * * * This is particularly true in the case at bar because Holcar, as

a corporation (not Carver and/or Holley as individuals) negotiated for and entered into the contracts and agreements and paid monies and allegedly lost profits and allegedly lost "the benefit of the bargain." [Brief in support of Rule 12(b)(6) motion to dismiss, etc., filed by Sedco on August 28, 1980.]

This argument is properly viewed as the claim that Carver, while he lived, was not the real party in interest to the claims he asserted. "Every action shall be prosecuted in the name of the real party in interest." Rule 17(a), F.R.Civ.P. "The 'real party in interest' is the person who, under governing substantive law, is entitled to enforce the right asserted, and in a diversity case, the governing substantive law is ordinarily state law...." *Iowa Pub. Serv. Co. v. Medicine Bow Coal Co.*, 556 F.2d 400, 404 (8th Cir. 1977). Sedco has been particularly concerned to attack Carver's personal right to sue for Holcar's lost profits and amounts still owing by Holcar to various other creditors. *See* Sedco's post trial brief at 127–35. However, perhaps in response to Sedco's briefing on these issues, Carver dropped his claims to lost profits and amounts still owing by Holcar to anyone but himself; his executors now seek recovery only of the out-of-pocket losses sustained by Carver in connection with the venture. Sedco has consistently admitted that "Carver did not make significant capital contributions to Holcar. Instead, he made loans to Holcar." [72]

> Carver became a creditor, rather than an equity owner on any substantial basis. In fact, the initial capital contribution was one dollar each for one share each of Holcar stock, and essentially the rest of the operating funds of Holcar was through the vehicle of Carver's loans, and some incidental and smaller loans by Holley. That continued throughout the course of the venture. [T. 45 (opening statement on behalf of Sedco).]

It is the amounts of Carver's unrepaid loans to Holcar (and expenses incurred in connection with the purchase of the tanker) of which recovery is now sought. The theory on which the right to recovery is based is that Carver was induced to make the loans and other expenditures through fraudulent or negligent misrepresentations made to him personally by Amos Carter and Robert Smith, acting on behalf of Sedco.

■ It is plain that the remaining right to recovery asserted is entirely independent of Carver's status as a shareholder in Holcar. Carver's personal right to assert it, as the real party in interest, would hardly be questioned, but for his status as shareholder. The question is whether his dual capacity—as creditor and shareholder—somehow operated to cut off his rights as creditor and vest them in the corporation itself. It did not.

> It is well settled that an individual cause of action can be asserted when the wrong is both to the stockholder as an individual and to the corporation. *White v. First Nat. Bank*, 252 Pa. 205, 97 A. 403 (1916); *Sutter v. General Petroleum Corp.*, 28 Cal.2d 525, 170 P.2d 898, 167 A.L.R. 271 (1946). Commentators likewise have recognized such a right: "A stockholder may sue as an individual where the act complained of creates not only a cause of action in favor of the corporation but also creates a cause of action in favor of the stockholder as an individual, as where the act is in violation of duties arising from contract or otherwise. * * *" 13a Fletcher, Cyclopedia Corporations, § 5921 (rev. ed. 1954).

*Buschmann v. Professional Men's Association*, 405 F.2d 659, 662 (7th Cir. 1969); *see also Empire Life Insurance Co. of America v. Valdak Corp.*, 468 F.2d 330, 335 (5th Cir. 1972) and cases there cited; *Rose v. Schantz*, 56 Wis.2d 222, 201 N.W.2d 593 (1972); *E. K. Buck Retail Stores v. Harkert*, 157 Neb. 867, 62 N.W.2d 288 (1954); *Cullum v. General Motors Acceptance Corp.*, 115 S.W.2d 1196 (Tex.Civ.App.1938). No Iowa case directly on point has been found, but this Court has no doubt that the Iowa courts would follow the rule announced in the cited cases. The rule is also followed in

---

72. Sedco's memorandum regarding conflicts of law, filed August 28, 1980.

the Cayman Islands, Holcar's place of incorporation, as to the law of which Sedco's expert on the matter testified as follows:

Q [by counsel for Carver] ... Assume that a party, by fraud or negligent misrepresentation, induces another to invest money in a project, and the investment is made by means of organizing a corporation and financing it to the benefit of the defrauding party. Is the victim, the individual shareholder, without recourse?

A ... [I]f a person did make a loan as a result of fraud or misrepresentation, and if it could be established that the loan was made because of that fraud or misrepresentation, undoubtedly he would have an action for the amount of money he had lent, plus a reasonable interest. That's clear law. I don't think there is any question of that ....

Q In other words, the shareholder in that situation would have an independent cause of action?

A It's nothing to do with being a shareholder.

Q I know that. But the shareholder, even through a corporation—

A No. You see, I think you are confusing two issues here. This man, apparently, has a dual capacity. He's a shareholder, and he has lent some money. Now, his rights as a shareholder are one thing, and completely separate of that are any rights he might have as a lender, who was induced to make a loan because of misrepresentation; and the fact he's a shareholder, when it comes to inducement to making a loan, is irrelevant. [T. 700–02].

In sum, whether the applicable substantive law be that of the Cayman Islands, Texas, or Iowa (the three possibilities suggested by the parties), Carver's personal right, as Holcar's creditor, to recover the amounts of any loans or other expenditures fraudulently or negligently induced, cannot be doubted. This right survived to his executors.

B.

The Iowa limitations period on actions "for injuries to property, or for relief on the ground of fraud in cases heretofore solely cognizable in a court of chancery, and all other actions, not otherwise provided for in this respect," is five years. Iowa Code § 614.1(4) (1977). This provision applies to actions for financial loss from fraudulent or negligent misrepresentations. *E. g., Clark v. Figge*, 181 N.W.2d 211, 215 (Iowa 1970) *Tietjen v. Hastie*, 342 F.Supp. 1195, 1199 (S.D.Iowa 1972). The Iowa courts have taken the view that the general Iowa statutes of limitations relate to remedy and procedure rather than right or substance, and that they should therefore apply to actions brought in Iowa irrespective of the governing substantive law dictated by other choice of law principles. *Williams v. Burnside*, 207 Iowa 239, 222 N.W. 413 (1928); *Wilson v. Stipp*, 194 Iowa 346, 189 N.W. 665 (1922). There is no reason to believe that this view has changed in recent years. *See Conradi v. Boone*, 316 F.Supp. 918 (S.D. Iowa 1970); *cf. Player Pianette, Inc. v. Dale Electronics, Inc.*, 478 F.2d 336 (8th Cir. 1973); Restatement (Second) of Conflicts §§ 142 and 143 (1971). Iowa does however have a borrowing statute, Iowa Code § 614.7 (1977):

When a cause of action has been fully barred by the laws of any country where the defendant has previously resided, such bar shall be the same defense here as though it had arisen under the provisions of this chapter; but this section shall not apply to causes of action arising within this state.

Two of the three counterclaim defendants have at all material times resided in Texas, and the third, Sedco International, has been treated by this Court (for jurisdictional purposes at least) as merely the alter ego of one of those two. *See* Order of January 7, 1980. The Texas limitations period on actions for fraudulent and negligent misrepresentation is two years. *White v. Bond*, 362 S.W.2d 295 (Tex.1962); *Citizens State Bank of Dickinson v. Shapiro*, 575 S.W.2d 375 (Tex.Civ.App.1978). Sedco argues that

this Court should, under the Iowa borrowing statute, apply the two-year Texas limitation to bar all claims made by Carver which "arose" before July 21, 1976. Although this suit was first filed on December 14, 1977, the counterclaim was not filed until July 21, 1978.

Sedco's argument obviously raises two main questions: whether Carver's causes of action "arose within this state" within the meaning of § 614.7; and, if not, whether any or all of them were "fully barred" by the laws of Texas when they were asserted. The answer to the first question is dispositive of the limitations issue.

 The traditional view, in Iowa as elsewhere, has been that a cause of action for tort arises when and where "the last event necessary to make an actor liable . . . takes place." Restatement of the Conflicts of Laws § 377 (1934); *cf. Stoller Fisheries, Inc. v. American Title Ins.*, 258 N.W.2d 336, 340 (Iowa 1977) (when); *Smith v. New York Life Insurance Co.*, 208 F.Supp. 240, 242 (S.D.Iowa 1962) (where) (predicting Iowa law) (Stephenson, J.). As applied to actions for fraud, this rule yields the result that "the place of wrong [hence, the place where the cause of action arises] is where the loss is sustained, not where the fraudulent representations are made." First Restatement of Conflicts § 377, note 4; *cf. Smith v. New York Life Insurance Co., supra.* "[T]he weight of authority . . . generally adopts the view of the First Restatement of Conflicts that a cause of action for fraud arises where the loss is sustained and that loss from fraud is deemed to be suffered where its economic impact is felt, normally the plaintiff's residence." *Sack v. Low*, 478 F.2d 360, 366 (2d Cir. 1973) (Friendly, Ch. J.). This traditional "place of injury" rule has continued to govern the construction and application of borrowing statutes, notwithstanding the advent of the "most significant relationships" test else-

where in the choice of law field. *Arneil v. Ramsey*, 550 F.2d 774 (2d Cir. 1977); *Sack v. Low, supra; Mack Trucks, Inc. v. Bendix-Westinghouse Auto. A. B. Co.*, 372 F.2d 18 (3d Cir. 1966); *Posner v. Merrill Lynch, Pierce, Fenner & Smith*, 469 F.Supp. 972 (S.D.N.Y.1979); *Bache Halsey Stuart Inc. v. Namm*, 446 F.Supp. 692 (S.D.N.Y.1978).[73] Among other reasons for this are the facts that borrowing legislation is after all legislation; that its construction depends ideally on ascertainment of the intents of the legislatures that enacted it; and that most such legislation, including Iowa's borrowing statute, was enacted during the period when the notion of the "place of arising of a cause of action" had a peculiar and appropriate meaning in law, given by the place of injury rule and its ramifications. The legislatures that enacted the legislation presumably had this meaning in mind; and there is no sufficient reason why it cannot or should not still be given effect by the courts.

> As the majority correctly points out, borrowing legislation has been seen as a permissible method legislators may use to instruct the courts in their dealings with limitation problems dealing with conflicts of law. Borrowing statutes, when applicable, largely preempt the court's examination into alternative conflicts of law theories because the statute requires a mechanical and uniform result intended to discourage forum shopping.

*Patch v. Playboy Enterprises, Inc.*, 652 F.2d 754 at 758 (8th Cir. 1981) (concurring opinion) (footnote omitted); *cf. Mack Trucks, Inc. v. Bendix-Westinghouse Auto A. B. Co., supra*, 372 F.2d at 21.

A majority of states are said to follow this place of injury rule. Estes, *Borrowing Statutes of Limitations and the Conflict of Laws*, 15 U.Fla.L.Rev. 33, 47 (1962); Vernon, *Statutes of Limitations in the Conflict of Laws: Borrowing Statutes*, 32 Rocky Mt.L.Rev. 287, 302 (1960).

---

**73.** *But see Natural Resources Corp. v. Royal Resources Corp.*, 427 F.Supp. 880 (S.D.N.Y. 1977), holding that New York would now apply the "most significant relationships" test in determining where a cause of action accrued for purposes of its borrowing statute. This "pre-

diction" of New York law was rejected in both *Posner v. Merrill Lynch, Pierce, Fenner & Smith*, 469 F.Supp. 972 (S.D.N.Y.1979) and *Bache Halsey Stuart Inc. v. Namm*, 446 F.Supp. 692 (S.D.N.Y.1978), both cited in the text.

This rule works well for injuries caused by a single act or for injuries occurring at a single location . . . .

*Patch v. Playboy Enterprises, Inc., supra,* slip op. at 3. Although no Iowa case directly on point has been found, this Court believes that the Iowa courts would follow the line of authority just cited and would apply the traditional place of injury rule in deciding where causes of action for fraudulent and negligent misrepresentation have arisen within the meaning of § 614.7.

■ That much being given, it follows from the facts of this case that for purposes of § 614.7 Carver's causes of action arose in Iowa. The last acts necessary to make Sedco liable under both of Carver's theories—the advancements of money by Carver to Holcar and others in reliance on the representations of Amos and Smith—occurred in Iowa, since the checks were written and sent out and the orders for payment given (for the most part by McKillip) in Iowa, namely, in Muscatine. The fact that the accounts from which the money was drawn were maintained in banks outside of Iowa is not dispositive: the main sources of Carver's wealth and hence of the sums expended, Carver Pump Co. and Bandag, Inc., were (and continue to be) headquartered in Iowa; the economic impact of the losses sustained was unquestionably felt mainly in Iowa. Moreover, although in his later years Carver traveled a good deal and spent much of his time outside of Iowa, he maintained his legal residence here, voted here, and continued to play an active role in this state's affairs; to the extent that he became a poorer man, he became principally a poorer Iowan. *Cf. Arniel v. Ramsey, supra,* 550 F.2d at 780. The Court believes that if

presented with the issue the Iowa courts would hold that the place of Carver's injury was Iowa and that his causes of action for fraudulent and negligent misrepresentation "arose within this state" within the meaning of § 614.7. It follows that the borrowing provisions of § 614.7 do not apply to the causes of action; and that Iowa's five-year limitations period applies whether or not the causes would be fully barred by the laws of Texas. Since Carver's counterclaims were asserted well within five years of the time(s) they accrued, they are time-barred neither in whole nor in part.

### C.

We next consider the effects of the $1.5 million payment to Ali Jaidah.

Sedco argues that the "payment violate[d] the law and public policy of every jurisdiction which has a substantial connection with the facts of this lawsuit," including that of Iowa, Texas, the United States, and Qatar. Sedco's post trial brief at 118. As to whether the payment violated the positive laws of Iowa, Texas, and the United States, the Court is in doubt. The laws cited [74] are criminal in nature; with the exception of the allegedly applicable section of the Foreign Corrupt Practices Act of 1977, 15 U.S.C. § 78dd–2 (1976 Supp. I) there is much room for question as to their applicability to such a foreign payment as was made here; and 15 U.S.C. § 78dd–2 did not become effective until well after the payment was made. Be that as it may, the Court does find that the payment violated the laws of Qatar. This was established through the testimony of Moustafa El-Kayl, an Egyptian lawyer and former judge now practicing in the United States.[75] A trans-

---

**74.** Iowa Code ch. 722 (1981) (formerly ch. 739); Tex.Penal Code § 36.02 (Supp.1980); 18 U.S.C. § 1952 (1970) (Travel Act); 18 U.S.C. § 1341 (1966) (Mail Fraud Act); 15 U.S.C. § 78dd–2 (1976 Supp. I) (Foreign Corrupt Practices Act).

**75.** Carver objected to El-Kayal's testimony on several grounds. *See* T. 3218–22. The Court received the testimony subject to the objection, and now overrules the objection in its entirety. As to the claim that insufficient notice was given that Sedco intended to raise the issue of

Qatar's law on bribery, and that El-Kayal in particular would be called to testify as an expert on this matter, the Court points out that: (1) Sedco's amended answer to the counterclaims, raising the illegality defense for the first time, was permitted to be filed on July 16, 1980. (2) In its order permitting the filing of the amended answer, the Court permitted Carver to conduct further discovery, up to the time of trial, relating to any matter put in issue for the first time by the amended answer. The Court also said explicitly that it would consider

lation of the provisions of the Qatar Penal Law relating to bribery of public employees in effect at all relevant times, Ex. 600, was introduced in evidence through El-Kayal and discussed by him. *See* T. 3229–41. It clearly appears from the evidence that Carver, along with Amos and the Jaidah brothers, violated the terms of those provisions.[76] Moreover, whether or not the payment violated any laws of the United States in effect at the time, it was certainly in violation of the public policy of this nation. The purpose of the Foreign Corrupt Practices Act was precisely to put added teeth into that policy.

Recent investigations by the SEC [77] have revealed corrupt foreign payments by over 300 U.S. companies involving hundreds of millions of dollars. These revelations have had severe adverse effects. Foreign governments friendly to the United States in Japan, Italy, and the Netherlands have come under intense pressure from their own people.[78] The image of American democracy abroad has been tarnished. Confidence in the financial integrity of our corporations has been impaired. The efficient functioning of our capital markets has been hampered.

Corporate bribery is bad business. In our free market system it is basic that the sale of products should take place on the basis of price, quality, and service. Corporate bribery is fundamentally destructive of this basic tenet. Corporate bribery of foreign officials takes place primarily to assist corporations in gaining business. Thus foreign corporate bribery

---

postponing the trial date for one month at Carver's request. (3) Sedco gave formal notice that it intended to raise an issue concerning the law of Qatar on the illegality of the payment on July 28, 1980. On the same date it indicated by way of response to Carver's interrogatories that either El-Kayal or some other attorney qualified to testify on the matter would be called. (4) Ex. 600 was furnished to Carver's attorneys sometime in August. (5) On August 29, 1980, by way of further response to Carver's interrogatories, Sedco indicated that El-Kayal would be called and gave information on him and his expected testimony. (6) Carver never requested postponement of the trial date for the reason that he had not had time to depose El-Kayal or for any other reason. Carver's other objections to El-Kayal's testimony are equally without merit.

76. The laws (as translated) read as follows:
ARTICLE 109: Any public employee who requests or accepts, for himself or others, money or a benefit or a promise of such a thing in return for performing an act within the scope of his duties or an act which he claims falls within the scope of his duties or refraining from performing such act, whether or not such act is otherwise legal, shall be punished by imprisonment for a period not to exceed seven years. The crime would be deemed to have been committed even if the public employee never intended to perform the act which he promised or refrain from performing such act.

Shall also be considered a bribe the specific benefit which accrues to the public employee or others from the sale of personal property or real estate for a price which exceeds its fair-market value or from buying such personal property or real estate for a price which is below its fair-market value or from any contract between the payor and the bribed employee.

ARTICLE 110: Any person who offers a public employee money or a benefit or a promise of such thing shall be subject to the punishment provided for in Article 109 if the public employee accepts what he was offered or promised. Shall be subject also to the same punishment the intermediary between the payor and the bribed employee.

The payor of the bribe or the intermediary shall be exempted from punishment if they report the crime to the competent authorities.

ARTICLE 111: Any person who offers a bribe that is not accepted from him shall be punished by imprisonment for a period not to exceed one year or a fine which does not exceed 1,000 Riyals or both.

77. *See* Securities and Exchange Commission, *Report on Questionable and Illegal Corporate Payments and Practices* (1976) (submitted to the Senate Banking, Housing and Urban Affairs Committee, May 12, 1976).

78. *Cf.* McLaughlin, *The Criminalization of Questionable Foreign Payments by Corporations: A Comparative Legal Systems Analysis,* 46 Fordham L.Rev. 1071, 1072 (1978): "Among other things, their disclosure has forced the removal of a Central American president, embarrassed a Philippine regime, led to a constitutional crisis in the Netherlands, caused legislative paralysis in Japan, and shaken an Italian government. In the United States, questions over the propriety of foreign payments recently delayed the confirmation of the chairman of the Federal Reserve Board." (Footnotes omitted).

affects the very stability of overseas business. Foreign corporate bribes also affect our domestic competitive climate when domestic firms engage in such practices as a substitute for healthy competition for foreign business.

... Secretary of the Treasury Blumenthal, in appearing before the committee in support of the criminalization of foreign corporate bribery testified that: "paying bribes—apart from being morally repugnant and illegal in most countries—is simply not necessary for the successful conduct of business here or overseas."

The committee concurs in Secretary Blumenthal's judgment. Many U.S. firms have taken a strong stand against paying foreign bribes and are still able to compete in international trade. Unfortunately, the reputation and image of all U.S. businessmen has been tarnished by the activities of a sizable number, but by no means a majority of American firms. A strong antibribery law is urgently needed to bring these corrupt practices to a halt and to restore public confidence in the integrity of the American business system.

\* \* \* \* \* \*

The committee recognizes that the SEC has diligently sought to enforce the existing provisions of the Federal securities laws by requiring corporate reports to disclose "material" payments. Nevertheless, the committee has concluded that— "The serious abuses which the Commission has uncovered justify an explicit congressional affirmation of our national commitment of ending corrupt foreign payments. While the Commission has made substantial progress in its enforcement program, the committee believes that legislation is appropriate to make clear that cessation of these abuses is a matter, not merely of SEC concern, but of national policy."

S.Rep.No.114, 95th Cong., 1st Sess. 3, *reprinted in* [1977] U.S.Code Cong. & Ad. News 4098, 4101 and 4107. In short, there is ample reason to condemn the payment to Ali Jaidah.

The Holcar project in Qatar would not have gone forth, says Sedco, and Carver would have sustained no losses, had he not made the payment. Hence, according to Sedco, Carver's causes of action are founded directly on an illegal and immoral act. Sedco sets up two hoary maxims as bars to any recovery by Carver: *Ex dolo malo non oritur actio* ; and (in view of Sedco's participation in the payment through Amos) *in pari delicto potior est conditio defendentis.* The meaning of these maxims may be gathered from the following passage from *Koepke v. Peper.* 155 Iowa 687, 136 N.W. 902, 903 (1912):

> Lord Mansfield said, in *Holman v. Johnson,* [1] Cowp. 341 [1775], that: "No court will lend its aid to a man who founds his cause of action upon an immoral or illegal act. If from the plaintiff's own stating or otherwise, the cause of action appears to arise ex turpi causa, or the transgression of a positive law of this country, then the court says he has no right to be assisted. It is upon that ground the court goes, not for the sake of the defendant, but because they will not lend their aid to such a plaintiff. So if the plaintiff and defendant were to change sides, and defendant was to bring his action against the plaintiff, the latter would then have the advantage of it; for, where both are equally in fault, potior est conditio defendentis [the condition of the defendant is the better]." And such has been the law since. \* \* \* The law will leave the parties exactly where they stand, not that it prefers one to the other, but because it will not recognize a right of action founded on an illegal contract [or act] in favor of either party. [Citations].

These maxims are obviously related to the equitable doctrine of unclean hands. They have continued to find application in these latter days. *See U.S. v. Farrell*, 606 F.2d 1341 (D.C.Cir.1979) and cases there cited; *cf. Wunschel Law Firm, P.C. v. Clabaugh*, 291 N.W.2d 331, 335 (Iowa 1980) ("A contract which contravenes public policy will not be enforced by the courts"). The same

**320**

rules apply in Texas, *see Norman v. B. V. Christie & Co.* 363 S.W.2d 175 (Tex.Civ.App. 1962), and, evidently in Qatar, *see* T. 3241–45 (El-Kayal).

 Every rule has its exceptions, and this is particularly true of the maxims invoked by Sedco. The policy of the courts is to discourage transactions illegal or in contravention of public policy. To this end the courts will generally refuse to lend their aid to one who founds his cause of action upon such a transaction, particularly if to do so would permit him to reap the benefits thereof. But the limits of the policy point the limits of the rule. On the one hand the plaintiff's wrongdoing may be merely incidental or collateral to his main cause of action; the right for which he seeks protection may have existed independently of his misdeed and not have accrued to him because of it. The test is said to be whether "it is necessary for him to prove his own illegal contract or act as a part of his cause of action, or [whether] an essential element of his cause of action is his own violation of law." *Koepke v. Peper, supra,* 136 N.W. at 903. If not, the law can have no objection to enforcing the independent right asserted; the plaintiff's *demands* are clean, if not, in whole, his hands. *Cf. Note, The Meaning of "Clean Hands" in Equity,* 35 Harv.L.Rev. 754 (1922). Thus, for example:

> Although one is engaged in a criminal activity with another person, he is nevertheless entitled to recover for harm intentionally inflicted by his fellow conspirator, and this is true even though the harm arises out of and because of the crime that is being committed. Thus if two robbers dispute over the spoils and one of them shoots the other, the other has a cause of action for the physical harm, although . . . he would not have a cause of action because of a refusal by the other to divide the spoils.

Restatement (Second) of Torts § 889 comment c (1979). Perhaps more to the point is

the following language from *National Bank & Loan Co. v. Petrie,* 189 U.S. 423, 425, 23 S.Ct. 512, 47 L.Ed. 879 (1903) (Holmes, J.):

> But a person does not become an outlaw and lose all rights by doing an illegal act. See *Connolly v. Union Sewer Pipe Co.,* 184 U.S. 540 [22 S.Ct. 431, 46 L.Ed. 679]. The right not to be led by fraud to change one's situation is anterior to and independent of the contract. The fraud is a tort. Its usual consequence is that as between the parties the one who is defrauded has a right, if possible, to be restored to his former position. That right is not taken away because the consequence of its exercise will be the undoing of a forbidden deed. That is a consequence to which the law can have no objection, and the fraudulent party, who otherwise might have been allowed to disclaim any different obligation from that with which the other had been content, has lost his right to object because he has brought about the other's consent by wrong.

Or as is said in *Note, Principles Governing Recovery by Parties To Illegal Contracts,* 26 Harv.L.Rev. 738, 740 (1913), "The reluctance of the courts to adjust the rights of criminals is hardly a sufficient reason for allowing clever scoundrels to defraud their victims whenever they can involve them in crime." *Cf. Loughran v. Loughran,* 292 U.S. 216, 228, 54 S.Ct. 684, 78 L.Ed. 1219 (1934) ("it is settled that illegality constitutes no defense when merely collateral to the cause of action sued on"); *Kansas City Operating Corp. v. Durwood,* 278 F.2d 354 (8th Cir. 1960); *Manning v. Noa,* 76 N.W.2d 75 (Mich.1956); *Norman v. B. V. Christie & Co., supra,* 363 S.W.2d at 177–78.

 On the other hand, the courts have also recognized that even where the rule *ex dolo malo* would otherwise apply in a suit between parties *in pari delicto*, overriding considerations of public policy may nevertheless require their interposition.[79]

**79.** *Marshall v. Lovell,* 19 F.2d 751 (8th Cir. 1927), *cert. denied,* 276 U.S. 616, 48 S.Ct. 207, 72 L.Ed. 733 (1928); *Stewart v. Wright,* 147 F. 321 (8th Cir.) *cert. denied,* 203 U.S. 590, 27 S.Ct. 777, 51 L.Ed. 330 (1906); *In re Sylvester,* 195 Iowa 1329, 192 N.W. 442 (1923); *Monroe v. Smith,* 39 S.D. 518, 165 N.W. 532 (1917); *Lewis v. Davis,* 145 Tex. 468, 199 S.W.2d 146

Barring wooden application of the maxims, the real question in every case must be whether the ends of the law will be furthered or defeated by granting the relief asked. *Cf.* 27 Harv.L.Rev. at 740. It will generally not further the ends of the law to aid a plaintiff to reap benefits from the illegal transaction, even if the defendant has done so; [80] such is one deterrent against illicit transactions. But the plaintiff may not seek to reap any such benefits. He may instead proceed by way of repudiation, seeking merely the return to him of what he has lost. And the effect of denying him this relief may merely be "to secure to the cleverer or more fortunate wrongdoer the continued enjoyment of his unjust enrichment, and to punish the other party to an extent which may be utterly disproportionate to the magnitude of his offense. * * * [S]uch injustice would seem, at least in the case of minor infractions of the law, clearly to outweigh any benefit which may result from the rule in the way of discouraging illegal transactions," 26 Harv.L.Rev. at 739 (footnote omitted); the ends of justice may be furthered more by requiring the defendant to disgorge his "unjust enrichment" or even to make whole the plaintiff's losses, thereby making an example of him rather than the plaintiff. Courts are particularly inclined to take this view when, despite the rule that "the doctrine of *par delictum* is not modified by the degree of guilt of the violators of the law, or the turpitude of the offense," *Steever v. Illinois Cent. R. Co.,* 62 Iowa 371, 17 N.W. 595, 597 (1883) (*and see* the dissenting opinion of Sanborn, J. in *Stewart v. Wright, supra* n. 78, 147 F. at 339, citing many cases), it appears that one of the parties is comparatively more innocent than the other, as when the plaintiff has been induced to join in the illegal transaction by fraud on the part of the defendant.[81]

 With these principles in mind,[82] the Court has determined to dispose of Sedco's *ex dolo malo* defense as follows. Carver's executors will not be permitted to recover the amount of the bribe paid to Ali Jaidah. As to the bribe itself the Court believes both Carver and Sedco (through Amos) to have been guilty of an offense against the laws of Qatar and the public policy of the United States. Carver's attempt to recover the amount of the payment as an item of his damages put its character directly in issue; and its character is such as the Court cannot countenance. There is no reason to believe that such bribes would be deterred more by forcing Sedco rather than Carver to bear the loss. But Carver's executors will be permitted to recover the balance of Carver's proved losses (assuming section VII, *infra*). First, the Court finds the illegal payment to be wholly collateral to Carver's causes of action for recovery of these other losses. His rights not to be misled by fraudulent or culpably negligent misrepre-

---

(1947); 2 Pomeroy, Equity Jurisprudence § 941 (5th ed. 1941).

**80.** Even this may not be true. *See, e. g., Wunschel Law Firm, P. C. v. Clabaugh,* 291 N.W.2d 331 (Iowa 1980), where a certain contingent fee contract between attorney and client was held to be against public policy so that the attorney could not recover under the contract for services rendered, although he was permitted a reasonable fee on a quantum meruit basis.

**81.** *Daniels v. Tearney,* 102 U.S. 415, 26 L.Ed. 187 (1880); *Wager v. Pro,* 575 F.2d 882 (D.C. Cir.1976); *Gold Bond Stamp Co. of Georgia v. Bradfute Corp.,* 463 F.2d 1158 (2d Cir. 1972); *Tampa Electric Co. v. Nashville Coal Co.,* 276 F.2d 766 (6th Cir. 1960); *National City Bank v. Carter,* 31 F.2d 25 (6th Cir.), *cert. denied,* 280 U.S. 559, 50 S.Ct. 18, 74 L.Ed. 614 (1929); *Marshall v. Lovell, supra; Stewart v. Wright, supra; In re Sylvester, supra; Devall v. Strunk,*

96 S.W.2d 245 (Tex.Civ.App.1936); 2 Pomeroy, Equity Jurisprudence § 942.

**82.** As the citations will have indicated, the principles relied on apply in both Iowa and Texas, the two domestic jurisdictions with the most significant relationships to the facts of this case. To that extent no choice of law issue arises out of Sedco's *ex dolo malo* defense. The law of Qatar on the applicability of the defense was by no means fully proved by Sedco. In any event, the Court believes that Qatar's interest in the outcome of the case is fully served by denying recovery by Carver's executors of the amount of the bribe paid to Ali Jaidah, which the Court has determined to do; and that as to whether recovery should be permitted of the balance of Carver's losses the laws of either Iowa or Texas should apply.

sentations to invest his money in the venture were anterior to and independent of the illegal payment; those are the rights on which he has sued, not any right ostensibly deriving from the payment itself, not even the production-sharing agreement with Qatar; and it would have been possible for him to prove up his causes of action for the balance of his losses without proving his own illegal act. Second, even were the illegal payment not collateral to the main causes of action, this would be a case in which overriding considerations of public policy would require the interposition of the Court on Carver's behalf. Carver's misconduct began and ended with the payment itself, while Sedco's extended to all the facts and circumstances of the case. To the extent that either of the parties benefited because the payment was made, it was Sedco that did so, not Carver. To bar all recovery by Carver would punish him out of all proportion to the magnitude of his offense while permitting Sedco to reap the benefits of its own more pervasive wrongdoing. Conversely, to permit recovery of Carver's losses exclusive of the amount of the payment will in no way further the ends of the payment or effectuate the wrong associated therewith, while it will serve to deter repetition of the offenses committed by Sedco. The Court is of the opinion that the ends of justice will be better served by adjusting the rights of the parties before it as indicated rather than by strict formalistic adherence to the maxim *ex dolo malo non oritur actio.*

## VII.

The Court now addresses the merits of Carver's alternative claims of fraudulent and negligent misrepresentation.

### A.

■ In an action for fraud, a plaintiff in either Iowa or Texas has the burden of proving by a preponderance of clear, satisfactory, and convincing evidence each of the following elements: (1) a material misrepresentation (2) made knowingly (scienter) (3) with intent to induce the plaintiff to act or refrain from acting (4) upon which the plaintiff justifiably relies (5) with resulting injury and damages. *Beeck v. Kapalis*, 302 N.W.2d 90, 94 (Iowa 1981); *Stone v. Lawyers Title Insurance Corp.*, 554 S.W.2d 183, 185 (Tex.1977). A greater showing than a mere preponderance is mandated in fraud actions by the presumption of fair dealing accompanying a transaction. *Omaha Bank for Cooperatives v. Siouxland Cattle Cooperative*, 305 N.W.2d 458, 464 (Iowa 1981); *cf. Neuhaus v. Kain*, 557 S.W.2d 125, 136 (Tex.Civ.App. 1977). Upon making the required showing, the plaintiff is entitled to the actual pecuniary loss sustained as a result of the wrong. *B & B Asphalt Co. v. T. S. McShane Co.*, 242 N.W.2d 279, 285 (Iowa 1976); *Fredonia Broadcasting Corp. v. RCA Corp.*, 569 F.2d 251, 259 (5th Cir. 1978), *cert. denied*, 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1979) (Texas law); Restatement (Second) of Torts § 549(1) (1977). Both Iowa and Texas recognize the benefit of the bargain rule in measuring damages suffered as the result of fraud, but this rule is irrelevant here because Carver claims and has offered proof only upon his out-of-pocket losses. *Cf.* Restatement (Second) of Torts § 459 comment g ("If the plaintiff is content with these damages [for out-of-pocket losses], he can always recover them.").

■ Carver alternatively argues that if Sedco is not liable for fraudulent misrepresentation, then it is at least liable for negligent misrepresentation. Both Iowa and Texas adopt the Restatement definition of negligent misrepresentation which states in pertinent part:

(1) One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552. *See Larsen v. United Federal Savings & Loan Ass'n*, 300 N.W.2d 281, 287 (Iowa 1981); *Great American Mortgage Investors v. Louisville Title Ins. Co.*, 597 S.W.2d 425, 429 (Tex.Civ.App.1980). Proof of this cause of action also entitles Carver to damages for his out-of-pocket losses. Restatement (Second) of Torts § 552B comment a. Sedco pleads in response the affirmative defense of contributory negligence: "The recipient of a negligent misrepresentation is barred from recovery for pecuniary loss suffered in reliance upon it if he is negligent in so relying." Restatement (Second) of Torts § 552A.

Since there is no indication that the substantive law or the policy of the laws of Texas are any different from those of Iowa, the Court will apply Iowa law to Carver's causes of action. *Cf. Smith v. New York Life Insurance Co., supra,* 208 F.Supp. at 242. The following element-by-element discussion pertains to both the fraud and negligence claims except where the elements of the two diverge. The fraud elements of scienter and intent to deceive are discussed separately from the negligence elements of duty of care and breach, as are the subjective (fraud) and objective (negligence) standards for justifiable reliance.

### 1. *Material Misrepresentations.*

A misrepresentation is material if a reasonable person would attach importance to it in making a decision regarding the transaction in question. Restatement (Second) of Torts § 538. Misrepresentation denotes "not only words spoken or written but also any other conduct that amounts to an assertion not in accordance with the truth." Restatement (Second) of Torts § 525 comment b. Accordingly, under cer-

tain circumstances, there may be not only misrepresentation by making affirmative false statements, but also "misrepresentation by silence resulting from the failure to disclose the existence of something which the other person has a reason to believe would be disclosed." Keeton, *Fraud-Concealment and Non-Disclosure*, 15 Tex.L. Rev. 1, 1–2 (1936).

> One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

Restatement (Second) of Torts § 551(1); *cf. First National Bank v. Brown*, 181 N.W.2d 178, 182 (Iowa 1970). The duty to disclose arises in a variety of contexts,[83] particularly "where there exists a relationship of trust or confidence, and the trusted party has superior knowledge of the fact ... the superior party has a duty to disclose all material facts of which he is aware ...." *Id.*[84]

Amos Carter and Robert Smith clearly cultivated a relationship of trust and confidence with Carver. Smith was paid to gather information and provide Carver with a wide range of other professional services. The TerraMar literature itself delineates the nature of the relationship Carver was entitled to expect: "During their careers, these professionals [referring to Smith and the other TerraMar consultants] have recognized and valued the special privileged relationship which must exist between a consultant and his client in all matters, technical or non-technical." Stipulation

---

83. *See* Restatement (Second) of Torts § 551(2).

84. The circumstances in which courts are willing to find this relationship of trust and confidence are expanding in accordance with the notion "that full disclosure of all material facts must be made whenever elementary fair conduct demands it." W. Prosser, *Handbook of the Law of Torts*, § 106 at 698 (4th ed. 1971). *Cf. Miller v. Berkoski*, 297 N.W.2d 334, 340

(Iowa 1980) ("Just as we have dislodged the encrusted concepts of the ancient doctrine of caveat emptor ... this court has rejected the old predatory philosophies of business relationships. Our decisions have enhanced the obligation of agents and fiduciaries, functioning in positions of trust and confidence, to perform their duties in complete candor, honesty, loyalty and good faith." (citations omitted)).

filed August 28, 1980, ¶ 6. In addition, it is clear that Amos assumed the role of Carver's special advisor throughout the venture, having gained Carver's trust and confidence through representations about his broad experience in Middle East oil exploration and drilling and his knowledge in particular about the former QOC concession.

It could not be plainer that Amos and Smith made material misrepresentations to Carver both by affirmative false statements and by their silence upon matters known to them that they were under a duty to disclose by reason of their superior knowledge and the special relationship they cultivated with Carver. The central misrepresentations initially concerned the time, cost, and manner in which the oil could be produced from the wells. These were affirmatively misrepresented; and material facts inconsistent with the representations made were suppressed. After Carver was well into the project the misrepresentations and failures to disclose went principally to Smith's statements of the production rates and resulting "net income to Holcar" the wells would supposedly yield.

■ Sedco argues that, at least as to the statements made by Smith, only opinions and projections were given to Carver and opinions "cannot form the basis for a cause of action for fraud." Sedco's post trial brief at 58. This is incorrect. Liability may exist where one fraudulently makes a misrepresentation of "fact, opinion, intention, or law." Restatement (Second) of Torts § 525; cf. Grefe v. Ross, 231 N.W.2d 863, 867 (Iowa 1975). Fact statements are distinguished from those of opinion only because [t]here is sometimes . . . a marked difference between what constitutes justifiable reliance upon statements of the maker's opinion and what constitutes justifiable reliance upon other representations." Restatement (Second) of Torts § 525 comment d. This matter will be considered further, infra.

2(a). *Scienter/Intent to Deceive.*

■ Three alternative means of establishing scienter are recognized: (1) proof of actual knowledge of the falsity of the representation; (2) proof that the representation was made with reckless disregard of whether it was true or false; or (3) proof that the party's special situation or means of knowledge was such as to make it his duty to know the truth or falsity of the representation. *Mills County State Bank v. Fisher,* 282 N.W.2d 712, 714 (Iowa 1979); *Grefe v. Ross, supra,* 231 N.W.2d at 867. Intent to deceive is closely related to scienter and "[i]t is ordinarily established from the same evidence." *B & B Asphalt Co. v. T. S. McShane Co., supra,* 242 N.W.2d at 284. "[T]he deceit consists in inducing the action of the plaintiff by representations [made by the defendant with scienter]." *Smith v. Packard & Co.,* 152 Iowa 1, 130 N.W. 1076, 1977 (1911).

■ The great weight of the clear, satisfactory, and convincing evidence supports the conclusion, and the Court finds, that Amos and Smith knew that their early representations as to the time, cost, and manner of production from the A structure were false. By virtue of their long experience in the oil business and their specialized knowledge of the QOC wells, particularly of the $H_2S$ and other gases the wells contained, these men knew that the wells could not be put on production in three months time, for $2 to $3 million, simply by reopening the wells and flowing the oil into a tanker or barge for immediate sale. Amos knew this all along, and Smith knew it at least from November 1975 when he examined the government files in Doha. Both also knew of information inconsistent with their representations which they deliberately suppressed. Both also knew that Smith's 1976 representations as to first-year production rates and resulting "net income" were false when made. These representations were made with the intent of influencing and did in fact influence Carver's conduct. Accordingly, the elements of scienter and intent to deceive have been proved. Even if Amos and Smith did not know their representations were false, they made them in reckless disregard of their truth or falsity, considering the excellent reasons there

were for questioning them. Finally, in view of the special relationship of trust and confidence they cultivated with Carver and their specialized knowledge and means of knowledge, Amos and Smith had a duty to know the truth or falsity of their representations. Therefore, under any of the three alternative means of proof, scienter and the closely related element of intent to deceive are clearly proved.

#### 2(b). *Duty/Breach.*

 Alternatively, even if the required state of mind for fraud were not proved, there is sufficient evidence from which the Court would conclude that under the theory of negligent misrepresentation, Amos and Smith breached a duty of care owed to Carver. The duty was "to exercise reasonable care or competence in supplying correct information." Restatement (Second) of Torts § 522 comment a. The duty extended to Carver because Amos and Smith "knew or should have foreseen" that he would rely on the information they supplied to him. *Larsen v. United Federal Savings & Loan Ass'n, supra*, 300 N.W.2d at 286.

Expert testimony by Walt Elson, Alexander Erickson, Rudy Luedtke, and Hugh Kirkpatrick established that in order to make an informed statement regarding the time, cost, and manner of production of oil from a given reservoir, certain information must be obtained: well production rates; composition of the well effluents including hydrocarbons, acid gas constituents, water, sulfur, hydrogen sulfide, and carbon dioxide; meteorological data; soils data; water depths; well conditions, completion methods; and probable marketing concerns. Only with this information can a production design and plan for production of the oil be devised. Thereafter, it is standard procedure to make inquiries of manufacturers and service companies in order to obtain cost estimates for the various components to be incorporated into the proposed production system. No such procedure was followed by Amos or Smith before they made their time, cost, and manner predictions. This was clearly a breach of their duty to Carver.

Furthermore, Smith's methods of presenting the wells' production rates and arriving at income projections based on those rates were the subject of severe criticism by Walter Crow, Philip Brennan, and Dr. Charles Smith, all experts qualified in such matters. The breach of duty by Smith in this regard is established.

#### 3. *Justifiable Reliance.*

 The Court must determine whether Carver did in fact rely upon the misrepresentations of Amos and Smith and if he did, whether this reliance was justified. Clearly there was reliance in fact by Carver. The Court rejects Sedco's contention that Carver's consultation of Secondary Recover Services (SRS) was an independent investigation upon which he relied and which legally precludes him from claiming reliance upon Amos and Smith. Sedco's post trial brief at 69–73. "It is not enough to relieve the maker of a fraudulent misrepresentation from liability that the person to whom it is made makes an investigation of its truth. It is only when he relies upon his investigation and does not rely upon the false statement that he cannot recover." Restatement (Second) of Torts § 547 comment a. Carver believed that the investigation for which he was paying TerraMar was his own investigation. Furthermore, it cannot be said that the services provided by SRS constituted an independent investigation—the only data available to them were those generated by TerraMar. Finally, it has been observed that Smith effectively quelled any doubt raised by SRS thereby "intentionally prevent[ing] the investigation from being effective." Restatement (Second) of Torts § 547(2).

 The question remains whether Carver's reliance on Amos and Smith was justified. There are two standards for determining whether one party to a transaction has a right to rely on representations of the other. The first is the subjective standard applicable in cases of fraud: "whether the complaining party, in view of his own information and intelligence, has a

right to rely on the representations." *Lockard v. Carson*, 287 N.W.2d 871, 878 (Iowa 1980). The second is the objective standard applicable in cases of negligence: whether a person acting with reasonable and ordinary prudence and caution would have a right to rely on the representations. Restatement (Second) of Torts § 552A comment a; *cf. Lockard v. Carson, supra*, 287 N.W.2d at 877. The latter standard raises the issue of contributory negligence—if Carver himself failed to exercise the care of a reasonably prudent person in relying on Sedco's representations, then his cause of action for negligent misrepresentation, but not fraudulent misrepresentation, would be barred. Restatement (Second) of Torts § 552A comment a. The Court finds that even by the higher, objective standard required for justifiable reliance on merely negligent misrepresentations, Carver was justified in relying on the representations of Amos and Smith, and there was no contributory negligence on his part in so relying.

 Sedco's argument that Carver had no right to rely on Amos and Smith because they were offering only opinions and projections is totally without merit. Even if the statements were "opinions" rather than statements of fact, Carver could reasonably interpret them as implied statements that facts known to Amos and Smith were not incompatible with their opinions or that they knew facts sufficient to justify the opinions given. Restatement (Second) of Torts § 539. Carver was also justified in relying on the statements as opinions because Amos and Smith purported to have special knowledge and they successfully endeavored to secure a relationship of trust and confidence with Carver. Restatement (Second) of Torts § 542.

Until May 27, 1976, when Carver learned from the Earl and Wright engineers the magnitude of the project, he certainly was justified in relying on Amos and Smith's representations as to the time, cost, and manner of oil production. Any early caveats expressed did not go to the heart of the misrepresentations, rather they only warned that the production rates—hence the profits—might not reach anticipated very high levels. As to the questions raised by Secondary Recovery Services, Carver took heed of their warnings and justifiably left Smith to look into and "handle" them. Upon being awarded the concession, Carver proceeded apace with the project, in justifiable reliance on Amos and Smith; Amos created a sense of urgency for Carver to commit to contracting for Rig 75 and Smith assured Carver that TerraMar could provide all the technical personnel he would need. The mention of $H_2S$ in the February 3, 1976 telex was insufficient to put either McKillip or Carver on notice of the problem; Carver was justifiably relying on Amos, Smith, and Bernie to call any serious problems to his *and* McKillip's attention. As to the February 25, 1976 meeting in Atlanta, Amos succeeded in negating the impact of Elson's presentation. Carver did commission Earl and Wright to look into the matter further anyway, but in the meantime, he justifiably relied on Amos and Smith's advice that he was not really faced with any big problem and that he should proceed with the on-site operations.

 Following the May 27 phone call from Earl and Wright, Carver could no longer, nor did he, justifiably rely on the original misrepresentations as to the time, cost, and manner of production. At this point, Carver had the options of rescission or affirmance: "[W]here the defrauded party discovers the fraud after substantial performance or where it would be economically unreasonable to terminate the relationship, he may affirm or continue the contract [in an attempt to mitigate his damages] and then bring suit for his entire damages." *Clements Auto Company v. Service Bureau Corp.*, 444 F.2d 169, 184 (8th Cir. 1971); *see also Bean v. Bickley*, 187 Iowa 689, 174 N.W. 675, 684 (1919). Having already made substantial commitments to the project, Carver affirmed. The question becomes whether he then made reasonable attempts to mitigate his damages. *Cf. Whewell v. Dobson*, 227 N.W.2d 115, 120 (Iowa 1975) (where a plaintiff seeks damages for a wrongful act of defendant, plaintiff has the

duty to make a reasonably diligent attempt to minimize his damages.). The Court finds that Carver did make reasonable attempts to mitigate his damages, and did not himself negligently contribute to bringing about or enhancing his losses in the course of doing so. He went forth with the project justifiably relying on Smith's reserve and production rate estimates which still indicated that a substantial profit could be made.[85] As to the manner of completing the project, Carver initially abandoned the Earl and Wright approach, but he made a reasonable business decision in justifiable reliance on Amos, who recommended the purported production systems expert Popich. After Earl and Wright refused to participate in a joint effort with Popich, Carver then took reasonable steps to put the project on a sounder footing by hiring Luedtke to manage the production phase. It was not unreasonable for Carver to proceed slowly thereafter as he attempted to determine his best course of action in completing the project in light of his money problems and the conflicting advice of Luedtke and Amos. Finally, after receiving the reports of Dr. Charles Smith, Carver stopped spending money directed toward getting the wells on production and made the reasonable business decision that his only hope of salvaging the project was to seek partnership with someone who could provide the necessary capital and technical expertise to handle the project on the scale that it required. Carver reasonably went ahead as far as he did in his attempts to bring the project to fruition. The Court finds that he made reasonable business decisions based on the information he had and the advice he was getting and justifiably relying on.

### 4. *Resulting Injury and Damage.*

It is plain that Carver suffered large losses as a result of his involvement in the Holcar venture. *See* section V–C, *supra.* Sedco argues however that these losses were not proximately or legally caused by

the misrepresentations of Amos and Smith. A part of this argument turns on the fact that many of the expenditures were made after Carver knew expensive production facilities would have to be installed; this part has already been addressed. But the main, more complex argument rests on different premises:

(1) Carver's *losses* (as opposed to his expenditures) were caused by Holcar's (and Isamar's) failure to repay the loans Carver made;

(2) Carver's loans would have been repaid if either (a) Holcar had completed the project on its own, or (b) Holcar had completed the project in partnership with Attock;

(3) Hence, Carver's losses were caused by Holcar's combined failure to complete the project on its own and failure to complete it in partnership with Attock;

(4) Holcar's failure to complete the project on its own was not legally caused by the misrepresentations of Amos and Smith or by any other action taken by Sedco; on the contrary, it was caused by Carver's bad business judgment—"he got out at the wrong time."

(5) Nor was Holcar's failure to complete the project in partnership with Attock legally caused by Sedco; it was caused by Carver's "incredible conduct" which brought about the termination of the production-sharing agreement;

(6) Hence, Carver's losses were caused by himself, not Sedco.

Sedco's post trial brief at 1–31.

The Court has little sympathy for this argument. In the first place, it is impossible to give much credence to premise (2), that had Holcar completed the project, one way or another, it would have made enough money from sale of oil from the A structure to pay back the necessary capital invest-

---

**85.** Sedco makes no claim that Carver should not have relied on Smith's production or reserve rate estimates; in fact, it argues that

Smith's figures were accurate. *See* Sedco's post trial brief at 60–67.

ment and operating expenses. It may be that this is so. Much depends on how big a capital investment one is talking about—$15 million more to install production facilities for wells A1, A2, and A3? Or the additional expense as well of reentering two more old wells and drilling three new ones, which runs the cost up steeply?[86] Much also depends on one's evaluation of the producing capabilities of wells A1, A2, and A3, and any other wells one might drill or look into. The evidence does not favor faith that the wells would produce very much for very long. The Court cannot find that had the project been completed Carver "would" have gotten his money back.

Second, whether or not he would have, he was amply justified in not betting much more money on it after January 1977. The project was already far out of the bounds he envisaged when he undertook it; he was carrying Holley and his banks along on a free ride; money was proving difficult to come by on acceptable terms; and even if he might have gotten all his money back had he gone all the way, he was advised that chances were not that good,[87] it would in any event have taken considerable time, and the return on the investment would certainly have been unreasonably low, particularly since Holley would take half Holcar's profits.[88] A person is not required to go on forever in the face of hopeless odds with his attempts to mitigate his damages; indeed, he may not. The Court is of the opinion that Carver could have stopped entirely in January 1977 and successfully sued Sedco then for recovery of his losses.

Third, had he done so, there would be no question but that the misrepresentations of Amos and Smith were legal causes of the losses. There was causation in fact: Carver's justifiable reliance on the misrepresentations was a "substantial factor in determining the course of conduct that result[ed] in his loss." Restatement (Second) of Torts § 546 (1977). There was also "legal causation": Carver's losses could reasonably have been expected to result from his reliance on the misrepresentations. Restatement (Second) of Torts § 548A. The overwhelming evidence is that "the project was doomed, and should have been doomed at the point that the QOC files were obtained." T. 596 (Charles Smith). Amos and Smith could and should reasonably have expected that Carver's hasty and ill-prepared entry on a project whose real magnitude was far greater than he knew and whose chances of success far less, on terms with Holley he never would have accepted had he been fully informed, would result in the disarray into which the project fell, the acrimony that developed between Carver and Holley, and Carver's decision, after going the extra mile to try to save the situation, to cut and run when he learned the truth.

Fourth, the misrepresentations were also legal causes of the ultimate loss of the concession, and hence of Holcar's failure to complete the project in partnership with Attock. The short of it is that Holcar could reasonably have been expected to fail (as it did) to come anywhere close to completing its work program, and that this failure was a substantial and foreseeable factor in the government's decision to terminate the production-sharing agreement. The government simply had nothing to gain by permit-

---

86. E. g., in the "Project Execution Report" Luedtke submitted to the government in September 1976, which contemplated full completion of Holcar's work program, he projected total costs of $24 million in 1976 (to put A1, A2, and A4 on production), of $26.8 million additional in 1977, and of $38.8 million more in 1978. Ex. 158. Much of this was operating expenses.

87. Sedco makes much of the fact that Charles Smith, who advised Carver to stop work on the project, made a certain erroneous assumption about the terms of the production-sharing

agreement in making his economic projections. Be that as it may, Carver was justified in relying on Charles Smith's advice; and the record amply supports Smith's ultimate conclusion that the project was "uneconomic."

88. Cf. Erickson's November 1976 conclusion that any investment of over $17 million would not realize a reasonable rate of return. Note also that despite the escalation of oil prices in recent years, the concession still stood idle at the time of trial.

ting Holcar, whose misrepresentation-induced incompetence had been demonstrated, to go on.

Fifth, even if (as Sedco argues) Carver's own negligent conduct contributed to bringing about his losses—the subject the Court will next take up—his contribution was no such "new" or "independent" or "supervenient" cause as might relieve Sedco of liability for its own intentional tortious acts. Nor were the other factors alleged by Sedco in paragraphs 205 to 207 of its proposed findings of fact and conclusions of law, either singly or in combination.[89]

 In sum, it is by no means clear that had the project been completed Carver would have suffered no losses. Even if he would not have, the misrepresentations of Amos and Smith were proximate or legal causes of Holcar's failure to complete the project and of the losses actually suffered. Finally, Carver's conduct was not a supervenient cause of his losses; nor did any other factors supervene. Carver proved each of the elements of both his causes of action by the overwhelming weight of the clear, satisfactory, and convincing evidence presented at the trial of the case.

### C.

 Sedco has pleaded and tried to prove two matters by way of affirmative defense: contributory negligence and assumption of risk. Both Iowa and Texas have abolished the doctrine of assumption of risk as a defense separate from contributory negligence. *Rosenau v. City of Estherville*, 199 N.W.2d 125, 130–33 (Iowa 1972); *Rosas v. Buddies Food Store*, 518 S.W.2d 534, 538–39 (Tex.1975) and *Farley v. M M Cattle Co.*, 529 S.W.2d 751, 758 (Tex.1975). Fraudulent misrepresentation being an intentional tort, contributory negligence is not available as a defense to it. *Lockard v. Carson, supra*, 287 N.W.2d at 878; Restatement (Second) of Torts § 545A (1977). Hence, even if Carver's own negligence contributed to bringing about his losses, he is

still entitled to recover them because they were proximately caused by Sedco's fraudulent misrepresentations. Nevertheless, since contributory negligence is a defense to a cause of action for negligent misrepresentation, *see* Restatement (Second) of Torts § 552A, and since the Court has found that Sedco's misrepresentations were negligent if not fraudulent, the Court briefly addresses the defense of contributory negligence as applied to Carver's cause of action for negligent misrepresentation. The burden of proving Carver's negligence, and that it was a proximate cause of his losses, was on Sedco. Iowa Code § 619.17 (1977).

The Court has already found that Carver was not negligent in relying on the misrepresentations of Amos and Smith, or in his conduct of the venture up to and including the time when he decided to stop further work on it. The only remaining question is whether he somehow brought his losses on himself by negligently contributing during 1977 to the loss of the concession.

The contention that he did so of course depends on the dubious proposition that had the production-sharing agreement not been terminated Carver would have suffered no loss. Sedco has not established the truth of this proposition by a preponderance of the evidence. Moreover, the Court does not believe that Carver's conduct during 1977, even the part he played in Holcar's failure to submit the one report to the government in July, was a substantial factor in bringing about the loss of the concession. Holcar's problems with the government had little to do with Carver or with any single report, and much to do with the predictable disarray into which the project fell. Blame for this disarray lies with Sedco, which has no defense to Carver's claims.

### VIII.

#### A.

 Carver set up two defenses to Sedco International's claim against him:

---

89. Sedco mentions, *e. g.*, the facts that the market price of Bandag stock temporarily declined; that Holley suffered financial reversal; that Holley failed to pay Carver for the airplane; and that weather conditions caused some delay.

improper and incomplete workmanship by Sedco International; and fraud in the inducement of the personal guaranty sued upon. The second of these has been proven. Amos Carter was clearly acting on behalf of Sedco International, as well as Sedco, Inc., when he induced Carver to sign the drilling contract and the personal guaranty of payment of Holcar's debts to Sedco International; and fraud in the inducement has been established. "It is a well settled principle of equity that misrepresentations amounting to fraud in the inducement of a contract, whether innocent or not, give rise to a right of avoidance on the part of the defrauded party." *First National Bank v. Brown, supra,* 181 N.W.2d at 182. Even if Carver incurred the debt Sedco International seeks to recover after he discovered or should have discovered the fraud, he did so in the course of his reasonable attempts to mitigate his damages, and the debt, had it been paid, would be recoverable herein as part of his actual damages. Sedco International shall take nothing.

## B.

Carver has sought an award of exemplary damages. "Fraud is one of the recognized grounds for exemplary damages, and most *general* statements of the bases for such damages include fraud." *Holcomb v. Hoffschneider,* 297 N.W.2d 210, 213 (Iowa 1980) (citing cases); *cf. Roberts, Inc. v. McDrilling Co.,* 579 S.W.2d 335, 340 (Tex. Civ.App.1979). Moreover, "it is now well settled a corporation may be liable for exemplary damages for the wrongful acts of its agents." *Northrup v. Miles Homes, Inc. of Iowa,* 204 N.W.2d 850, 858 (Iowa 1973). But " 'ordinary' or 'simple' fraud alone is not enough for exemplary damages; additional circumstances of aggravation are essential." *Holcomb v. Hoffschneider, supra,* 297 N.W.2d at 214. In any event, even if exemplary damages might be proper in a given case, "they are not allowed as a matter of right. Such damages are always discretionary" with the trier of fact. *Rowen v. LeMars Mut. Ins. Co. of Iowa,* 282 N.W.2d 639, 661 (Iowa 1979).

The Court shall make no award of exemplary damages. While there are to be sure certain aggravating circumstances in the case, particularly Amos's and Smith's abuse of the trust Carver reposed in them, there is little evidence of real malice. Exemplary damages are not compensatory, but may be allowed by way of punishment to restrain the defendant and others from the commission of like acts in the future. The Court is of the opinion that Sedco is sufficiently punished for the acts of Amos and Smith, and like acts sufficiently deterred, by the award of actual damages to be made herein.

## C.

Carver has also sought what one used to call "prejudgment interest," that is, interest on the amounts he expended from the time each expenditure was made. A new term is needed here: on March 28, 1980, the Iowa statute governing interest on judgments was amended to provide that "Interest shall be allowed on all money due on judgments and decrees of courts at the rate of ten percent per year . . . . *The interest shall accrue from the date of the commencement of the action.*" Iowa Code § 535.3 (1981) (emphasis added) (effective January 1, 1981). The new statute has been held to apply to judgments rendered after January 1, 1981, even though the action was commenced before that date; this Court shall follow the authorities so holding. *See Woolery v. Sears Roebuck & Co.,* No. CL 22–12508 (Iowa Dist. Ct. in and for Polk County, April 27, 1981) (Lavorato, J.); *McWilliams v. Yukon-Delta, Inc.,* Civ. No. 77–335–2 (S.D.Iowa, order filed May 5, 1981) (Vietor, J.) (Judge Lavorato's opinion in *Woolery, supra,* "is thoughtfully reasoned and amply supported by authority, and I believe that the conclusions reached by him as to the state law will be shared by the Iowa Supreme Court when it addresses the issue"); *King v. Bemis Manufacturing Co.,* Civ. No. 77–129–1 (S.D.Iowa, order filed May 8, 1981) (Stuart, J.) (same). As to judgments rendered on counterclaims, this Court believes that § 535.3 will be construed

to mean that interest shall accrue from the date the counterclaim is filed. Iowa law governs the amount of interest due on the judgment to be rendered herein. *N-Ren Corp. v. American Home Assurance Co.*, 619 F.2d 784, 789 (8th Cir. 1980). The result is, that with certain qualifications to be noted, the counterclaim plaintiffs are in any case entitled to interest on the judgment from July 21, 1978, the date the action by way of counterclaim was commenced. The remaining question is whether "pre-commencement" interest should also be allowed. This is the analog of the old question whether in a given case prejudgment interest should be allowed.

The Court does not believe it should be here. While it is true that in one case the Supreme Court of Iowa allowed recovery of prejudgment interest on a claim for monetary loss due to fraudulent misrepresentation, *Moore v. Fryman*, 154 Iowa 534, 134 N.W. 534 (1912), "Iowa has followed the general rule that interest runs from the time money becomes due and payable, and in the case of unliquidated claims this is the date they become liquidated, ordinarily the date of judgment." *Mrowka v. Crouse Cartage Co.*, 296 N.W.2d 782, 783 (Iowa 1980). *Moore v. Fryman* fits into the exception to this rule recognized "in cases in which the entire damage for which recovery is demanded was complete at a definite time before the action was begun." *Bridenstine v. Iowa City Electric R. Co.*, 181 Iowa 1124, 165 N.W. 435 (1917), *quoted in Mrowka v. Crouse Cartage Co., supra.* The instant case does not fit into that exception. As of December 14, 1977, the date this action was commenced by Sedco International, Carver's efforts to salvage the venture were still continuing; his damages were neither liquidated nor complete at that time. By July 21, 1978, when the counterclaim was filed, the concession had been lost; but Carver continued to incur expenses for which recovery is here demanded, in fact up to January 11, 1979.[90] The new Iowa statute governing interest on

judgments substantially ameliorates the harshness of the old rule allowing interest on unliquidated claims only from the date of the judgment except in specified cases, and this Court does not believe the exceptions to that rule are likely to be much expanded in the direction of allowing pre-commencement interest in new or questionable classes of cases. Here the date of filing of the counterclaim reasonably approximates any date one might choose to call the time when Carver's damages were "complete," and the Court believes that allowing interest on most of the expenditures from that date will provide reasonable recompense for the losses.

The Court has found that Carver proved the loss of $14,706,081.25. Recovery of the $1.5 million payment to Ali Jaidah, which is included in that sum, is not to be permitted. That leaves $13,206,081.25. Of that, $12,853,329.50 was expended before July 21, 1978, the date the counterclaim was filed. Interest on that sum will be paid from July 21, 1978 at the legal rate, namely, ten percent per year. The remaining $352,751.75 was expended after the counterclaim was filed. The Court does not believe that § 535.3 will be construed in such a way as to permit recovery of interest from the time of the commencement of the action on expenses incurred after the action was commenced. To do so would result in unjust enrichment of the plaintiff, who would in effect begin to recover interest on his money before he had even spent it. This result cannot have been in the contemplation of the legislature that enacted the new statute. The Court will allow recovery of interest at the legal rate on the post-July 21, 1978 expenditures only from the date each was made.

### ORDER FOR JUDGMENT

In accordance with the foregoing,

IT IS HEREBY ORDERED THAT:

Harris Trust and Manufacturers Hanover.

---

**90.** Most of the post-July 21, 1978 expenditures were payments of interest on the loans from

1. Sedco International, S.A., plaintiff, recover nothing from William F. Cory and Marcella McKillip, Executors of the Estate of Roy J. Carver, deceased, defendants. Judgment shall be entered against plaintiff and in favor of defendants on plaintiff's claim.

2. William F. Cory and Marcella McKillip, Executors of the Estate of Roy J. Carver, deceased, counterclaim plaintiffs, recover $13,206,081.25 from Sedco International, S.A., Sedco, Inc., and Sedco Energy Corporation (formerly TerraMar Consultants, Inc.), counterclaim defendants. Judgment shall be entered accordingly on counterclaim plaintiffs' claims against counterclaim defendants.

3. Interest on the judgment in favor of counterclaim plaintiffs, at the rate of ten percent per year, shall be paid by counterclaim defendants as follows:

 a. On $12,853,329.50, from July 21, 1978.

 b. On $2,275.00, from August 28, 1978.

 c. On $96,296.54, from September 15, 1978.

 d. On $82,684.92, from September 25, 1978.

 e. On $12,638.88, from November 6, 1978.

 f. On $2,640.87, from November 14, 1978.

 g. On $71,898.97, from November 27, 1978.

 h. On $74,578.56, from January 5, 1979.

 i. On $9,738.01, from January 11, 1979.

4. Counterclaim plaintiffs shall recover no exemplary damages.

5. Judgment shall be entered in favor of counterclaim plaintiffs and against counterclaim defendants for the costs of this action.